**GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS, Plaintiff**
**v.**
**TAKATA CORPORATION, TK HOLDINGS, INC., HONDA MOTOR COMPANY, AMERICAN HONDA MOTOR COMPANY, INC., and HONDA OF AMERICA MANUFACTURING, INC., Defendants**

Case No. ST-16-CV-286

Superior Court of the Virgin Islands

Division of St. Thomas and St. John

June 19, 2017

317

318

320

321

322

323

324

325

326

329

330

331

CLAUDE E. WALKER, ESQ., Attorney General, CAROL THOMAS-JACOBS, ESQ., Assistant Attorney General, V.I. Department of Justice, Office of the Attorney General, St. Thomas, USVI; J. RUSSELL B. PATE, ESQ., The Pate Law Firm, St. Thomas, USVI; LINDA SINGER (pro hac vice), Motley Rice, LLC, Washington, DC, *For Government of the Virgin Islands, Plaintiff.*

CHAD C. MESSIER, ESQ., MICHAEL C. QUINN, ESQ., Dudley, Topper & Feuerzeig, LLP, St. Thomas, USVI; KEITH A. TEEL (pro hac vice), Covington & Burling, LLP, Washington, DC, *For TK Holdings, Inc. and Takata Corporation, Defendants.*

MARIA HODGE, ESQ., MARK HODGE, ESQ., Hodge & Hodge, St. Thomas, USVI, *For Honda Motor Company, American Honda Motor Company, and Honda of America Manufacturing, Inc., Defendants.*

DUNSTON, *Judge*

## MEMORANDUM OPINION

### (June 19, 2017)

Pending before the Court are Defendants TK Holdings, Inc.'s and Takata Corporation's Motions to Dismiss the Complaint, or in the Alternative, for a Stay. Defendants' motions will be denied in part because the Court has personal jurisdiction over Defendants under the Virgin Islands long-arm statute and the Complaint states a claim for Counts I-IV. However, because the Complaint fails to state a claim for fraudulent concealment, the Court will grant Defendants' motions as to Count V of the Complaint and Plaintiff's request for punitive damages. Defendants' alternative requests for a stay will be denied.

## RELEVANT FACTUAL & PROCEDURAL HISTORY

This matter arises out of a Complaint filed on May 25, 2016, by the Attorney General of the United States Virgin Islands on behalf of Plaintiff the Government of the United States Virgin Islands against Defendants Takata Corporation ("Takata Japan"), TK Holdings, Inc. ("TKH"), Honda Motor Company, American Honda Motor Company, and Honda of America Manufacturing, Inc. (collectively "Honda"). Plaintiff seeks civil penalties, general damages, punitive damages, injunctive relief, and declaratory relief in connection with Defendants' role in equipping at least 7,000 vehicles in the Virgin Islands with defective airbags containing Phase-stabilized ammonium nitrate ("PSAN") as a propellant (sometimes referred to as "PSAN-propelled inflators").[1] According to the Complaint, PSAN is a "dangerous" and "inherently unstable compound"[2] with a "significantly greater risk of over-aggressive combustion" that can cause airbags containing PSAN-propelled inflators to "rupture" in "persistent

---

[1] Compl. ¶¶ 1-26.
[2] Compl. ¶ 22.

334

conditions of high absolute humidity[,]" such as that in the Virgin Islands,[3] which places Virgin Islands consumers at "a significantly greater risk of injury or death[.]"[4] Specifically, the Complaint alleges Defendants are liable for civil violations of the Virgin Islands Criminally Influenced and Corrupt Organizations Act ("CICO"), 14 V.I.C. § 600 *et seq.* (Count I),[5] unfair or deceptive trade practices in violation of 12A V.I.C. § 101 *et seq.* (Count II),[6] consumer fraud in violation of 12A V.I.C. § 301 *et seq.* (Count III),[7] public nuisance (Count IV),[8] and fraudulent concealment (Count V).[9] On May 25, 2016, Plaintiff filed a Motion for Preliminary Injunction and moved for expedited consideration of the motion on October 28, 2016.[10]

On July 19, 2016, and October 3, 2016, Defendants TKH and Takata Japan moved to dismiss the Complaint or alternatively to stay these proceedings.[11] Plaintiff filed timely oppositions on August 29, 2016, and October 28, 2016, to which Defendants timely replied on September 29, 2016, and November 21, 2016. In connection with its Oppositions, Plaintiff moved for leave to file pages of its legal memoranda and exhibits under seal, which the Court denied.

## STANDARDS

### I. Procedural Authority.

The Virgin Islands Rules of Civil Procedure came into effect on March 31, 2017.[12] Applied here, the new procedural rules largely mirror their federal counterparts under the Federal Rules of Civil Procedure, through which most precedent of the Supreme Court of the Virgin Islands is

---

[3] Compl. ¶ 26.

[4] Compl. ¶ 26.

[5] Compl. ¶¶ 131-144.

[6] Compl. ¶¶ 145-157.

[7] Compl. ¶¶ 158-169.

[8] Compl. ¶¶ 170-176.

[9] Compl. ¶¶ 177-181.

[10] An evidentiary hearing on Plaintiff's request for a preliminary injunction is scheduled for July 28, 2017. An emergency hearing on this matter is also scheduled for June 19, 2017.

[11] Def. TKH's July 19, 2016, Mot. to Dismiss; Def. Takata Japan's October 3, 2016, Mot. to Dismiss.

[12] *See In re Adoption of the Virgin Islands Rules of Civil Procedure*, S. Ct. Prom. Order No. 2017-001, 2017 V.I. Supreme LEXIS 22 (V.I. April 3, 2017).

derived.[13] Consequently, this precedent remains applicable to the extent the Supreme Court of the Virgin Islands' prior precedent is consistent with the Virgin Islands Rules of Civil Procedure. The Court understands the Virgin Islands Rules of Civil Procedure to apply in all cases pending after March 31, 2017, including matters filed, but not yet decided, prior to that date.[14] Nevertheless, should the Supreme Court of the Virgin Islands rule hereafter that the new procedural rules are not retroactive until it "decides a case and applies the (new) legal rule of that case to the parties before it[,]"[15] that decision will not affect the substantive validity of the Court's analysis here, since the relevant provisions of the Virgin Islands Rules of Civil Procedure coincide with the prior precedent of the Supreme Court of the Virgin Islands and Virgin Islands jurisprudence.

## II. Motion to Dismiss for Lack of Personal Jurisdiction.

 "Personal jurisdiction is the authority of a court to exercise jurisdiction over a party before it."[16] The Court's personal jurisdiction over out-of-state parties is governed by V.I. R. CIV. P. 4(f), which permits the Court to exercise personal jurisdiction only to the extent allowed by the Virgin Islands long-arm statute.[17] "A defendant may challenge a court's exercise of personal jurisdiction in a pre-answer motion" under V.I. R. CIV. P. 12(b)(2).[18] "Once a defendant challenges the court's jurisdiction, the burden then shifts to the plaintiff to show that jurisdiction over the defendant is proper."[19] In determining whether a litigant is subject to personal jurisdiction, Virgin Islands courts employ a "two part test":[20]

---

[13] Likewise, decisions by the Superior Court interpreting and applying the Federal Rules of Civil Procedure remain applicable where the relevant provision of the Virgin Islands Rules of Civil Procedure resembles its federal counterpart.

[14] *See In re Adoption of the Virgin Islands Rules of Civil Procedure*, S. Ct. Prom. Order No. 2017-001 (V.I. January 18, 2017).

[15] *Pelle v. Certain Underwriters at Lloyd's of London*, 66 V.I. 315, 320 (V.I. 2017) (citing *Mercer v. Bryan*, 53 V.I. 595, 601 (V.I. 2010)).

[16] *St. Croix, Ltd. v. Shell Oil Co.*, 60 V.I. 468, 473 (V.I. 2014) (citing *Molloy v. Indep. Blue Cross*, 56 V.I. 155, 172 (V.I. 2012)).

[17] *See* V.I. R. CIV. P. 4(f).

[18] *St. Croix, Ltd.*, 60 V.I. at 473 (citing *Molloy*, 56 V.I. at 172) (both applying FED. R. CIV. P. 12(b)(2), the substance of which is mirrored by V.I. R. CIV. P. 12(b)(2)).

[19] *Id.* (citing *Molloy*, 56 V.I. at 172).

[20] *Molloy*, 56 V.I. at 173 (citing *In re Najawicz*, 52 V.I. 311, 336 (V.I. 2009)).

First, the Court evaluates whether the defendant is subject to personal jurisdiction under the Virgin Islands long arm statute, codified at V.I. CODE ANN. tit. 5, § 4903.[21] Second, the Court must be satisfied that "the exercise of personal jurisdiction satisfies the requirements of due process."[22]

■ "The plaintiff bears the ultimate responsibility to prove by a preponderance of the evidence that the trial court may exercise personal jurisdiction over the out-of-state defendant."[23] "However, at the motion to dismiss stage of the litigation, the burden on the plaintiff depends on the actions a trial court takes in disposing of the motion."[24] "[I]f the trial court does not hold an evidentiary hearing to determine the motion to dismiss based on personal jurisdiction, the plaintiff is only required to establish a prima facie case for personal jurisdiction."[25] "Under this standard, it is plaintiff's burden to demonstrate the existence of every fact required to satisfy 'both the forum's long-arm statute and the Due Process Clause of the Constitution.' "[26] In making this prima facie determination, the Superior Court "must accept as true all of plaintiff's factual allegations that are supported by affidavits or other competent evidence which would be admissible at trial and must resolve all factual disputes in the plaintiff's favor."[27]

## III. Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted.

■ Under V.I. R. CIV. P. 12(b)(6), a defendant may test the sufficiency of the pleadings against preliminary defenses by seeking dismissal for the plaintiff's "failure to state a claim upon which relief can

---

[21] *Chabuz v. Putnam Lumber & Exp. Co.*, 2016 V.I. LEXIS 33, at *6 (V.I. Super. Ct. Apr. 12, 2016) (citing *Molloy*, 56 V.I. at 173).

[22] *Id.* 2016 V.I. LEXIS 33, at *6-7 (citing *St. Croix, Ltd.*, 60 V.I. at 474).

[23] *Molloy*, 56 V.I. at 172 (citing *Unlimited Holdings, Inc. v. Bertram Yacht, Inc.*, 49 V.I. 1002, 1006 (D.V.I. 2008)).

[24] *Id.*

[25] *Id.* (citing *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007)) (other citations omitted).

[26] *Id.* at 173 (citing *United Elec. Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 987 F.2d 39, 44 (1st Cir. 1993)) (quotation marks omitted).

[27] *Id.* (citing *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330, 51 V.I. 1219 (3d Cir. 2009)).

be granted." The pleading requirements of V.I. R. CIV. P. 8 "require a complaint to set forth a plausible claim for relief, thus allowing courts to dismiss, under Rule 12(b)(6), complaints that fail to meet that standard."[28] According to the three-pronged analysis employed by the Supreme Court of the Virgin Islands in reviewing motions to dismiss based on Rule 12(b)(6):

> First, the court must take note of the elements a plaintiff must plead to state a claim so that the court is aware of each item the plaintiff must sufficiently plead. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. These conclusions can take the form of either legal conclusions couched as factual allegations or naked [factual] assertions devoid of further factual enhancement. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief. If there are sufficient remaining facts that the court can draw a reasonable inference that the defendant is liable based on the elements noted in the first step, then the claim is plausible.[29]

The Virgin Islands Supreme Court has further instructed that "[t]he plausibility determination is a 'context-based' determination which should be guided by the court's 'judicial experience and common sense.' "[30] "Plausibility requires that the plaintiff allege facts that are more than simply 'consistent with a defendant's liability' and must permit the court to infer more than the mere possibility of misconduct."[31]

█ "A motion to dismiss a complaint should be denied if the factual allegations are 'enough to raise a right to relief above the speculative

[28] *Joseph v. Bureau of Corrections*, 54 V.I. 644, 649 (V.I. 2011) (applying FED. R. CIV. P. 8) (citations omitted). V.I. R. CIV. P. 8 and 12(b)(6) mirror FED. R. CIV. P. 8 and 12(b)(6) such that the standard delineated by Virgin Islands courts under the federal rules remains applicable.

[29] *Fleming v. Cruz*, 62 V.I. 702, 713-714 (V.I. 2015) (citing *Pollara v. Chateau St. Croix, LLC*, 58 V.I. 455, 471 (V.I. 2013) (other citations omitted).

[30] *Joseph*, 54 V.I. at 650 (citing *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009)).

[31] *Id.* (citing *Fowler*, 578 F.3d at 211).

level' "[32] and "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."[33] Only after satisfying this multi-step analysis can a party survive a motion to dismiss under Rule 12(b)(6).

## IV. Motion to Stay Proceedings.

■ The Court has the inherent power to stay proceedings.[34] Further, "in the exercise of its sound discretion, a court may hold one lawsuit in abeyance to abide the outcome of another which may substantially affect it or be dispositive of the issues."[35] Similarly, "[u]nder the ripeness doctrine, courts will defer from ruling on a claim when ongoing or potential future litigation precludes an informed determination of the issues."[36]

## ANALYSIS

## I. TKH's and Takata Japan's Motions to Dismiss for Lack of Personal Jurisdiction.

### A. Personal Jurisdiction under the Virgin Islands Long-Arm Statute.

■ "The Virgin Islands long arm statute[, set forth in 5 V.I.C. § 4903,] specifies several bases for exercising personal jurisdiction over an out-of-state individual, or corporation, in the Virgin Islands:"[37]

---

[32] *Peters v. V.I. Water & Power Auth.*, 58 V.I. 49, 54 (V.I. Super. Ct. 2013) (citations omitted); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 & n.3, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007).

[33] *Twombly*, 550 U.S. at 555; *see Fleming*, 62 V.I. at 710 (applying the standard articulated in *Twombly*), V.I. R. Civ. P. 8(a)(2) ("a pleading that states a claim for relief must contain: . . . a short and plain statement of the claim showing that the pleader is entitled to relief — because this is a notice pleading jurisdiction").

[34] *Creque v. Roebuck*, 1979 V.I. LEXIS 23, at *2 (V.I. Terr. Ct. 1979); *see also Gov't of the V.I. v. Lansdale*, 2009 U.S. Dist. LEXIS 15149, at *8 (D.V.I. Feb. 18, 2009); *see Landis v. N. Am. Co.*, 299 U.S. 248, 254, 57 S. Ct. 163, 81 L. Ed. 153 (1936)).

[35] *Bechtel Corp. v. Local 215, Laborers' Int'l Union*, 544 F.2d 1207, 1215 (3d Cir. 1976) (citing *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 215, 81 L. Ed. 605, 57 S. Ct. 377 (1937)).

[36] *Simon v. Joseph*, 59 V.I. 611, 613 (V.I. 2013).

[37] *Molloy*, 56 V.I. at 174. It is undisputed that the Virgin Islands long-arm statute applies here since Defendant TKH, a "subsidiary of Takata Japan," is "a corporation organized under the laws of Delaware, with its principal place of business . . . [in] Michigan[,]" while Defendant

(a) A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's

(1) transacting any business in this territory;

(2) contracting to supply services or things in this territory;

(3) causing tortious injury by an act or omission in this territory;

(4) causing tortious injury in this territory by an act or omission outside this territory if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this territory;

. . .

(b) When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him.[38]

In evaluating whether the long-arm statute is satisfied, "the correct procedure is for a court to determine (1) whether the defendant's contacts meet one of categories under section 4903(a) and then (2) whether the plaintiff's claim 'arises from' that contact[,]" which in turn requires "a prima facie showing for each . . . claim[ ] that (1) one of [the defendant's] contacts with the Virgin Islands is a but-for cause of that claim; and (2) that the obligations and privileges that accompany that contact with the Virgin Islands are closely related to the cause of action."[39] In conducting this analysis, each claim "must be separately analyzed[,]" though "certain factually overlapping claims" may be considered together when "based on the same factual predicate[.]"[40]

Here, all the Counts alleged in the Complaint pertain to the presence of TKH and Takata Japan's allegedly defective airbags in vehicles in the Virgin Islands. The Court will consider Counts II-V together because they are based on the same factual predicate: that Defendants "misrepresented

---

Takata Japan is "a foreign for-profit company organized under the laws of Japan." Compl. ¶¶ 14-15; Def. TKH's Mot. to Dismiss, p. 3 & Ex. A; Def. Takata Japan's Mot. to Dismiss, pp. 1-2 & Ex. A.

[38] 5 V.I.C. § 4903.

[39] *Molloy*, 56 V.I. at 174-175 (internal and other citations omitted).

[40] *Id.* at 174-175 (citations omitted).

340

to and concealed material information from Virgin Islands consumers . . . related to its airbags that were incorporated into vehicles sold in the Virgin Islands."[41] While this factual predicate is relevant to Count I, a distinct factual predicate underlies Count I: that Defendants violated CICO by engaging in an association-in-fact enterprise "to sell cars equipped with Takata's defective airbags and to conceal the nature and extent of their defect[,]" and, in doing so, engaged in a pattern of criminal activity in furtherance of the enterprise.[42] Consequently, the Court will consider the factual predicate of Count I separately from that of Counts II-V.

With respect to the first step, whether Defendants TKH and Takata Japan's contacts meet one of categories under section 4903(a), TKH and Takata Japan argue that the Court lacks personal jurisdiction over them because their conduct does not fall within any of the enumerated categories under section 4903(a) of the Virgin Islands long-arm statute.[43] Specifically, TKH and Takata Japan argue that the only potentially applicable subsections of section 4903 are (a)(1) and (a)(4), but that these provisions do not apply because TKH and Takata Japan "ha[ve] never had contact with the U.S. Virgin Islands."[44] In opposition, Plaintiff argues Defendants TKH's and Takata Japan's contacts satisfy the "transacting any business in this territory" and "tortious injury" categories, namely (a)(1), (a)(3), and (a)(4) of section 4903, because TKH and Takata Japan received "substantial compensation for the sale of [the] defective airbags[,]" knew the defective airbags "were destined for the Virgin Islands as a regular course of dealing[,]" and intended to have a relationship with residents of the Virgin Islands as "end-user" customers of TKH and Takata Japan.[45]

---

[41] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, p. 13: *See* Compl. ¶¶ 145-157 (Count II), Compl. ¶¶ 158-169 (Count III), Compl. ¶¶ 170-176 (Count IV), Compl. ¶¶ 177-181 (Count V).

[42] Compl. ¶¶ 135, 131-144.

[43] Def. TKH's Mot. to Dismiss, pp. 9-12, Def. Takata Japan's Mot. to Dismiss, pp. 1-3 (also adopting the arguments made by Defendant TKH in its Motion to Dismiss).

[44] Def. TKH's Mot. to Dismiss, p. 11; Def. Takata Japan's Mot. to Dismiss, p. 2.

[45] Pl.'s Opp'n to TKH's Mot. to Dismiss, pp. 5, 5-13; Pl.'s Opp'n to Takata Japan's Mot. to Dismiss, pp. 1-8 (adopting Plaintiff's arguments made in opposition to Defendant TKH's Motion to Dismiss).

### a. Jurisdiction under 5 V.I.C. § 4903(a)(4), causing tortious injury in this territory by an act or omission outside this territory.

While the bulk of Plaintiff's argument is focused on establishing the Court's jurisdiction under section 4903(a)(1), the Court finds Plaintiff's argument is most compelling under section 4903(a)(4), where Plaintiff argues that it has satisfied its prima facie burden by showing that TKH and Takata Japan caused "tortious injury in this territory by an act or omission outside this territory" and "derive[ ] substantial revenue from goods used or consumed or services rendered, in this territory[.]"[46] On the other hand, TKH and Takata Japan argue Plaintiff "has failed to provide specific facts showing that TKH [and Takata Japan] ha[ve] caused cognizable injury in the Virgin Islands . . . in combination with either doing regular business with, soliciting business from, engaging in persistent course of conduct in, or deriving substantial revenue from the Virgin Islands."[47] Further, Takata Japan contends that its contacts with the Virgin Islands are more attenuated than TKH's contacts because Takata Japan "sells airbag modules exclusively to automakers in Japan (none of which manufacture vehicles in the Virgin Islands), which then incorporate the modules into their vehicles[,]" though Takata Japan admits that it "also sells airbag module components to TKH[.]"[48] Takata Japan also argues that TKH's contacts cannot be imputed to Takata Japan.[49]

 According to the Supreme Court of the Virgin Islands:

> section 4903(a)(4), requires a two part showing: first, that [the defendant] committed a tort outside the Virgin Islands causing an injury in the Virgin Islands and, second, that the [Plaintiff] can "establish the existence of additional unrelated forum contacts, a plus factor," by showing, through one or more of the following that [the defendant] has (1) regularly done business with or solicited business from the Virgin Islands, (2) engaged in any other persistent course of conduct in the

---

[46] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, p. 12 (quoting 5 V.I.C. § 4903(a)(4)).

[47] Def. TKH's Reply, p. 9.

[48] Def. Takata Japan's Mot. to Dismiss, p. 2; Def. Takata Japan's Reply, p. 3.

[49] Def. Takata Japan's Reply, pp. 7-10.

territory, or (3) derived substantial revenue from goods or services consumed in the Virgin Islands.[50]

When considering the second part-the existence of additional unrelated forum contacts-the Court may consider the aforementioned factors "individually" or "cumulatively" and this conduct need not "have any relationship with the tortious activity."[51]

### i. Whether Plaintiff has established that TKH and Takata Japan committed a tort outside the Virgin Islands causing an injury in the Virgin Islands and the existence of additional unrelated forum contacts of TKH.

 In arguing that TKH and Takata Japan committed a tort outside the Virgin Islands causing an injury in the Virgin Islands, Plaintiff refers to the claims alleged in the Complaint, which assert that TKH and Takata Japan committed torts in the territory by violating Virgin Islands' consumer protection laws (Counts II and III), causing a public nuisance (Count IV), and committing fraudulent concealment (V)."[52] Below, the Court discusses at length the viability of Plaintiff's claims and concludes that Counts II-IV of the Complaint state claims against TKH and Takata Japan upon which relief can be granted. Because the factual allegations of the Complaint, as supported by the affidavit and evidence submitted by Plaintiff, indicate that this allegedly tortious activity by TKH and Takata Japan occurred outside of the Virgin Islands, which caused injury in the Virgin Islands by misleading and deceiving Virgin Islands residents as to the extent of the defect and the safety risks associated therewith, the Court finds the first requirement under section 4903(a)(4) is satisfied.

 As to the second requirement under section 4903(a)(4), that additional unrelated forum contacts exist, the statute provides that the Court may consider whether the defendant has derived "substantial revenue from goods used or consumed in this territory." In making this determination, " 'substantial' must be interpreted by local Virgin Islands

---

[50] *Molloy*, 56 V.I. at 179-80 (citing *In re Manbodh Asbestos Litigation II*, 47 V.I. 267, 281 (Super. Ct. 2005)).

[51] *Id.* at 180 (citing *In re Manbodh Asbestos Litigation II*, 47 V.I. at 281) (other citation omitted) (quotation marks omitted).

[52] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, p. 12.

standards . . . [b]ecause 'this is a jurisdiction with a small population more than 1,000 miles away from any continent. . . .' "[53] Despite TKH and Takata Japan's contention, "[t]he ratio of a defendant's total sales to its local sales does not control the analysis."[54] Instead, "[t]he substantiality of the revenues must be measured by objective factors[.]"[55] For example, when assessing whether a defendant derived "substantial revenue" in the context of section 4903(a)(1), the Superior Court has considered whether "the Virgin Islands sales were 'isolated or exceptional occurrences' or whether they 'were part of a regular course of dealing.' "[56] In making this determination, the Superior Court has concluded that a defendant derives substantial revenue by receiving "as much as $442,000.00" in compensation from goods "to be used in the Virgin Islands."[57]

Here, Plaintiff submitted evidence that indicates the sale of vehicles with the allegedly defective airbags in the Virgin Islands was not an "isolated or exceptional occurrence." The evidence suggests that during the recall and warranty recovery process of the allegedly defective airbags, Takata Japan and TKH targeted the Virgin Islands as one of four "priority regions" that experience "higher levels of heat and absolute humidity."[58] For example, when testifying before the United States Senate's Committee on Commerce, Science, and Transportation on November 20, 2014, Hiroshi Shimizu, Senior Vice President for Global Quality Assurance for Takata Japan, consistently referred to the allegedly defective airbags as "our product," discussed Takata Japan's role in working with National Highway Traffic Safety Administration ("NHTSA") and automakers to cure the alleged defects, stated that Takata Japan was investigating the alleged defects and "regularly sharing the results of this ongoing testing and analysis with the automakers and NHTSA[,]" and, after proclaiming that

---

[53] *Chapin v. Whitecap Inv. Corp.*, 2015 V.I. LEXIS 127, at *9 (V.I. Super. Ct. Oct. 22, 2015) (citing *Hendrickson v. Reg. O. Co.*, 17 V.I. 457, 463-64 (D.V.I. 1980), *aff'd* 657 F.2d 9, 12-13 (3d Cir. 1981)); *see also Chabuz*, 2016 V.I. LEXIS 33, at *8-9.

[54] *Chabuz*, 2016 V.I. LEXIS 33, at *9 (citing *Hendrickson*, 17 V.I. at 464) (other citation omitted).

[55] *Hendrickson v. Reg. O. Co.*, 657 F.2d 9, 13 (3d Cir. 1981) (*"Hendrickson II"*).

[56] *Hills v. Whitecap Inv. Corp*, 2013 V.I. LEXIS 41, at *5 (V.I. Super. Ct. June 14, 2013) (citing *Hendrickson II*, 657 F.2d at 12).

[57] *Id.*

[58] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, Ex. A, Pate Decl. ¶ 24, Ex. 20; Pl.'s Opp'n to Def. Takata Japan's Mot. to Dismiss, Ex. A, Pate Decl. ¶ 17, Ex. 38.

the "ongoing regional actions and recalls are targeted at vehicles sold or registered in Puerto Rico, Hawaii, Florida, and the U.S. Virgin Islands[,]" announced that it was Takata Japan's position that "the ongoing field actions and the recalls should remain the specific regions of high absolute humidity."[59] Documents submitted by Plaintiff indicate that during the NHTSA recall process, the number of parts received from "Florida, Puerto Rico, Hawaii, & U.S. V.I. [sic]" amounted to 38,379 as of November 14, 2014.[60]

Additionally, e-mail correspondence during 2011, 2012, and 2014, suggests that TKH employees knew vehicles containing the allegedly defective airbags were located in the Virgin Islands.[61] For example, in e-mail correspondence dated October 13, 2014, a TKH employee informed a Takata Japan employee that he thought the warranty recovery negotiations with Honda should he "focus[ed] on 4 state/region — Florida, Hawaii, Puerto Rico and US Virgin Island [sic]."[62]

The targeting of the Virgin Islands by TKH and Takata Japan during its recall and warranty recovery efforts suggests that the sales of vehicles containing the allegedly defective airbags in the Virgin Islands were not "isolated" or "exceptional" occurrences, otherwise the territory would not have been targeted. Even assuming, *arguendo*, TKH and Takata Japan did not intend to conduct business in the Virgin Islands when they initially manufactured the airbags, the evidence suggests that TKH and Takata Japan targeted the Virgin Islands throughout the recall and warranty

---

[59] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, Ex. A, Pate Decl. ¶ 24, Ex. 20 (emphasis added).

[60] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, Ex. A, Pate Decl. ¶ 14, Ex. 9.

[61] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, Ex. A, Pate Decl. ¶ 18, Exs. 12-14 (e-mail correspondence in 2012 indicating that employees of TKH and Honda discussed various aspects of the defective airbags in relation to their replacement by Bella International, a distributor of Honda's product line in Puerto Rico and the Virgin Islands), ¶ 17, Ex. 38 (e-mail correspondence dated October 13, 2014, indicates that a TKH employee informed an employee of Takata Japan that he thought the warranty recovery negotiations with Honda should be "focus[ed] on 4 state/region — Florida, Hawaii, Puerto Rico and US Virgin Island [sic]"); ¶¶ 7-8, Exs. 2-3 (e-mail correspondence dated February 8, 2011, through February 10, 2011, where employees of Honda and TKH refer to "the recent St. Croix Inflator failure" and "the St. Croix issue"), ¶ 23, Ex. 19 (indicating counsel for "Takata and Honda" took a video sworn statement under oath of Suetania Francis Emmanuel on July 27, 2011, on St. Croix, U.S.V.I.); *See* Compl. ¶¶ 27-30 ("On November 8, 2010, S.F.E. was driving her 2002 Honda Civic DX in Frederiksted, on the island of St. Croix" when she sustained injuries as a result of her airbag rupturing).

[62] Pl.'s Opp'n to Def. Takata Japan's Mot. to Dismiss, Ex. A, Pate Decl. ¶ 17, Ex. 38.

recovery process, during which time Plaintiff alleges TKH and Takata Japan engaged in tortious acts and omissions.[63]

With respect to the revenue derived by TKH and Takata Japan from the sale of vehicles containing the allegedly defective airbags in the Virgin Islands, Plaintiff submitted evidence that suggests the price of each airbag inflator part manufactured by TKH was $60.00.[64] From the documentation submitted by the parties, the Court is unable to discern the exact number of vehicles that were sold in the Virgin Islands with the allegedly defective airbags or how the $60.00 price is distributed between TKH and Takata Japan, if at all. In the declaration submitted by Takata Japan in support of its Motion to Dismiss, Osamu Ohama, Senior Manager at Takata Japan, declares that Takata Japan "owns 0.4% of [TKH,]" "sells airbag modules . . . to automakers located in Japan" and "also sells airbag module components to TKH[,]"[65] which indicates Takata Japan potentially derived revenue from the sales. Additionally, Plaintiff alleges in the Complaint that "[d]ata obtained from the USVI Bureau of Motor Vehicles [('BMV')] indicates that roughly 7,000 vehicles on the Islands are makes and models that contain inflators relying on [TKH and Takata Japan's] unstable, explosive propellant."[66] Although the BMV data was not submitted to the Court, the record reflects that Plaintiff submitted an affidavit of Devin F. Carrington, the Government of the Virgin Islands' Commissioner for the Department of Licensing & Consumer Affairs, in connection with its Motion for Preliminary Injunction, in which Carrington attests that a review of the BMV's records supports the 7,000 figure.[67] While TKH and Takata Japan do not concede to the 7,000 vehicle figure alleged by Plaintiff, TKH and Takata Japan submitted TKH's Defect Information Report dated May 18, 2015, which states that recalled vehicles containing the allegedly defective airbags are located in the Virgin Islands.[68] Considering the affidavits and

---

[63] *See* Compl. ¶¶ 145-176.

[64] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, Ex. A, Pate Decl. ¶ 22, Ex. 18.

[65] Def. Takata Japan's Mot. to Dismiss, p. 2 & Ex. A, Ohama Decl. ¶ 5.; Def. Takata Japan's Reply, p. 3.

[66] Compl. ¶ 31.

[67] Pl.'s May 25, 2016, Mot. for Prelim. Inj. Against Def. TKH, Carrington Aff. ¶ 7.

[68] *See* Def. TKH's Reply, Ex. C, May 18, 2015, Defect Information Report, pp. 4-6; Def. TKH's Mot. to Dismiss, p. 14 (arguing that even when accepting Plaintiff's allegation as true,

evidence submitted by the parties, the Court is satisfied that Plaintiff's 7,000 figure is sufficiently supported such that the factual allegation must be accepted as true. As a fact in dispute, it must be resolved in favor of Plaintiff at this stage of the proceedings.

In multiplying 7,000 by the price of $60.00 per part, TKH would have received at least $420,000.00 in compensation as a result of the sale of vehicles containing their allegedly defective airbags. Considering the size and population of the territory, the Court finds that this figure constitutes "substantial revenue" under section 4903(a)(4). Having found that TKH derived substantial revenue from the sale of vehicles containing the allegedly defective airbags, which was not an "isolated or exceptional occurrence," the Court concludes that Plaintiff has made a prima facie showing that the Court may exercise personal jurisdiction over TKH under section 4903(a)(4) of the long-arm statute.

### ii. At this stage of the proceedings, TKH's contacts can be imputed to Takata Japan.

Because it is unclear how much revenue Takata Japan derived from the sale of the allegedly defective airbags in the Virgin Islands, if any, the Court cannot conclude that Takata Japan satisfies section 4903(a)(4). However, Takata Japan could fall within section 4903(a)(4) of the Virgin Islands long-arm statute through the imputation of TKH's contacts to Takata Japan. Takata Japan opines that the evidence does not warrant an imputation of TKH's contacts, while Plaintiff urges the Court to do so under an agency theory.[69] While the Court recognizes that it is improper to blindly impute the TKH's contacts to Takata Japan merely because they are subsidiary and parent entities,[70] Takata Japan ignores the argument that the factual allegations, supported by the evidence submitted by Plaintiff, suggest that an agency relationship existed between TKH and

---

"out of the more than 300 million Takata airbags worldwide, at most approximately 0.000023% of them have wound up in the Virgin Islands").

[69] Def. Takata Japan's Reply, pp. 7-10: Pl.'s Opp'n to Def. Takata Japan's Mot. to Dismiss, p. 7.

[70] *In re St. Croix Seamen's Asbestos Cases*, 1993 V.I. LEXIS 20, at *8 (V.I. Terr. Ct. June 16, 1993) ("It is well established that a corporation is a legal entity endowed with a separate and distinct existence from that of its owners") (citing *American Protein Corp. v. Ab. Volvo*, 844 F.2d 56 (2nd Cir. 1988)). *Cannon Mfg. Co. v Cudahy Packing Co.*, 267 U.S. 333, 336-37, 45 S. Ct. 250, 251, 69 L. Ed. 634 (1925).

Takata Japan, which warrants the imputation of TKH's contacts to Takata Japan at this stage of the proceedings.

 "5 V.I.C. §4903 permits the Court to exercise personal jurisdiction over a person who acts directly or by an agent as to a claim for relief."[71] Virgin Islands courts have long construed this provision as authorizing the Court to disregard corporate separateness and impute the contacts of a subsidiary corporation to a parent corporation in certain circumstances.[72] An imputation of a subsidiary's contacts to its corporate parent is also permitted, when justified, under the Due Process Clause of the Fourteenth Amendment.[73] Thus, this discussion applies to the Court's analyses under the Virgin Islands long-arm statute, as well as due process.

 In determining whether to impute a subsidiary's minimum contacts to a foreign corporate parent, many courts apply an "alter-ego" theory or a formal "agency" theory.[74] Generally, courts begin their analysis by recognizing that "corporate entities are presumed separate . . . [and] the mere 'existence of a relationship between a parent company and its subsidiaries is not sufficient to establish personal jurisdiction over the parent on the basis of the subsidiaries' minimum contacts with the forum.' "[75] The alter-ego and agency theories constitute narrow exceptions to this general rule, which allow courts to impute "subsidiaries' contacts . . . to parent companies[,]" at least with respect to

---

[71] *In re St. Croix Seamen's Asbestos Cases*, 1993 V.I. LEXIS 20, at *7-8.

[72] *Id.* 1993 V.I. LEXIS 20, at *8; *see Government v. O'Brien*, 21 V.I. 549, 554 (Terr. Ct. 1985) ("[W]here, as here, a parent corporation so controls and dominates a subsidiary as to disregard its independent corporate existence, the judicial power which a court exercises over the subsidiary is also exercisable over the parent").

[73] *See Daimler v. Bauman*, 571 U.S. 117, 134 S. Ct. 746, 760, 759 n. 13, 187 L. Ed. 2d 624 (2014) ("Agency relationships, we have recognized, may be relevant to the existence of specific jurisdiction") (citing *International Shoe Co. v. Washington*, 326 U. S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)); *D'Jamoos v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 108-09 (3d Cir. 2009) ("The concept underlying the agency theory of personal jurisdiction is the familiar principle that a principal is responsible for the actions of its agent") (citations omitted); *Mackey v. Compass Mktg.*, 391 Md. 117, 125-26, 892 A.2d 479, 483-84 (2006) ("Courts have drawn routinely from the substantive law of agency to justify the exercise of personal jurisdiction over nonresident defendants").

[74] *In re St. Croix Seamen's Asbestos Cases*, 1993 V.I. LEXIS 20, at *8 (citing *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*, 842 F.2d 1466 (3rd Cir. 1988)).

[75] *Viega GmbH v. Eighth Judicial Dist. Court of the State*, 328 P.3d 1152, 1157 (Nev. 2014) (citing *Doe v. Unocal Corp.*, 248 F.3d 915, 925 (9th Cir. 2001)); *In re St. Croix Seamen's Asbestos Cases*, 1993 V.I. LEXIS 20, at *8.

establishing specific jurisdiction.[76] However, the alter-ego and agency theories are distinct concepts, although courts frequently muddle their underlying principles by failing to distinguish the theories.[77] As the Nevada Supreme Court has explained:

> The alter ego theory allows plaintiffs to pierce the corporate veil to impute a subsidiary's contacts to the parent company by showing that the subsidiary and the parent are one and the same.[78] The rationale behind this theory is that the alter ego subsidiary is the same entity as its parent, and thus, the jurisdictional contacts of the subsidiary are also jurisdictional contacts of the parent.[79] Unlike with the alter ego theory, the corporate identity of the parent company is preserved under the agency theory; the parent nevertheless "is held for the acts of the [subsidiary] agent" because the subsidiary was acting on the parent's behalf.[80]

With respect to the imputation of a subsidiary's contacts to a corporate parent for purposes of establishing personal jurisdiction, the Supreme Court of the Virgin Islands has not addressed the alter-ego or agency theories, nor has the Superior Court in recent years. The concepts were addressed by the Territorial Court, which applied the United States District Court for the Virgin Islands' test for piercing the corporate veil,[81] but the Superior Court has

---

[76] *Viega GmbH*, 328 P.3d at 1157 (citations omitted).

[77] *See* William J. Rands, Article, *Domination of a Subsidiary by a Parent*, 32 IND. L. REV. 421, 444-445 (1999); *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 540, 99 Cal. Rptr. 2d 824, 837 (2000).

[78] *Viega GmbH*, 328 P.3d at 1157 (citing *Goodyear v. Brown*, 564 U.S. 915, 131 S. Ct. 2846, 2857, 180 L. Ed. 2d 796 (2011) (implying, but not deciding, that an alter ego theory would be appropriate in such a situation)); *see also Platten v. HG Bermuda Exempted, Ltd.*, 437 F.3d 118, 139 (1st Cir. 2006); *Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 653 (5th Cir. 2002).

[79] *Id.* (citing *Patin*, 294 F.3d at 653).

[80] *Id.* (citing *F. Hoffman-La Roche, Ltd. v. Superior Court*, 130 Cal. App. 4th 782, 30 Cal. Rptr. 3d 407, 418 (2005); *Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.*, 863 F. Supp. 186, 188-89 (D. Del. 1993) ("This [agency] theory does not treat the parent and subsidiary as one entity, but rather attributes specific acts to the parent because of the parent's authorization of those acts")).

[81] *In re St. Croix Seamen's Asbestos Cases*, 1993 V.I. LEXIS 20, at *12 (citing *Anderson v. Lorck-Schierning*, 20 V.I. 200 (D.C. 1983)); *see also Arawak Foods, Inc. v. Lawaetz*, 1985 V.I. LEXIS 42, at *10 (V.I. Terr. Ct. Feb. 21, 1985) (discussing piercing the corporate

since adopted a new rule for piercing the corporate veil in accordance with *Banks*.[82] Notably, piercing the corporate veil involves the imposition of liability by disregarding corporate separateness, which resembles the alter-ego theory in the jurisdictional context, while the agency theory does not.[83] Thus, when applying the agency theory for jurisdictional purposes, an application of the piercing of the corporate veil test is not mandated, though the factors inherent therein may remain relevant.

■■ ■■ There is surprisingly sparse case law regarding the foundational underpinnings of the agency theory in the Virgin Islands. However, the Court is guided by the application of the Restatement (Second) of Agency by other courts, which have explained:

> Whether a subsidiary is an agent of its parent corporation is a question that "defies resolution by 'mechanical formulae,' for the inquiry is inherently fact-specific." ... "At a minimum, however, ... the relationship of principal and agent does not obtain unless the parent has manifested its desire for the subsidiary to act upon the parent's behalf, the subsidiary has consented so to act, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and the parent exercises its control in a manner more direct than by voting a majority of stock in the subsidiary or making appointments to the subsidiary's Board of Directors."[84]

---

veil); *Balbo Corp. v. Enighed Condos., LLC*, 58 V.I. 93, 104 (Super. Ct. 2013) (discussing the alter-ego theory under Delaware law).

[82] *Donastorg v. Daily News Publ'g Co., Inc.*, 63 V.I. 196, 333 (Super. Ct. 2015) (conducting the requisite analysis mandated in *Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967 (V.I. 2011) and adopting the majority traditional veil piercing approach after concluding "[t]he soundest rule of law is to disregard corporate separateness and utilize the assets of a shareholder to satisfy a corporation's liability, but only in those circumstances where the shareholder has exercised such domination and control over the corporation that the corporation has become an alter ego of the shareholder, and where the shareholder has utilized the corporate form to perpetuate the fraud or injustice at issue in the litigation").

[83] *See Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229, 1238 (N.D. Cal. 2004) ("Unlike liability under the alter-ego or veil-piercing test, agency liability does not require the court to disregard the corporate form").

[84] *Doe v. Exxon Mobil Corp.*, 573 F. Supp. 2d 16, 31 (D.D.C. 2008) (citing *TransAmerica Leasing, Inc. v. La Republica De Venezuela*, 339 U.S. App. D.C. 385, 200 F.3d 843, 849 (D.C. Cir. 2000) (citing RESTATEMENT (SECOND) OF AGENCY § 1 (1958))); *See* Timothy P. Glynn, Article, *Beyond "Unlimiting" Shareholder Liability: Vicarious Tort Liability for Corporate Officers*, 57 VAND. L. REV. 329, 347 n. 76 (2004) (Under an agency theory, courts must

Indeed, "[t]he relationship of principal and agent depends . . . upon the principal having 'the right to control the conduct of the agent with respect to matters entrusted to [the agent].' "[85]

The evidence submitted by Plaintiff indicates that, no later than 2011, Takata Japan knew vehicles in the Virgin Islands contained the allegedly defective airbags; Takata Japan was "actively involved" in overseeing and supervising the work and employees of TKH; Takata Japan employees were the direct supervisors of some TKH employees; when a TKH employee planned to leave the company, Takata Japan employees proposed new terms to facilitate the employee's continued employment with TKH; a TKH employee described Takata Japan as TKH's "corporate office"; TKH "didn't do anything" without Takata Japan's approval; liaisons and representatives of Takata Japan were present at TKH's facilities to ensure that TKH complied with Takata Japan's directives; Takata Japan was intimately involved in — if not controlled — the investigation into TKH's allegedly defective airbag inflators and TKH's participation in the recall process; both TKH and Takata Japan provided replacement parts during the recall process; an executive of Takata Japan, while under oath, publicly took responsibility for the investigation and recall efforts into the allegedly defective airbags manufactured by TKH; Takata Japan played a key role in disseminating information regarding the investigation of the allegedly defective airbags to retailers, NHTSA, and the public; Takata Japan's 2008 annual report states that it "is currently a major supplier to the Big Three automakers" and "work[s] closely with automakers . . . to ensure that commercialized products meet their respective specifications"; and Takata Japan's 2010 annual report states that the United States is Takata Japan's "most important [mature] market."[86]

The factual allegations, coupled with the evidence submitted by the parties, suggest that Takata Japan controlled the internal affairs of TKH.

---

"simply determine whether the shareholder exercised sufficient control — or had the right to exercise such control — to be considered a principal, or, in the tort context, a master") (citing RESTATEMENT (SECOND) OF AGENCY §§ 1-2 (1958)).

[85] *TransAmerica Leasing*, 200 F.3d at 849 (citing RESTATEMENT (SECOND) OF AGENCY § 14 (1958)).

[86] Pl.'s Opp'n to Def. Takata Japan's Mot. to Dismiss, Ex. A, Pate Decl. ¶¶ 9-11, 17-20, 42, 44, 48-57, Exs. 1, 35-36, 38-42, 50, 52, 55-63; Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, Ex. A, Pate Decl. ¶¶ 19-20, 24, Ex. 15-16, 20.

At this stage in the proceedings, this is sufficient to satisfy Plaintiff's prima facie burden of showing Takata Japan exercised dominion or control over TKH's operations such that an agency relationship was formed between the entities. This, in turn, permits the Court to impute TKH's contacts in the Virgin Islands to Takata Japan at this stage of the proceedings. In imputing TKH's contacts to Takata Japan, the Court concludes that Takata Japan's contacts satisfy section 4903(a)(4) of the Virgin Islands long-arm statute. Notwithstanding, the Court reiterates that Plaintiff will have the burden of proving personal jurisdiction, including the requisite control and agency relationship, before the fact-finder on the merits. However, under the standard applicable here, and "in light of the inherent presumption taken in favor of plaintiffs for the resolution of all reasonable inferences[,]" the imputation of TKH's contacts to Takata Japan is warranted.[87]

### iii. Whether each of Plaintiff's claims against TKH and Takata Japan arise from TKH's and Takata Japan's contacts.

The second step of the long-arm statute analysis requires the Court to consider whether each of Plaintiff's claims against TKH and Takata Japan arises from TKH's and Takata Japan's contacts in the Virgin Islands.[88] In addressing this requirement, the Court must assess whether TKH and Takata Japan's contacts with the Virgin Islands "is a but-for cause" of each of Plaintiff's claims and whether "the obligations and privileges that accompany that contact with the Virgin Islands are closely related to the cause of action."[89] As discussed, the Court will consider Counts II-V together because those counts allege factually overlapping claims.

In Counts II-V, Plaintiff asserts claims against TKH and Takata Japan for unfair or deceptive trade practices 12A V.I.C. § 101 *et seq.*, consumer fraud in violation of 12A V.I.C. § 301 *et seq.*, public nuisance, and fraudulent concealment.[90] These claims pertain to allegedly misleading and deceptive statements made by TKH and Takata Japan "about the nature of the defects plaguing [their] airbag inflators and the number of

---

[87] *See In re Manbodh Asbestos Litigation II*, 47 V.I. at 281.

[88] 5 V.I.C. § 4903(b).

[89] *Molloy*, 56 V.I. at 174-175 (internal and other citations omitted).

[90] Compl. ¶¶ 145-181.

cars affected,"[91] which created a dangerous condition involving "significant interference with public safety" that TKH and Takata Japan concealed from "regulators and the public"[92] and allowed "to remain unaddressed."[93] Plaintiff submitted evidence demonstrating that TKH and Takata Japan knew no later than 2008 and 2011, respectively, that vehicles containing the allegedly defective airbags were sold in the Virgin Islands,[94] that the defective airbags posed an increased risk of injury in the U.S. Virgin Islands due to its persistent climate of high heat and "absolute humidity",[95] and that TKH and Takata Japan "participated with Honda and NHTSA in determining the content of recall notices and actively misrepresented or concealed material information about the source and scope of the defect in its airbags, knowing that the information would be shared with — or kept from — Virgin Islands consumers who were in one of the top jurisdictions at risk from the defect."[96] But for TKH and Takata Japan's role in investigating the alleged defect, TKH and Takata Japan could not have engaged in the alleged unfair or deceptive trade practices, consumer fraud, public nuisance, and fraudulent concealment. As to the remaining part of the Court's analysis under the long-arm statute, the Court also finds that the obligations and privileges that accompany TKH and Takata Japan's contacts with the Virgin Islands are closely related to the cause of actions alleged in Counts II-V.[97] The laws of the territory impose obligations on TKH and Takata Japan as manufacturers of products sold in the U.S. Virgin Islands,[98] which are encompassed in Plaintiffs claims, as set forth in Counts II-V of the Complaint, against TKH and Takata. Since these obligations are also the but-for cause of the claims, the Court concludes that Plaintiff has presented a prima facie case that Counts II-V arise from TKH and

---

[91] Compl. ¶¶ 152, 165.

[92] Compl. ¶ 180.

[93] Compl. ¶ 173.

[94] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, Ex. A, Pate Decl. ¶¶ 7-8, 11, Exs. 2-3, 6; Pl.'s Opp'n to Def. Takata Japan's Mot. to Dismiss, Ex. A, Pate Decl. ¶¶ 9-11, Exs. 1, 35-36.

[95] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, Ex. A, Pate Decl. ¶ 24, Ex. 20; Pl.'s Opp'n to Def. TKH's Mot. to Dismiss. Ex. A, Pate Decl. ¶¶ 39-40, Exs. 34, 31.

[96] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, p. 10 (citing Ex. A, Pate Decl. ¶¶ 11, 19-20, 24, Exs. 15-16, 20).

[97] *Molloy*, 56 V.I. at 174-175 (internal and other citations omitted).

[98] *See* 12A V.I.C. § 304 *et seq.* and 12A V.I.C. § 101 *et seq.*

Takata's conduct in this forum. Consequently, the Court has personal jurisdiction over TKH and Takata under section 4903(a)(4) with respect to Counts II-V.

With respect to Count I of the Complaint, Plaintiff alleges TKH and Takata Japan violated CICO by engaging in an "association in fact" enterprise with the other Defendants for the purpose of "sell[ing] cars equipped with [TKH and Takata Japan's] defective airbags and to conceal the nature and extent of their defect"[99] through which Takata Japan and TKH "conducted and participated in the conduct of affairs of the . . . [e]nterprise through a pattern of criminal activity in furtherance of th[e] enterprise."[100] The Court finds that, like Counts II-V, Count I also satisfies the second step of the requisite analysis under the long-arm statute.[101] As discussed, Count I reverberates the essence of the other counts in the Complaint, but frames TKH and Takata Japan's purportedly wrongful conduct in terms of Defendants' participation in an "association in fact" enterprise and criminal liability. Similar to the other counts, but for TKH and Takata Japan's role in investigating the alleged defect, TKH and Takata Japan would not have engaged in an "association in tact" enterprise with the other Defendants to conceal and mislead regulators and the public with respect to the "nature of the defects," nor would TKH and Takata Japan have committed the alleged "pattern of criminal activity" inherent in Plaintiff's CICO claim. Likewise, TKH and Takata Japan's contacts with the Virgin Islands are accompanied by obligations imposed by CICO, 14 V.I.C. § 600 *et seq.*, which are closely related to cause of action alleged in Count I of the Complaint. Since the obligations under CICO are also the but-for cause of the claim set forth in Count I, the Court concludes that Plaintiff has presented a prima facie case that Count I arises from TKH and Takata's conduct in this forum. Because all of the requirements under the long-arm statute analysis are met with

---

[99] Compl. ¶ 135.

[100] Compl. ¶ 142.

[101] Plaintiff argues that Defendant TKH concedes to the Court's personal jurisdiction over it with respect to this claim, but the Court finds no concession in Defendant TKH's filings with the Court. *See* Pl.'s Opp'n to Def. Mot. to Dismiss, p. 5.

respect to Count I, the Court concludes that it also has personal jurisdiction over TKH and Takata Japan under section 4903(a)(4).[102]

## B. Personal Jurisdiction in accordance with constitutional Due Process.

■ Even if the Court is satisfied that the jurisdictional requirements imposed by the Virgin Islands long-arm statute are met, "[t]he second half or the personal jurisdiction test requires a court to find that its exercise of personal jurisdiction over the defendant does not violate due process."[103] In making this determination, the Court must first determine whether the Court has general or specific personal jurisdiction over the defendant by assessing whether the defendant has "sufficient contacts with the forum to warrant jurisdiction under either standard[.]"[104] Then, even if the first step is satisfied, the Court "must . . . determine that exercising jurisdiction will comport with 'fair play and substantial justice.' "[105] TKH and Takata Japan argue due process prohibits the Court from exercising personal jurisdiction over them.[106]

### a. General Jurisdiction.

■ "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State."[107] In general, a corporation is "at home in the forum State" when the corporation was incorporated there or has a principal place of business in the forum

---

[102] In the interest of judicial economy and efficacy, the Court will not address the parties' remaining arguments with respect to the other provisions of section 4903(a).

[103] *Molloy*, 56 V.I. at 181 (citing *In re Najawicz*, 52 V.I. at 336).

[104] *Id.* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)).

[105] *Id.* at 181-182 (citing *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 260 (3d Cir. 2000) (quoting *International Shoe*, 326 U.S. at 320)) (internal quotation marks omitted); *Antilles Sch., Inc. v. Lembach*, 64 V.I. 400, 418 (V.I. 2016) ("Clearly, state and territorial courts must follow, as binding precedent, decisions of the United States Supreme Court that interpret the United States Constitution, federal statutes, and federal treaties").

[106] Def. TKH's Mot. to Dismiss, p. 12; Def. Takata Japan's Mot. to Dismiss, pp. 1-3.

[107] *Goodyear*, 564 U.S. at 919.

State.[108] In addition, the Supreme Court of the Virgin Islands has stated that "[f]or a non-resident business entity, the contacts with the Virgin Islands should form a central part of the company's business."[109]

Here, Plaintiff does not allege that TKH or Takata Japan are incorporated in or have their principal places of business in the Virgin Islands, nor has Plaintiff alleged that TKH and Takata Japan's contacts in the Virgin Islands form a central part of each company's business.[110] Because Plaintiff has not alleged any other circumstances that would indicate TKH or Takata Japan have formed a relationship with the Virgin Islands that is so continuous and systematic that they are to he considered at home in the Virgin Islands, the Court concludes that TKH and Takata Japan are not subject to the Court's general jurisdiction.

### b. Specific Jurisdiction.

██ ██ The Superior Court "may exercise specific personal jurisdiction, jurisdiction on a claim-by-claim basis, over a defendant if it finds the defendant has the requisite minimum contacts with the forum *and* the claim arises out of those contacts with the forum."[111] According to the Supreme Court of the Virgin Islands:

> To determine whether specific jurisdiction exists, we apply a three-part test.[112] "First, the defendant must have 'purposefully directed [its] activities' at the forum."[113] "Second, the litigation must 'arise out of or relate to' at least one of those activities."[114] "And third, if the first

---

[108] *Daimler*, 134 S. Ct. at 760, 761 n.19 (citations omitted); *Chapin*, 2015 V.I. LEXIS 127, at *10 (V.I. Super. Ct. Oct. 22, 2015) (citing *Daimler*, 134 S. Ct. at 760).

[109] *Molloy*, 56 V.I. at 182-83 ("To establish general jurisdiction, the nonresident's contacts must be continuous and substantial. For a non-resident business entity, the contacts with the Virgin Islands should form a central part of the company's business") (citing *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437-38 (3d Cir. 1987)).

[110] Compl. ¶¶ 14, 21, 23, 31, 97, 111 (alleging that the allegedly defective airbags have been installed in "millions of vehicles[,]" but that only "roughly 7,000 vehicles on the Islands are makes and models that contain inflators relying on [TKH and Takata Japan's] unstable, explosive propellant").

[111] *Molloy*, 56 V.I. at 181 (citations omitted).

[112] *Id.* at 183 (citing *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007)).

[113] *Id.* (citing *D'Jamoos*, 566 F.3d at 102) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)).

[114] *Id.* (citing *D'Jamoos*, 566 F.3d at 102) (quoting *Helicopteros*, 466 U.S. at 414)).

two requirements have been met, a court may consider whether the exercise of jurisdiction otherwise 'comport[s] with fair play and substantial justice.' "[115] The purpose of the test is to ensure that the defendant has the requisite minimum contacts with a forum to receive "fair warning" that the defendant may be haled into court in that forum to answer for its actions in relation to those contacts.[116]

### i. Whether TKH and Takata Japan purposefully directed their activities at the Virgin Islands.

With respect to the first prong, TKH and Takata Japan argue that Plaintiff has only shown that TKH "direct[ed their] products to a national market by selling to national retailers[,]" provided "information to national retailers and regulatory agencies[,]" and "tested their products' responses to climate conditions found in locations throughout the United States (and the world)[,]" which "do not provide a basis for the exercise of jurisdiction" in accordance with the principles of due process because they do not "amount to purposeful availment of th[e] forum."[117] In opposition, Plaintiff argues that TKH and Takata Japan purposefully directed their activities at the forum by selling allegedly defective airbags that TKH and Takata Japan knew were destined for the U.S. Virgin Islands and determining "the content of the deceptive recall notices and communicat[ing] deceptive information to Honda and NHTSA knowing those deceptive notices and information would be passed on to consumers in the Virgin Islands."[118]

As Plaintiff points out, the Supreme Court of the Virgin Islands found in *Molloy v. Indep. Blue Cross*[119] that the plaintiff made a prima facie showing that the out-of-state defendant, Blue Cross Blue Shield Association ("BCBSA"), "purposefully directed their activities at this forum" by licensing to another entity the use of the Blue Cross name in the Virgin Islands, providing "some equipment and procedures" to the other entity that BCBSA knew would be used in the Virgin Islands, and,

---

[115] *Id.* (citing *D'Jamoos*, 566 F.3d at 102) (quoting *Burger King Corp.*, 471 U.S. at 476).

[116] *Id.* at 183-84 (citing *Burger King Corp.*, 471 U.S. at 472).

[117] Def. TKH's Reply, p. 9.

[118] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, p. 14.

[119] 56 V.I. at 184.

"most importantly, approv[ing] all advertisements . . . that BCBSA knew would be circulated in the Virgin Islands."[120]

Considering the conclusions already drawn by the Court from the factual allegations that are supported by the affidavits and evidence submitted by the parties, the Court can reasonably infer that, in knowing that vehicles containing the allegedly defective airbags were sold in the Virgin Islands and in providing information to the public, Honda, and NHTSA regarding TKH and Takata Japan's investigation for purpose of facilitating the vehicle recalls, TKH and Takata Japan were significant participants in disseminating information in the Virgin Islands regarding the alleged defective airbags, risks associated therewith, and recalls and in controlling the replacement of the allegedly defective airbags, including those in the territory. TKH and Takata Japan's role resembles BCBSA's approval of false advertisements in *Molloy*, which the Supreme Court of the Virgin islands found was significant in showing that BCBSA purposefully availed itself of the forum. While all of TKH and Takata Japan's contacts in the Virgin Islands are not identical to those in *Molloy*, many are similar and the Court will not, as TKH and Takata Japan suggest, disregard the similarities merely because TKH and Takata Japan did not give the national retailers permission to use its name when transacting business in the Virgin Islands.[121]

■■■ TKH and Takata Japan correctly note that "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State."[122] However, the above described actions of TKH and Takata Japan with the Virgin Islands clearly demonstrate that TKH and Takata Japan's contacts with the Virgin Islands amount to more than mere placement of their products in to the stream of commerce on a national level, considering TKH and Takata Japan orchestrated the replacement of the allegedly defective airbags in the Virgin Islands and, in so doing, targeted the territory in terms of its recall and warranty recovery efforts. TKH and Takata Japan rely on the

---

[120] *Id.*

[121] *See* Def. TKH's Reply, p. 10 n. 4.

[122] *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882-83, 131 S. Ct. 2780, 2788-89, 180 L. Ed. 2d 765 (2011); Def. TKH's Reply, pp. 9-10; Def. Takata Japan's Reply, pp. 4-5.

First Circuit's opinion in *Alers-Rodriguez v. Fullerion Tires Corp.*,[123] but that case is distinguishable from facts at issue in this case. In *Rodriguez*, the Plaintiff argued that the out-of-state defendant, a manufacturer of tire rims, was subject to the court's specific personal jurisdiction merely because the tire rims were placed into the stream of commerce.[124] In rejecting this argument, the First Circuit explained that even if the out-of-state defendant was aware that "the stream of commerce would move its rims into Puerto Rico[,]" this would be insufficient to "constitute the purposeful availment which is necessary for a showing of minimum contacts" and the fact that the tire rims were designed for use in sand, without more, was not enough to subject the out-of-state defendant to personal jurisdiction in the forum merely because Puerto Rico has sandy beaches, as this "would offend the constitutional principles" of due process.[125]

Here, however, Plaintiff submitted significantly more evidence of TKH and Takata Japan's contacts in the Virgin Islands than the mere placement of the airbags in the national stream of commerce, and Plaintiff does not suggest that TKH and Takata Japan are subject to this Court's specific personal jurisdiction merely because TKH and Takata Japan tested the allegedly defective airbags in areas of high heat and absolute humidify similar to that in the Virgin Islands. Rather, the evidence submitted by Plaintiff suggests that TKH and Takata Japan were aware that the allegedly defective airbags posed a greater risk in the Virgin Islands but failed to employ the remedial measures necessary to ameliorate it, instead opting to deceive to the public as to the true extent of the defect and the risk involved.

Finally, TKH and Takata Japan emphasize their purported lack of knowledge regarding the sale of the airbags in the Virgin Islands prior to their discovery of the alleged defects, but this disputed fact is not dispositive of the Court's specific jurisdiction here. As discussed, even assuming, *arguendo*, TKH and Takata Japan were initially unaware of the sales in the Virgin Islands, Plaintiff's claims rest on TKH and Takata Japan's conduct after the defects were discovered, and it is through this

---

[123] 115 F.3d 81 (1st Cir. 1997); *see* Def. TKH's Reply, pp. 9-10.

[124] *Alers-Rodriguez*, 115 F.3d at 85.

[125] *Id.*

"post-event conduct" that TKH and Takata Japan purposefully availed themselves of the forum. Moreover, while Plaintiff has the burden of making a prima facie showing that jurisdiction is proper, at this stage of the proceedings, Plaintiff is "entitled to have . . . [its] allegations viewed as true and have disputed facts construed in their favor."[126] As a result, the Court finds that Plaintiff has satisfied his prima facie burden of showing TKH and Takata Japan purposefully availed themselves of the forum, the Court concludes that the first prong of the due process analysis has been established.

██ While Takata Japan seeks to differentiate itself from TKH on the grounds that its contacts are "more attenuated" than TKH's contacts with the forum, the Court has already concluded that Plaintiff has satisfied his burden of showing that Takata Japan controlled TKH so as to warrant the imputation of TKH's contacts to Takata Japan under the Virgin Islands long-arm statute. Indeed, the United States Supreme Court has noted that "[a]gency relationships, we have recognized, may be relevant to the existence of *specific* jurisdiction"[127] and has implied that the imputation of a subsidiary's contacts to a corporate parent would be appropriate where the entities are "one and the same."[128] Considering the discussion above, the Court concludes that the imputation of TKH's contacts to Takata Japan at this stage of the proceedings is consistent with constitutional due process.

### ii. Whether the litigation arises out of or relates to at least one of TKH's and Takata Japan's activities directed at the Virgin Islands.

██ The second prong of the due process analysis requires the "litigation 'arise out of or relate to' at least one of" the activities wherein the out-of-state defendant purposefully availed itself of the forum.[129] As TKH and Takata Japan point out, the second step is "identical to the test under the Virgin Islands long-arm statute."[130] The Court has already

---

[126] *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 333, 51 V.I. 1219 (3d Cir. 2009).

[127] *Daimler*, 134 S. Ct. at 759 n.13 (citing *International Shoe*, 326 U.S. at 316).

[128] *See Goodyear*, 564 U.S. 930.

[129] *Molloy*, 56 V.I. at 183 (citations omitted).

[130] Def. TKH's Mot. to Dismiss, p. 13; *Molloy*, 56 V.I. at 184 ("[W]e adopted the Third Circuit's approach to the 'arising out of' requirement of specific personal jurisdiction as a

addressed the second prong in connection with its long-arm statute analysis and found that Plaintiff made a satisfactory showing of the "arising from" requirement. Because that reasoning remains equally applicable here, the Court concludes that Plaintiff has met the "arising out of" requirement of the due process analysis.

### iii. Whether the exercise of personal jurisdiction over TKH and Takata Japan otherwise comports with fair play and substantial justice.

 The final prong of the due process analysis requires the Court to "consider whether the exercise of jurisdiction otherwise 'comport[s] with fair play and substantial justice.' "[131] In making this determination, the Court must:

> analyze "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." However, where the plaintiff has established that a defendant has the requisite minimum contacts and that his claim arises out of those contacts, the burden of proof shifts to the defendant to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."[132]

Because the Court has found that Plaintiff sufficiently demonstrated that TKH and Takata Japan have the minimum requisite contacts with the Virgin Islands with respect to all of Plaintiff's claims, the burden of proof on this prong of the due process analysis shifts to TKH and Takata Japan.

### 1. TKH.

TKH argues that all of the aforementioned factors "weigh against jurisdiction over TKH" because "defending this action" in the Virgin Islands "would impose an undue burden on TKH" since "TKH's alleged

---

guide for the appropriate approach to deal with the 'arising from' requirement of section 4903(b) . . . the 'arising from' and 'arising out of' tests are the same").

[131] *Molloy*, 56 V.I. at 183 (citations omitted).

[132] *Id.* at 184 (citing *Burger King Corp.*, 471 U.S. at 477).

misconduct took place far from the U.S. Virgin Islands[,] . . . no witnesses are in the Territory" and, "although a locality is generally deemed to have an interest in providing its residents with a convenient forum, the U.S. Virgin Islands has only a limited interest in policing the alleged conduct at issue . . . because it involves out-of-state entities with whom Virgin Islands consumers have had no contact."[133] In opposition, Plaintiff argues that "TKH has not made a compelling case that litigation here would be unfair and unreasonable[,]" noting that, as "a priority state for recall," the Virgin Islands "has a priority interest in adjudicating the dispute" and that TKH's burden in defending against the suit "is not great" because, *inter alia*, "TKH is represented by a reputable [law] firm in the Virgin Islands."[134]

■ As to the burden on TKH in defending this case, the Court recognizes that the witnesses presented by TKH on its behalf will likely not be located in the Virgin Islands, but considering only limited discovery has commenced in this case, the Court cannot place great weight on TKH's blanket statement that *no* witnesses in the case will be located in the Virgin Islands. For example, it is not out of the realm of possibility that both parties would call witnesses from Bella International regarding TKH's involvement in replacing the defective parts in vehicles located in the Virgin Islands. Moreover, TKH fails to articulate where its witnesses are located so as to explain why defending this suit in the Virgin Islands imposes a greater burden than that posed in any other jurisdiction. Further, " 'telephones, facsimile machines, and photocopiers' detract from logistical difficulties in litigating this case in the Virgin Islands."[135] Thus, while "[m]ounting an out-of-state defense most always means added trouble and cost, . . . [f]or this type of burden to affect the [due process] analysis, the defendant must show that it is 'special or unusual.' "[136] TKH has not set forth any special or unusual circumstances that indicate its out-of-state defense would be unduly burdensome.

---

[133] Def. TKH's Mot. to Dismiss, p. 17.

[134] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, p. 17.

[135] *Chapin*, 2015 V.I. LEXIS 127, at *27 (citing *A. Uberti & C. v. Leonardo*, 181 Ariz. 565, 575-576, 892 P.2d 1354 (1995)).

[136] *C. W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, 771 F.3d 59, 69-70 (1st Cir. 2014) (citing *BlueTarp Fin., Inc. v. Matrix Constr. Co.*, 709 F.3d 72, 83 (1st Cir. 2013)) (internal quotation marks and citations omitted).

Moreover, TKH does not contend that it "did not have adequate notice of the suit or sufficient time to prepare its defenses and appear[,]"[137] and "[o]btaining competent local counsel does not represent an obstacle for [TKH,] as it is currently represented by a reputable firm in the Virgin Islands."[138] While there will, of course, be some inconvenience associated with defending this suit in the Virgin Islands, this factor does not prevent a finding of personal jurisdiction.

▇▇▇ As to TKH's contention that the Virgin Islands has only a limited interest in policing the alleged conduct, this factor does not tip the scale away from the Court exercising personal jurisdiction. As other courts have held, the Virgin Islands has a significant interest in redressing harms committed against its citizens by out-of-state companies.[139] Further, even if the Virgin Islands is less convenient than another forum, which TKH has failed to identify, the Court must take into account that this factor "requires deference to a plaintiff's choice of forum."[140]

As to the remaining factor, the shared interest of the several States in furthering fundamental substantive social policies, the Court finds it weighs in favor of jurisdiction. Suits similar to this case have been filed against Defendants by state governments.[141] For example, a suit similar to the one at issue here is currently pending in the Circuit Court of the First Circuit, State of Hawai'i, which recently denied Defendants' motion to dismiss.[142] While Michigan, the state of TKH's principal place of business and where TKH contends the "alleged misconduct occurred[,]" and Delaware, the laws of which TKH is organized under, also have an

---

[137] McGee v. Int'l Life Ins. Co., 355 U.S. 220, 224, 78 S. Ct. 199, 201, 2 L. Ed. 2d 223 (1957).

[138] Chapin, 2015 V.I. LEXIS 127, at *27.

[139] See Adelson v. Hananel, 510 F.3d 43, 51 (1st Cir. 2007).

[140] Id. (citations omitted).

[141] State of Hawai'i, by Its Office of Consumer Protection v. Takata Corporation, et al., Civil No. 16-1-0922-05 RAN (pending before the Circuit Court of the First Circuit, State of Hawai'i); State of New Mexico, ex rel. Hector Balderas, Attorney General v. Takata Corporation, et al., No. D-101-CV-2017-00176 (pending before the First Judicial District Court, State of New Mexico).

[142] State of Hawai'i, by Its Office of Consumer Protection v. Takata Corporation, et al., Civil No. 16-1-0922-05 RAN (November 28, 2016, Order denying Defendants Takata Corporation and TK Holdings, Inc.'s August 16, 2016, Motion to Dismiss the Complaint or, in the Alternative, for a Stay); See Pl.'s December 21, 2016, Notice of the Hawai'i Trial Court Order.

interest in this case,[143] TKH has submitted no argument regarding these interests in terms of due process. In any event, considering all of the factors as a whole, the Court finds that these interests are not so significant as to require this Court to decline to exercise personal jurisdiction over TKH in this case. As a result, the Court determines that TKH has failed to satisfy its burden of showing the exercise of personal jurisdiction over it would be unfair and unreasonable. Consequently, the exercise of jurisdiction over TKH would not offend the constitutional principles of fair play and substantial justice.

Considering all three prongs of the due process analysis are met, the Court concludes that the exercise of specific personal jurisdiction over TKH would not violate due process.

### 2. Takata Japan.

With respect to Takata Japan, the third prong of the due process analysis differs because, unlike TKH, Takata Japan is "a Japanese corporation with its principal place of business in Japan."[144] This raises concerns regarding "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system[, which] should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders."[145] But, unlike in *Asahi Metal Indus. Co. v. Superior Court of California*,[146] one of the rare cases "ever to present so compelling a situation" that the forum state's minimum contacts did not justify the "serious burdens placed on the alien defendant[,]"[147] the dispute here is not "primarily about indemnification rather than safety standards[,]" nor are the only remaining parties to this dispute foreign corporations.[148]

Rather, this case pertains to Takata Japan's alleged awareness of a purportedly unsafe manufacturing defect, involvement in safety

---

[143] Def.'s TKH's Mot. to Dismiss, pp. 2-3.

[144] *See* Def. Takata Japan's Mot. to Dismiss, Ex. A, Ohama Decl. ¶ 3.

[145] *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 114, 107 S. Ct. 1026, 1033, 94 L. Ed. 2d 92 (1987).

[146] *Id.* at 114-116.

[147] *O'Connor*, 496 F.3d at 325 (citing *Asahi*, 480 U.S. at 114); *see also Daimler*, 134 S. Ct. at 765 (Sotomayor, J., concurring) (discussing the onerous burdens imposed by Argentine plaintiffs bringing suit against a German defendant in California).

[148] *Asahi*, 480 U.S. at 115.

investigations, and dissemination of safety information to the public that failed to relay or remedy the risk of injury to consumers in the Virgin Islands. Notably, Takata Japan focuses on its role (or lack thereof) in selling TKH's airbags to consumers in the Virgin Islands, but provides few specifics regarding its role in directing the internal affairs of TKH, the investigation into the allegedly defective airbags, or dissemination of information regarding same to the Virgin Islands public, which form the basis of Plaintiff's claims.[149]

 In taking into consideration the interests of the "several States," the Court must "consider the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction by" this Court, which requires "careful inquiry into the reasonableness of the assertion of jurisdiction in" this case.[150] However, considering the plethora of evidence submitted by Plaintiff that suggests that Takata Japan controlled TKH and had a significant role in remedying the risks posed by the alleged defective airbags that were manufactured by its subsidiary based in the United States and which posed an increased risk of injury and death in the Virgin Islands, the unreasonableness associated with bringing this foreign corporation into this Court is ameliorated. The increased risk of injury and death in the territory also causes the forum to have a substantial interest in adjudicating Plaintiff's claim. Further, as with TKH, Takata Japan is represented by reputable local counsel, and modern advances in technology have significantly eased the burdens posed by having to appear in a foreign court. Considering these reasons as a together, the third prong of the due process analysis does not require the Court to refrain from exercising personal jurisdiction over Takata Japan.[151]

Consequently, the Court concludes that exercising personal jurisdiction over Takata Japan would not violate due process.

---

[149] *See* Def. Takata Japan's Mot. to Dismiss, Ex. A, Ohama Decl.

[150] *Asahi*, 480 U.S. at 115.

[151] With respect to Count I of the Complaint, Takata Japan contends that the CICO statute, specifically 14 V.I.C. § 607(j), does not vest this Court with personal jurisdiction over Takata Japan where doing so would violate constitutional due process. Def. Takata Japan's Reply, pp. 10-13. However, because the Court has already found that the principals of due process are not violated by the Court's exercise of personal jurisdiction over Takata Japan in this case, this argument is moot.

### C. TKH and Takata Japan's request for an evidentiary hearing on the issue of personal jurisdiction.

██ In the event the Court finds Plaintiff has established a prima facie case for personal jurisdiction, TKH and Takata Japan request that the Court "hold an evidentiary hearing to evaluate [Plaintiff's] evidence in support of personal jurisdiction."[152] TKH and Takata Japan cite no authority that would obligate the Court to conduct an evidentiary hearing immediately after making its prima facie determination. Notwithstanding, the Court declines to hold a pre-trial evidentiary hearing because the jurisdictional issues here are "intertwined with the merits and therefore can be determined based on jury fact findings."[153] Whether TKH and Takata Japan are subject to personal jurisdiction and the merits of Plaintiff's case both relate to TKH's and Takata Japan's contacts in the territory, including the extent of Takata Japan's control over TKH, and their involvement in the sale of, and dissemination of information regarding, the allegedly defective airbags in the Virgin Islands. In this instance, it is appropriate to have the jurisdictional issues resolved with the merits of the case.[154] Consequently, TKH's and Takata Japan's requests for a pre-trial evidentiary hearing on personal jurisdiction is denied.

## II. TKH's and Takata Japan's Motions to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted.

Even if the Court finds that it may exercise personal jurisdiction over them, both TKH and Takata Japan contend that the Complaint must be dismissed because it fails to state a claim upon which relief can be granted.

### A. Count I: Civil violations of CICO under 14 V.I.C. § 600 *et seq.*

In Count I of the Complaint, Plaintiff alleges that TKH, Takata Japan, and Honda participated in an "association-in-fact" enterprise through a

---

[152] Def. TKH's Mot. to Dismiss, p. 18 n.14; Def. Takata Japan's Mot. to Dismiss, p. 3 n.2.

[153] *C-Innovation, LW v. Norddeutsche Seekabelewerke GmbH*, No. 10-4441, 2012 U.S. Dist. LEXIS 182634, at *6 (E.D. La. Dec. 28, 2012) (citing *Walk Haydel & Assocs. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008)).

[154] *See id.*

pattern of criminal activity in violation of CICO, 14 V.I.C. § 600 *et seq.*[155] With respect to TKH and Takata Japan, Plaintiff alleges that they engaged in a "pattern of criminal activity" by "falsely conceal[ing] material facts about the source and scope of the defects associated with its PSAN-propelled inflators" in violation of "14 V.I.C. § 834's prohibition on obtaining money by false pretense."[156] By communicating this information to Honda by electronic and telephonic means, Plaintiff alleges TKH and Takata Japan violated 18 U.S.C. § 1343, and, that TKH and Takata Japan mislead NHTSA in violation of 49 U.S.C. § 30170(a)(1).[157]

In their Motions to Dismiss,[158] TKH and Takata Japan contend that Count I of the Complaint fails to state a claim upon which relief can be granted because Plaintiff fails to allege facts that plausibly suggest that TKH and Takata Japan "participated in the 'affairs of the enterprise.' "[159] Specifically, TKH and Takata Japan contend that and that an "association-in-fact" enterprise under CICO requires "members of the enterprise [act] beyond 'their individual capacities' and beyond 'advance[ment of] their individual self-interests[,]' " but that Plaintiff has failed to set forth facts that show TKH, Takata Japan, and Honda engaged in anything other than a permissible "commercial relationship."[160] In opposition, Plaintiff looks to federal precedent interpreting the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and argues that, like RICO, CICO defines "enterprise" broadly and only requires a showing of three structural features: "purpose, relationships, and longevity[,]" all of which are demonstrated by the factual allegations in the Complaint.[161]

██ CICO permits "[t]he Attorney General . . . to institute civil proceedings against any person in the Superior Court . . . in order to

---

[155] Compl. ¶¶ 131-144.

[156] Compl. ¶¶ 136, 142(a), 143.

[157] Compl. ¶¶ 136, 142(b)-(c), 143.

[158] With respect to its argument pertaining to V.I.R. CIV. P. 12(b)(6), Takata Japan adopted TKH's arguments, but also asserted separate arguments pertaining to "issues unique to [Takata Japan]." Def. Takata Japan's Mot. to Dismiss, p. 1.; Def. Takata Japan's Reply, p. 13.

[159] Def. TKH's Mot. to Dismiss, p. 19.

[160] Def. Takata Japan's Reply, pp. 13-14; Def. TKH's Mot. to Dismiss, pp. 20-21.

[161] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, p. 18.

obtain relief from conduct constituting a violation . . . of any provisions of section 605 [Violations] of this chapter."[162] 14 V.I.C. § 605(a) provides that "[i]t is unlawful for any person employed by, or associated with, any enterprise, as that term is defined herein, to conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of criminal activity[,]" while section 605(d) makes it "unlawful . . . to conspire or attempt to violate . . . the provisions of section 605."[163] Thus, in order to state a claim under CICO, Plaintiff must identify: (1) a "person"; (2) an "enterprise"; and (3) demonstrate that the person conducted or participated in the affairs of the enterprise through a "pattern of criminal activity."

"Person" is defined under CICO to "mean[ ] any individual or entity holding or capable of holding a legal or beneficial interest in property."[164] CICO defines "enterprise," as referenced under section 605(a), to "include[ ] any individual, sole proprietorship, partnership, corporation, trust, or other legal entity, or any union, association or group of persons, associated in fact although not a legal entity, and includes illicit as well as licit enterprises and governmental as well as other entities."[165]

 Because Virgin Islands "CICO is cast in the mold of the federal statute[,]"[166] Plaintiff TKH, and Takata Japan assert that case law interpreting RICO is persuasive.[167] However, as Takata Japan points out, all provisions of CICO and RICO "are not the same" and "any differences in language are significant and require distinct applications."[168] Notably, the language describing violations under CICO in section 605(a) and (d)

---

[162] 14 V.I.C. § 607(a).

[163] 14 V.I.C. § 605(d).

[164] 14 V.I.C. § 604(l).

[165] 14 V.I.C. § 604(h).

[166] *Charleswell v. Chase Manhattan Bank, N.A.*, 308 F. Supp. 2d 545, 562, 577, 45 V.I. 495 (D.V.I. 2004) (citations omitted); *see Gumbs v. People of the V.I.*, 59 V.I. 784, 790 n.2 (V.I. 2013) (noting that "our local CICO statute was modeled . . . upon [RICO]") (citing *Charleswell*, 308 F. Supp. 2d at 562).

[167] Def. TKH's Mot. to Dismiss, p. 20 n.19; Pl.'s Opp'n to TKH's Mot. to Dismiss, p. 18 & n.8; *See* Takata Japan's Reply, p. 14 (relying on federal case law interpreting RICO).

[168] Def. Takata Japan's Reply, p. 11 (citations omitted); *see People of the Virgin Islands v. McKenzie*, 66 V.I. 3, 17-21 (V.I. Super. Ct. 2017) (distinguishing CICO from RICO with respect to the meaning of a "pattern of criminal activity" under CICO).

resembles that under section 1962(c) and (d) of RICO,[169] while "enterprise" is similarly defined under RICO to "include[ ] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]"[170] However, the definitions of "enterprise" under RICO and CICO are not identical, as the CICO definition explicitly provides that an "enterprise" includes "illicit as well as licit enterprises."[171] While the RICO definition of "enterprise" does not contain this language, "the United States Supreme Court has interpreted RICO as including both."[172] Considering the similarities between the statutory provisions, the Court agrees that federal case law interpreting RICO is persuasive with respect to the CICO provisions outlining violations under the Act and defining "enterprise," namely, sections 605 and 604(h).[173]

### a. "Person" under CICO.

█ Here, Plaintiff points to TKH and Takata Japan as the "persons" for purposes of CICO.[174] Since corporations are capable of holding a legal or beneficial interest in property, TKH and Takata Japan fall within the definition of "person" under CICO and may be identified as such in the Complaint. Thus, the "person" element of Plaintiff's CICO claim has been met.

---

[169] *Compare* 14 V.I.C. § 605(a), (d) with 18 U.S.C.S. § 1962(c) and (d). 18 U.S.C.S. § 1962(c) states that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt[,]" while section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

[170] *Compare* 14 V.I.C. § 604(h) with 18 U.S.C.S. § 1961(4).

[171] *Id.*

[172] *Chancey v. State*, 256 Ga. 415, 418, 349 S.E.2d 717, 723 (1986) (discussing Georgia's "little RICO" statute, which defines "enterprise" as including "illicit as well as licit enterprise," in relation to the definition of "enterprise" under RICO) (citing *United States v. Turkette*, 452 U.S. 576, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981)).

[173] *Accord McKenzie*, 66 V.I. at 12-13.

[174] Compl. ¶¶ 132-133, 139, 142, 143, 16.

369

### b. The existence of an "association-in-fact" enterprise.

It is undisputed that Plaintiff alleges that TKH, Takata Japan, and Honda engaged in an "association-in-fact" enterprise.[175] While the Supreme Court of the Virgin Islands has yet to define an "association-in-fact" enterprise under CICO, the United States Supreme Court has concluded that an "association-in-fact" enterprise under RICO is "a group of persons associated together for a common purpose of engaging in a course of conduct."[176] This "association-in-fact" enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."[177]

■■ ■ The requisite "purpose" under RICO refers to the common interest or goal that the "group of persons associate[ ] together" in order to achieve.[178] The "relationships among those associated with the enterprise" feature requires that the members act collectively or as a "continuing unit" for a common purpose, as opposed to "several individuals, [who] independently and without coordination, engage[ ] in a pattern of crimes listed as RICO predicate [offenses.]"[179] "[L]ongevity sufficient to permit these associates to pursue the enterprise's purpose" involves a showing that "the enterprise had 'affairs' of sufficient duration to permit an associate to 'participate' in those affairs through 'a pattern of [criminal] activity.' "[180] In discussing an "association-in-fact" enterprise under RICO, the United States Supreme Court opined that:

> Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number

---

[175] Compl. ¶ 133; Def. Takata's Mot. to Dismiss, p. 19.

[176] *Boyle v. United States*, 556 U.S. 938, 946, 129 S. Ct. 2237, 2244, 173 L. Ed. 2d 1265 (2009) (citing *Turkette*, 452 U.S. at 583).

[177] *Id*; *see McKenzie*, 66 V.I. at 12-13 (applying the federal interpretation of "association-in-fact" enterprise to CICO).

[178] *Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d 671, 687 (N.D. Ill. 2012) ("The existence of a common goal or purpose is an 'essential ingredient' of an association-in-fact enterprise") (citing *Baker v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004)); *see also Boyle*, 556 U.S. at 946 ("The concept of 'association' requires both interpersonal relationships and a common interest").

[179] *Boyle*, 556 U.S. at 947-48 & n. 4.

[180] *Id.* at 946 (citing 18 U.S.C.S. § 1962(c)).

of methods — by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.[181]

Here, Plaintiff alleges that TKH, Takata Japan, and Honda, engaged in an "association-in-fact" enterprise.[182] Specifically, Plaintiff alleges that TKH, Takata Japan, and Honda associated "with one another to sell cars equipped with [TKH and Takata Japan's] defective airbags and to conceal the nature and extent of their defect" in order "to sell as may airbags, and vehicles containing such airbags, as possible, and to delay and narrow the scope of the recall once the defect was discovered, thereby maximizing the revenue and profitability of the . . . [e]nterprise's members[,]" namely, TKH, Takata Japan, and Honda.[183] This sufficiently describes the purpose of the alleged enterprise and the facts, as pled, plausibly suggest that this purpose was common among TKH, Takata Japan, and Honda "beyond their own individual interests."[184] For example, Plaintiff alleges that "Honda and Takata worked together with respect to the design, manufacture, and sale of the defective inflators" and the discovery of the defect would negatively impact their profit margins, considering "Honda is Takata's biggest customer," "Honda is . . . one of Takata's largest shareholders[,] . . . holding 1.2 percent of Takata's stock[,]" and the sale of "millions of cars containing Takata's airbags" has driven "profits for both companies."[185]

---

[181] *Id.* at 948.

[182] Compl. ¶¶ 134-135.

[183] Compl. ¶¶ 135, 140.

[184] *See Guaranteed Rate*, 912 F. Supp. 2d at 687.

[185] Compl. ¶¶ 135-136, 140-141. While TKH and Takata Japan are frequently referenced collectively as "Takata," other factual allegations are sufficient to separately implicate TKH and Takata Japan and suggest that Takata Japan controlled, or at least exerted significant influence over, TKH's decisions and actions regarding the alleged defect and throughout the recall process. *See* Compl. ¶¶ 14-15, 47-49, 51-61, 67, 69, 112.

These facts, as well as others in the Complaint, plausibly suggest that TKH, Takata Japan, and Honda worked together as a "continuing unit" to achieve this common purpose. The allegations in paragraph 136 of the Complaint, which are supported by specific facts pled throughout,[186] state that: "Takata's inflators were designed to meet Honda's specifications and Honda bore the ultimate responsibility to ensure that they did"; "Once the inflators began to rupture, Honda and Takata were in constant contact behind the scenes regarding their root cause"; "Takata repeatedly provided Honda with incomplete explanations that minimized the extent of the problem"; "Honda was aware that Takata's explanations were likely false but — rather than undertake its own investigation . . . [Honda] parroted Takata's explanations to NHTSA and consumers."[187]

TKH and Takata Japan contend that the interactions between TKH, Takata Japan, and Honda only show "the normal business relationship between Takata and Honda entities[,] . . . not that they had joined together to create a distinct entity for purposes of duping USVI consumers into purchasing defective airbags."[188] In support of this argument, TKH and Takata Japan cite *United Food & Commer. Worker Unions & Emplrs. Midwest Health Bens. Fund v. Walgreen Co.*,[189] a United States Court of Appeals for the Seventh Circuit case, for the proposition that an "association-in-fact" enterprise must "extend beyond [the "person's] own normal business activity[.]"[190] In *United Food*, the plaintiff identified Walgreens and Par, a drug manufacturer, "as the 'persons' . . . for purposes of RICO, . . . define[d] the 'enterprise' as an entity consisting of Walgreens, Par, and management personnel from the two companies[,]" through which "the members of the enterprise associated for the common purpose of profiting from illegally substituting Par's more expensive dosage forms . . . for the cheaper dosage forms actually prescribed."[191] In affirming the dismissal of the complaint, the Seventh Circuit found that the complaint failed to allege sufficient facts to demonstrate that defendants "were conducting the affairs" of the "enterprise" as opposed to

---

[186] *See* Compl. ¶¶ 21, 37, 42-82, 86-89, 91, 94-98, 100-101, 104, 106-107, 112, 122-124.

[187] Compl. ¶¶ 136.

[188] Def. TKH's Mot. to Dismiss, pp. 20-21.

[189] 719 F.3d 849 (7th Cir. 2013).

[190] Def. TKH's Mot. to Dismiss, pp. 19-20.

[191] *Id.* at 854.

their own individual business enterprises.[192] Despite TKH and Takata Japan's suggestion, the Seventh Circuit did not conclude that the performance of an entity's regular business activity negated the existence of an "association-in-fact" entetprise.[193] Rather, the Court *assumed* that the "existence of an association-in-fact enterprise" had been adequately pled, and based its ruling on plaintiff's failure to allege facts that showed defendants violated RICO by "conducting the affairs" of the entelprise.[194]

Notwithstanding their misplaced reliance on *United Food*, TKH and Takata Japan's argument ignores the factual allegations that suggest extraordinary collaboration among TKH, Takata Japan, and Honda, in the handling of the alleged defects and recall process, which in turn, suggests that TKH, Takata Japan, and Honda were not working towards their individual self-interests. With respect to TKH and Takata Japan, the facts suggest that Takata Japan exerted control over TKH employees and the business decisions made by TKH with respect to the manufacture, testing, and sale of the allegedly defective airbag inflators.[195] Additionally, the facts indicate that TKH and Takata Japan worked with Honda together.

Even though "Honda . . . had the ultimate responsibility to ensure that the inflators installed in its automobiles met its own specifications," Honda never conducted its own investigation or "independent testing process to ensure the safety of the parts it installed in its vehicles."[196] Rather, Honda continuously relied on data collected by TKH, but provided to Honda by Takata Japan, and TKH and Takata Japan's "shifting explanations" for the on-going issues with the airbag inflators, even when "Takata's advice" repeatedly failed to encompass the magnitude of the problems with the airbag inflators, which resulted in Honda having to expand its recalls on multiple occasions, all while Honda consumers continued to incur injury and even death as a result of the allegedly defective airbag inflators.[197] Honda employees repeatedly met

---

[192] *Id.* at 854-55 (citations omitted).

[193] *Id.*

[194] *Id.*; *see Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1094 (N.D. Ill. 2016) (discussing defendants' misplaced reliance on *United Food*, 719 F.3d 849).

[195] *See* Compl. ¶¶ 14-15, 47-49, 51-61, 67, 69, 112.

[196] Compl. ¶¶ 50, 72-85.

[197] Compl. ¶¶ 146-69, 72-86, 88, 91-110. By April of 2013, "Takata and Honda had identified more than nineteen 'Case Events' in which PSAN-propelled inflators caused injury or

with "Takata" employees to discuss the airbag inflator problems, and, despite Honda's awareness that the root cause of the inflator ruptures had not been identified, Honda repeatedly neglected to inform NHTSA "regulators and consumers Takata's prior explanation demonstrably understated the problem . . . [, n]or did Honda admit the extent of the defect or its lack of knowledge regarding the source of the defect, and [instead] . . . continued to manufacture, market, and sell vehicles containing airbags made by Takata[.]"[198] Like Honda, when questioned, "Takata" also did not inform NHTSA regulators that their "personnel were still searching for the true cause of the ruptures[,]" and instead "claimed that the defects resulted from a manufacturing flaw [that] . . . affected only" a narrow scope of vehicles and insinuated that "Takata" "had solved the rupture problem."[199]

According to the Complaint, this pattern of public misrepresentations by Honda and Takata began with Honda's issuance of Recall 08V593 on November 11, 2008, and continued through 2016.[200] In issuing Recall 16V061 on January 29, 2016, "which recalled 2.2 million vehicles with model years ranging from 2005 to 2014[,]" Honda still "did not disclose the extent of the defect[,]" and "[a]s of March 22, 2016," "approximately sixteen years since Takata first introduced airbags that made use of PSAN propellant and approximately eight years since Honda's initial recall of just over 3,000 cars[,]" "the total number of recalled vehicles reached approximately 28 million."[201] On "May 4, 2016[,] . . . NHTSA 'expanded[ed] and accelerat[ed]' the recall of Takata's airbag inflators[,]" which "will encompass 35-40 million Takata inflators" in addition "to the 28.8 million Takata inflators that were already subject to recall[.]"[202]

Considering Takata Japan provided Honda the results of the first "process validation testing" on June 15, 2000, Honda learned of "four events involving airbag ruptures that occurred in the field" on July 18,

---

death[.]" Compl. ¶¶ 96, 98. All the while, "Takata kept selling PSAN-propelled inflators to Honda, and Honda kept installing them in its cars and selling those cars to consumers[, while] . . . [b]oth companies continued to profit." Compl. ¶ 98.

[198] Compl. ¶¶ 77, 81, 86, 91-94.
[199] Compl. ¶¶ 87-88, 95-97.
[200] Compl. ¶¶ 77-109.
[201] Compl. ¶¶ 107-108.
[202] Compl. ¶ 109.

2007, Honda issued its first recall on November 11, 2008, which was expanded, modified, or superseded by Honda through no less than 11 subsequent recalls, all while injuries and death continued to result from "Takata's" airbag inflators, Honda's continued reliance on "Takata" for information regarding the alleged defect does not reflect a "normal business relationship" between Honda, TKH, and Takata Japan.[203] On the contrary, it is reasonable to infer from the facts, as pled, that had Honda been conducting the affairs of its own, individual business interests, Honda would have conducted an independent investigation into the alleged defects. Indeed, the facts certainly suggest that Honda had the means to do so, as even NHTSA was able to obtain its own expert report on the matter.[204]

The combined actions of TKH, in collecting the data and manufacturing the inflators, Takata Japan, in controlling the internal affairs of TKH, and providing misinformation to Honda; Honda, in failing to conduct its own investigation into the alleged defect when faced with overwhelming evidence that "Takata" had not identified the root cause of the problem; and all three entities, in providing of false or misleading information to NHTSA and the public, plausibly suggest that TKH, Takata Japan, and Honda acted as a continuing unit "to conceal the nature and extent of the[ ] defect" in order "to sell as may airbags, and vehicles containing such airbags, as possible" in order to maximize their profits.[205] Consequently, the structural "relationship" feature of an "association-in-fact" enterprise has been met.

The factual allegations in the Complaint also satisfy the "longevity" feature of an "association-in-fact" enterprise. Indeed, the eight years between "Honda's initial recall of just over 3,000 cars" in 2008 to NHTSA's expanded recall in 2016 is of a sufficient duration to permit TKH, Takata Japan, and Honda to collectively act towards this purpose through "a pattern of criminal activity."[206]

Having found all three structural features of an "association-in-fact" enterprise are established by the well-pleaded factual allegations of the

---

[203] Compl. ¶¶ 51, 72; *see* Compl. ¶¶ 46-69, 72-86, 88, 91-107.

[204] Compl. ¶ 109.

[205] Compl. ¶¶ 135, 140.

[206] Compl. ¶¶ 77, 109.

Complaint, and construing those facts as true, the Court concludes that the facts, as pled, permit the reasonable inference that an "association-in-fact" enterprise existed between TKH, Takata Japan, and Honda.

### c. The "person" conducted or participated in the affairs of the enterprise through a "pattern of criminal activity."

 "Pattern of criminal activity" is defined under section 604(j) of CICO.[207] "The express requirements for establishing a 'pattern of criminal activity' under CICO are:"

> (1) "two or more occasions of conduct . . . that"; (2) "constitute criminal activity;" (3) "are related to the affairs of the enterprise;" and (4) "are not isolated; and" (5) where the "occasions of conduct" occur within the specified time period; (6) one of which "constitute[s] a felony under the Virgin Islands Code" [if the action is brought for purposes of criminal remedies under section 606 of CICO.][208]

Notably, this interpretation differs from the interpretation of "pattern of racketeering activity" under RICO, which contains different statutory lan-

---

[207] 14 V.I.C. § 604(j) provides:

"Pattern of criminal activity" means two or more occasions of conduct

(1) that:

 (A) constitute criminal activity;
 (B) are related to the affairs of the enterprise; and
 (C) are not isolated; and

(2) where;

 (A) at least one of the occasions of conduct occurred after November 9, 1990;
 (B) the last of the occasions of conduct occurred within five years of the filing of the action under this chapter, or within the relevant period within the Statute of Limitations as provided in section 3541 of Title 5, Virgin Islands Code, if such statutory period shall be greater than five years; and
 (C) for the purposes of section 606 [Criminal penalties] of this chapter, but not section 607 [Civil remedies] of this chapter, at least one of the occasions of conduct constituted a felony under the Virgin Islands Code, or, if committed subject to the jurisdiction of the United States, or any state of the United States, would constitute a felony under the Virgin Islands Code if committed in the Territory of the Virgin Islands.

[208] *McKenzie*, 66 V.I. at 17 (citing 14 V.I.C. § 604(j)).

guage from its CICO counterpart.[209] While the United States Supreme Court found the definition of "pattern of racketeering activity" under RICO to be ambiguous, and thus was free to discern its meaning based on Congress' legislative intent,[210] this Court has found that the statutory language describing "pattern of criminal activity" under CICO is unambiguous, and, therefore, that the Court is bound by the express requirements of "pattern of criminal activity" as set forth by statute.[211] As a result, federal case law regarding "pattern of racketeering activity" is not applicable.

 With respect to the express requirements of "pattern of criminal activity" under CICO, "criminal activity" is defined in section 604(e) to "mean[ ] . . . violations or the prohibited conduct as variously described in the laws governing this jurisdiction[,]" including federal felony offenses, and "in addition, . . . violations or prohibited conduct as found in" enumerated chapters of the Virgin Islands Code.[212] This Court has construed the requirement that there be "two or more occasions of conduct [that] . . . are not isolated" to mean that the conduct constitutes at least two predicate offenses that are related in that they are not "lone instances of criminal activity."[213] However, "at least one of the occasions of conduct occurred after November 9, 1990" and "the last of the occasions of conduct occurred within five years of the filing of the action under this chapter. . . ."[214] There is no requirement that "at least one of the occasions of conduct constitute[ ] a felony under the Virgin Islands Code[,]" where, as here, the action pertains solely to civil remedies under section 607 of CICO.[215]

Here, Plaintiff alleges that TKH and Takata Japan "conducted and participated in the conduct of affairs of the . . . [e]nterprise through a pattern of criminal activity in furtherance of this enterprise" by "falsely

---

[209] *Compare* 14 V.I.C. § 604(j) with 18 U.S.C.S. § 1961(5). 18 U.S.C.S. § 1961(5) provides that " 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity[.]"

[210] *See H. J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989).

[211] *McKenzie*, 66 V.I. at 15-21.

[212] 14 V.I.C. § 604(e).

[213] *McKenzie*, 66 V.I. at 19-20 (citations omitted).

[214] 14 V.I.C. § 604(j)(2)(A)-(B).

[215] 14 V.I.C. § 604(j)(2)(C); *see* 14 V.I.C. § 607; Compl. ¶¶ 9-10, 12.

conceal[ing] material facts about the source and scope of the defects associated with [the] PSAN-propelled inflators[.]"[216] According to the Complaint, "residents of the Virgin Islands relied on the information[,]" which enabled TKH and Takata Japan "to continue supplying defective airbags to auto manufacturers and consumers and to avoid the substantial expense of an expanded recall in the Virgin Islands[,]" in violation of "14 V.I.C. § 834's prohibition on obtaining money by false pretense[.]"[217] TKH and Takata allegedly violated 18 U.S.C. § 1343 by communicating the information to Honda by "electronic and telephonic" means, which resulted in Honda's "continued purchasing [of] airbags from Takata[,]" and in "Takata . . . aid[ing] and abett[ing] Honda's communications with consumers, including the deceptive recall notices that Honda sent to millions of its car owners."[218] Finally, TKH and Takata Japan allegedly violated 49 U.S.C. § 30170(a)(1) by "ma[king] misleading statements to NHTSA, 'with the specific intention of misleading the Secretary with respect to motor vehicle or motor vehicle equipment safety related defects that have caused death or serious bodily injury of an individual.' "[219]

Obtaining money by false pretenses in violation of 14 V.I.C. § 834 falls within one of the enumerated crimes explicitly constituting "criminal activity" under section 604(e), as do violations of 18 U.S.C. § 1343 and 49 U.S.C. § 30170(a)(1), which constitute felony offenses under federal law.[220] The facts, as pled, indicate that the purported violations occurred after November 9, 1990, "occurred more than twice," and were related to each other, as well as the "affairs of the enterprise," in that they stemmed from the handling of the allegedly defective airbag inflators and the dissemination of information regarding same.[221] Moreover, as discussed, the Court can reasonably infer from the facts alleged that TKH, Takata Japan, and Honda acted in a manner that was beyond a mere "commercial

---

[216] Compl. ¶ 142.

[217] Compl. ¶ 142(a).

[218] Compl. ¶ 142(b).

[219] Compl. ¶ 142(c).

[220] 18 U.S.C. § 1343 (violator may be "imprisoned for not more than 20 years"); 49 U.S.C. § 30170(a)(1) (violator may be "imprisoned for not more than 15 years"); 18 U.S.C.S. § 3559(a)(3) ("An offense that is not specifically classified by a letter grade in the section defining it, is classified if the maximum term of imprisonment authorized is — . . . less than twenty-five years but ten or more years, as a Class C felony").

[221] *See generally* Compl. & ¶¶ 143, 50-51, 69, 72-77, 79-82, 86-91, 93-101.

relationship" and advancement of their individual business interests so as to plausibly suggest that that TKH, Takata Japan, and Honda were conducting the affairs of the enterprise. Having alleged facts that demonstrate the express requirements of section 604(j), the Court finds that the Complaint makes a sufficient showing that TKH and Takata Japan conducted or participated in the affairs of the enterprise through a "pattern of criminal activity."

Because the well-pleaded factual allegations plausibly suggest that all of the elements of a CICO claim have been met, the Court concludes that Plaintiff states a claim against TKH and Takata Japan under CICO. Therefore, TKH and Takata Japan's Motions to Dismiss will be denied as to Count I of the Complaint.

### B. Count II: Unfair or deceptive trade practices under 12A V.I.C. § 101 *et seq.* and Count III: Consumer fraud under 12A V.I.C. § 301 *et seq.*

In Counts II and III of the Complaint, Plaintiff alleges that by making "numerous affirmative deceptive statements about the nature of the defects plaguing its airbag inflators and the number of cars affected, intending to deceive the regulators and the public[,]" Takata Japan and TKH are liable for deceptive or unconscionable trade practices under the Virgin Islands Consumer Protection Law, 12A V.I.C. § 101 *et seq.* ("CPL"), and consumer fraud under the Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. § 301 *et seq.* ("CFDBPA").[222] In moving to dismiss the counts, TKH and Takata Japan argue the claims fail because the statutory requirements for imposing liability are not met since TKH and Takata Japan "do[ ] not sell" consumer goods to Virgin Islands consumers.[223] Additionally, TKH and Takata Japan argue Plaintiff's claim under CFDBPA fails because Plaintiff fails to plead actual damages.[224] In opposition, Plaintiff argues that the factual allegations are sufficient under a liberal construction of the statutes, because, *inter alia*, the statutes only require "a logically related string of transactions between Plaintiff and Defendants[,]" airbags are consumer goods as a component "incorporated

---

[222] Compl. ¶¶ 152, 145-146, 153-157, 158-159, 165-169.

[223] TKH's Mot. to Dismiss, pp. 21-25.

[224] TKH's Mot. to Dismiss, p. 25.

into a larger consumer good[,]" and liability under the statutes is not limited to the actual transaction, but rather "is broad enough to include deceptive conduct that is *connected to* the sale[.]"[225] Plaintiff also argues actual damages is only "one of the many forms of relief [the Attorney General] is authorized to seek under CFDBPA," but nevertheless points to the allegation in the Complaint that "TKH economically devalued the vehicles driven by Virgin Islands residents equipped with those defective airbags."[226]

The Virgin Islands Legislature instructs that both CPL and CFDBPA should be construed in accordance with "the Federal Trade Commission and judicial interpretation . . . of the Federal Trade Commission Act" ("FTCA").[227] Specifically, the Court must construe CPL "so as to supplement the rules, regulations, and decisions of the Federal Trade Commission and judicial interpretation of 15 U.S.C. § 45(a)(1)," while CFDBPA provides that the Court must "consider[ ] . . . the interpretations of the Federal Trade Commission and the federal courts relating to 15 U.S.C. § 45 at *the time of enactment of . . . [the CFDBPA],*" which was on May 17, 2006,[228] and "liberally construe[ the CFDBPA] . . . to protect the consuming public from deceptive and unfair acts or practices in the conduct of any trade or commerce."[229] The Attorney General may bring suit on behalf of the Government of the Virgin Islands and its executive department, the Department of Licensing and Consumer Affairs, for violations of CPL and CFDBPA.[230]

---

[225] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, pp. 21-22, 24, 21-28.

[226] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, p. 28 (citing Compl. ¶ 7).

[227] 12A V.I.C. § 110; 12A V.I.C. § 304.

[228] *See* Act No. 6833, § 1, Sess. L. 2006.

[229] 12A V.I.C. § 110; 12A V.I.C. § 302, 304 (emphasis added).

[230] Compl. ¶¶ 12 & n. 1, 156; *see* 3 V.I.C. § 114(a)(1)-(2), (4) ("The Attorney General shall have the following powers and duties: (1) except in cases where the United States attorney is representing the Government of the United States Virgin Islands at the request of the Governor, to appear for and represent the executive branch of the Government of the Virgin Islands before the courts in all civil proceedings in which the said Government, or any executive department, board, commission, agency, instrumentality or officer thereof is interested; (2) to prosecute in the inferior courts all offenses against the laws of the Virgin Islands; (4) to investigate violations of the laws of the Virgin Islands for which the executive branch of the Government of the United States Virgin Islands may invoke penalties, fines or forfeitures, or deny, suspend or revoke licenses, and to initiate and conduct appropriate proceedings in relation thereto . . . ."); 12A V.I.C. § 104(d) ("Whenever the Commissioner has

### a. Consumer Protection Law.

#### 1. Statutory provisions under CPL.

█ 12A V.I.C. § 101 of CPL provides that "[n]o person shall engage in any deceptive or unconscionable trade practice in the sale, lease, rental or loan or in the offering for sale, lease, rental, or loan of any consumer goods or services, or in the collection of consumer debts."[231] In terms of the circumstances at issue in this case, to state a claim under CPL, a plaintiff must establish the following elements: (1) defendant is a "person" under CPL; (2) defendant is engaged in a deceptive or unconscionable trade practice; and (3) the deceptive or unconscionable trade practice occurred during the sale, lease, rental or loan of any consumer goods or services.[232]

---

reason to believe that any person is using any method, act, or practice that would be in violation of any provision of this chapter, he may bring an action in the name of the Government of the United States Virgin Islands against such person to restrain, by temporary or permanent injunction, the use of such method, act or practice"); 12A V.I.C. § 107(b) ("The Director and any other governmental official or agency in the United States Virgin Islands having supervisory or regulatory authority over a merchant shall consult and assist each other in maintaining compliance with this chapter. Within the scope of their authority, they may jointly or separately make investigations, prosecute suit, and take other official action they consider appropriate"); 3 V.I.C. § 270(a) ("There is established as an executive department in the Government of the United States Virgin Islands the Department of Licensing and Consumer Affairs"); 3 V.I.C. § 272(a) ("The Department [of Licensing and Consumer Affairs] shall have the following duties and responsibilities: . . . (3) coordinate with other agencies and departments of the Government of the United States Virgin Islands to promote and watch over the enforcement of all laws, rules, regulations and orders which affect the interests of consumers; (8) enforce all laws relating to the advertising, offering for sale and the sale of commodities, goods, wares and services; receive and evaluate complaints and initiate its own investigations relating to these matters and take appropriate action, including referral to a federal or territorial department or agency; (9) represent the public consumer before any private entity or public organization in any matter affecting or which might affect the interests of consumers; . . . ."); 12A V.I.C. § 328 (outlining the remedies of the Department of Licensing and Consumer Affairs); *See also* Kathleen S. Morris, Article and Essay, *Expanding Local Enforcement of State and Federal Consumer Protection Laws*, 40 FORDHAM URB. L.J. 1903, 1911 n.36 & 37 (2013) ("Most state statutes contemplate enforcement [of their consumer protection laws] by the Attorney General and State's attorneys; some also have state officers specifically charged with enforcement") (citations omitted).

[231] 12A V.I.C. § 101.

[232] Neither the Supreme Court of the Virgin Islands, nor this Court, has explicitly outlined the elements necessary for stating a claim under CPL. However, other state courts have determined the essential elements of a claim under their consumer protection statutes in this manner. *See State v. O'Neill Investigations*, 609 P.2d 520, 534 (Alaska 1980).

As to the first element, CPL does not define "person." However, the Legislature has instructed that the term " 'person' . . . include[s] corporations, companies, associations, joint stock companies, firms, partnerships, and societies, as well as individuals[.]"[233] As corporations, TKH and Takata Japan constitute "persons" susceptible to liability under CPL.

As to the second element, defendant is engaged in a deceptive or unconscionable trade practice, both terms are defined under CPL, which provides, in pertinent part:

> (a) "Deceptive trade practice" means any false, falsely disparaging, or misleading oral or written statement, visual description or other representation of any kind made in connection with the sale, lease, rental, or loan of consumer goods or services, or in the extension of consumer credit or in the collection of consumer debts, which has the capacity, tendency or effect of deceiving or misleading consumers. . . .
>
> . . .
>
> (b) "Unconscionable trade practice" means any act or practice in connection with the sale, lease, rental or loan or in connection with the offering for sale, lease, rental or loan of any consumer goods or services, or in the extension of consumer credit, or in the collection of consumer debts which unfairly takes advantage of the lack of knowledge, ability, experience or capacity of a consumer; or results in a gross disparity between the value received by a consumer and the price paid, to the consumer's detriment; . . .[234]

The definition of "deceptive trade practice" also sets forth a non-exhaustive list of prohibited practices,[235] which include, *inter alia*:

> (1) representations that goods or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have . . . or goods or services are of particular standard, quality, grade, style or model, if they are of another;

---

[233] 1 V.I.C. § 41.

[234] 12A V.I.C. § 102(a), (b).

[235] 12A V.I.C. § 102(a)(1)-(10).

(2) the use, in any oral or written representation, of exaggeration, innuendo or ambiguity as to a material fact or failure to state a material fact if such use deceives or tends to deceive; . . .[236]

Additionally, "[c]onsumer" is defined as "a purchaser or lessee . . . or prospective purchaser or lessee . . . of consumer goods or services . . . [,]"[237] while "consumer goods, services, credit and debts" "means goods, services, credit and debts which are primarily for personal, household or family purposes."[238] CPL also defines "[m]erchant" to "mean[ ] a seller, lessor, creditor or any other person who makes available either directly or indirectly, goods, services or credit, to consumers[,]" which "shall include manufacturers, wholesalers and others who are responsible for any act or practice prohibited by this chapter."[239]

 Notably, the parameters of a "deceptive trade practice" action under CPL are significantly more lenient than those required for "an action for common law fraud."[240] This is because "an action for deceptive trade practices does not require proof of scienter[,]" nor does it require a showing of reliance or injury by the plaintiff.[241] Instead, "all that is

---

[236] 12A V.I.C. § 102(a)(1)-(2).

[237] 12A V.I.C. § 102(d).

[238] 12A V.I.C. § 102(c). The parties dispute the specific terms used by the Legislature in defining "consumer goods" under CPL. TKH and Takata Japan assert that "consumer goods" is defined as "*foods*, services, credit and debts which are primarily for personal, household or family purposes," but Plaintiff asserts that the use of the term "foods" rather than "goods" is a typographical error "in the online publication (by LexisNexis) of the Virgin Islands Code." Def. TKH's Mot. to Dismiss, p. 23 (emphasis added); Def. TKH's Reply, pp. 13-14; Pl.'s December 22, 2016, Notice of Typographical Error in 12A V.I.C. § 102(c) ("Notice of Typographical Error"); Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, p. 22 n. 11. The text of the session laws of the Virgin Islands enacting CPL in 1973 states: " '[c]onsumer goods, services, credit and debts' . . . means goods, services, credit and debts which are primarily used for personal, household or family purposes." Act No. 3431, § 4, Sess. L. 1973, p. 89; *see* Pl.'s Notice of Typographical Error, Ex. B. Nevertheless, the Legislature recently clarified the confusion by amending 12A V.I.C. § 102(c) "by striking 'foods' and inserting 'goods' to correct a typographical error." Act No. 7972, § 14, Sess. L. 2016, p. ___ (amended January 20, 2017). Consequently, the Court will read and construe the definition of "consumer goods" in section 102(c) of CPL as referring to "goods" rather than "foods."

[239] 12A V.I.C. § 102(e).

[240] *Island Insteel Sys. v. Waters*, 296 F.3d 200, 204, 44 V.I. 389 (3d Cir. V.I. 2002).

[241] *Id.* (analogizing an action for deceptive trade practices under 12A V.I.C. § 101 to an action for trademark infringement under the Lanham Act. 15 U.S.C.S. § 1125(a), in order to determine the statute of limitations period applicable to a claim for trademark infringement);

required in an action for deceptive trade practice . . . [is] that the practice at issue has the 'tendency or effect of deceiving or misleading consumers[.]' "[242] With respect to public enforcement of CPL, the statute explicitly provides that "it need not be shown that consumers are being or were actually injured[,]"[243] while "a consumer may bring an action . . . [w]hether he seeks or is entitled to damages or has an adequate remedy at law."[244] Thus, unlike consumer protection statutes in other jurisdictions, CPL contains no requirement that the consumer sustain an "ascertainable" loss or "injury" in order to state a claim under CPL.[245]

### 2. Statutory interpretation of CPL.

■■■ Here, TKH and Takata Japan argue that "there can be no CPL violation . . . because the statute applies only to the direct sale of consumers, i.e., purchasers of consumer goods."[246] Plaintiff counters that the use of the phrase "in connection with the sale . . . of consumer goods" in the definition of "deceptive trade practice" indicates that actions under CPL extend to "practices by persons who were not the direct seller."[247] The scope of CPL has yet to be interpreted by the Supreme Court of the Virgin Islands and there is no other binding authority addressing the issue.

---

*Regina Corp. v Fed. Trade Com.*, 322 F.2d 765, 768 (3d Cir. 1963) (Under the FTC, "proof of . . . [an] intention to deceive is not a prerequisite to a finding of a violation . . . it is sufficient that deception is possible") (citations omitted); *see* Note, *Toward Greater Equality in Business Transactions: A Proposal to Extend the Little FTC Acts to Small Businesses*, 96 HARV. L. REV. 1621, 1622 n.7 (1983) ("Little FTC Acts that incorporate the jurisprudence of FTC Act § 5 have significantly augmented preexisting common law actions for fraud and deceit. In essence, they impose strict liability for misrepresentation: the consumer need prove only that a misrepresentation had the capacity to deceive, not that he relied on or was harmed by the misrepresentation. Furthermore, the innocent intent or good faith of the seller is irrelevant seller is irrelevant") (collecting cases).

[242] *Id.*; *accord Poulin v. Ford Motor Co.*, 147 Vt. 120, 124, 513 A.2d 1168, 1171 (1986) ("Many federal courts have held that a misrepresentation which has the tendency and capacity to mislead consumers is a deceptive act or practice under federal law. . . . Similarly, a number of courts in states with statutes similar to Vermont's Consumer Fraud Act have also adopted this definition of deception") (collecting cases) (internal citations omitted).

[243] 12A V.I.C. § 104(e).

[244] 12A V.I.C. § 108(a).

[245] *See Hall v. Walter*, 969 P.2d 224, 237 (Colo. 1998) (identifying state consumer protection statutes that require an ascertainable injury).

[246] Def. TKH's Mot. to Dismiss, p. 23.

[247] Pl.'s Opp'n to TKH's Mot. to Dismiss, p. 24.

384

As a result, the Court must construe CPL in order to determine whether an action for deceptive trade practices may only be brought by a direct purchaser of the consumer good. In so doing, the Court applies the standard for statutory interpretation.[248]

 First, the Court considers the words "sale, lease, rental, or loan" as used in section 101's prohibition against "deceptive or unconscionable trade practices" and the definition of "deceptive trade practice" under section 102(a).[249] Black's Law Dictionary defines as "sale" as "the transfer of property or title for a price[,]"[250] "lease" as "a contract by which the rightful possessor of personal property conveys the right to use that property in exchange for consideration[,]"[251] and "loan" as "[a]n act of lending; a grant of something for temporary use[,]" and "[a] thing lent for the borrower's temporary use; esp., a sum of money lent at interest."[252] Merriam-Webster defines "rental" "an amount paid or collected as rent" and "something that is rented[,]"[253] while Black's Law Dictionary defines "rent" as the "consideration paid, usually periodically,

---

[248] Statutory interpretation is governed by the "Rules of Construction." 1 V.I.C. §§ 41-52. The Supreme Court of the Virgin Islands has described the standard for statutory interpretation, as follows:

"The first step when interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning. If the statutory language is unambiguous and the statutory scheme is coherent and consistent, no further inquiry is needed. In analyzing a statutory scheme, we must give effect to every provision, making sure to avoid interpreting any provision in a manner that would render it — or another provision — wholly superfluous and without an independent meaning or function of its own. But even where a statutory scheme is plain and internally consistent, no statute should be read literally if such a reading is contrary to its objective [and] this Court must consider whether applying the statute's literal language leads to . . . absurd consequences or is otherwise inconsistent with the Legislature's intent." *In re L.O.F.*, 62 V.I. 655, 661 (V.I. 2015) (internal and other citations omitted).

[249] *Defoe v. Phillip*, 56 V.I. 109, 121 (V.I. 2012) ("[T]he Virgin Islands Legislature has instructed that '[w]ords and phrases shall be read with their context and shall be construed according to the common and approved usage of the English language,' but that '[t]echnical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to their peculiar and appropriate meaning' ") (citing 1 V.I.C. § 42).

[250] BLACK'S LAW DICTIONARY 1454 (9th ed. 2009).

[251] BLACK'S LAW DICTIONARY 970 (9th ed. 2009).

[252] BLACK'S LAW DICTIONARY 1019 (9th ed. 2009).

[253] https://www.merriam-webster.com/dictionary/rental (last visited on May 16, 2017).

for the use or occupancy of property. . . ."[254] A common sense reading of these definitions together makes clear that there is one concept underlying all of these terms: a transaction.[255] Because sections 101 and 102(a) specifically refer "the sale, lease, rental, or loan of consumer goods or services, or in the extension of consumer credit or in the collection of consumer debts,"[256] it is clear that these provisions refer to not just *any* transaction, but *consumer* transactions.[257]

▉ Next, the Court looks to the definition of "deceptive trade practice" under section 102(a), which requires the "deceptive trade practice" be "made *in connection with* the sale, lease, rental, or loan of consumer goods or services . . . ."[258] Merriam-Webster defines "in connection with" as "in relation to (something)" and "for reasons that relate to (something)."[259] By providing that a "deceptive trade practice" is "made in connection with the sale, lease, rental, or loan of consumer goods or services, . . ." the language unambiguously denotes that the conduct described in section 102(a) constitutes a deceptive trade practice when it occurs in relation to a consumer transaction.

---

[254] BLACK'S LAW DICTIONARY (9th ed. 2009).

[255] "Transaction" is defined by Merriam-Webster as "an exchange or transfer of goods, services, or funds" or "a communicative action or activity involving two parties or things that reciprocally affect or influence each other." https://www.merriam-webster.com/dictionary/transaction (last visited on May 16, 2017). Black's Law Dictionary defines "transaction" as "[t]he act or an instance of conducting business or other dealings" and "[s]omething performed or carried out; a business agreement or exchange." BLACK'S LAW DICTIONARY 1635 (9th ed. 2009). Thus, transactions "of" consumer goods or services refers to transactions proceeding from, with their origin in, consumer goods or services. Consumer goods and services are purchased by "consumers." *See* 12A V.I.C. § 102(c)-(d).

[256] 12A V.I.C. § 102(a); *see* 12A V.I.C. § 101 (phrase is similar, but not identical, to the words used in section 102(a)).

[257] *See* BLACK'S LAW DICTIONARY 1080 (6th ed. 1990) (defining the term "of" as "denoting that from which anything proceeds; indicating origin, source, descent, and the like . . . ."); *accord Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 180, 296 Ill. Dec. 448, 497, 835 N.E.2d 801, 850 (2005) (discussing Illinois' consumer protection law and referring to the terms "trade" and "commerce," which are statutorily defined to "mean the advertising, offering for sale, sale, or distribution of any services. . . [,]" as "consumer transactions") (citing 815 ILCS 505/1(f) (West 1998)).

[258] 12A V.I.C. § 102(a) (emphasis added).

[259] https://www.merriam-webster.com/dictionary/in%20connection%20with (last visited on June 16, 2017).

■ In the Court's view, the plain meaning of the phrase "in connection with" under section 102(a) is a broad reference to *the context* in which the deceptive trade practice must be made in order for the conduct to fall within the purview of CPL, rather than a limitation on *who* may bring, or be subject to, an action under CPL. Essentially, TKH and Takata Japan argue that contractual privity is required in order for a plaintiff to state a viable cause of action for deceptive trade practices against a defendant. However, neither the plain language of section 102(a), nor any other provision under CPL, suggests that CPL actions are restricted to the confines of contractual privity.

■ ■ Nevertheless, to ensure that this conclusion does not undermine legislative intent, the Court must consider the statutory scheme as a whole by giving effect to all statutory language of CPL.[260] A consumer transaction, as referenced in sections 101 and 102(a), inherently involves at least two parties, which according to the definitions set forth in the CPL, are a "consumer" and a "merchant."[261] While a "consumer" is "a purchaser or lessee . . . or prospective purchaser or lessee . . . of consumer goods or services . . . [,]"[262] a "merchant" is "any other person" who makes consumer goods "indirectly" available to consumers, such as a "manufacturer" or "wholesaler."[263] Notably, section 108 provides that a "consumer may bring an action to . . . enjoin in accordance with the principles of equity, a *merchant* who has violated, is violating, or is otherwise likely to violate this chapter."[264] This provision makes clear that an action for deceptive or unconscionable trade practices under CPL can be brought against defendants, such as wholesalers and manufacturers, even though they are only *indirectly* involved in the

---

[260] *Dupigny v. Tyson*, 66 V.I. 434, 440-441 (V.I. 2017) ("The first canon of statutory interpretation states that, if the language of a statute is clear and unambiguous, no further analysis is required in order to discern the meaning of that language. All the statutory language must be given effect when doing so does not undermine the legislative intent. Interpretations that are unjust or lead to absurd results must be avoided because they are inconsistent with legislative intent. An interpretation that renders a statute nonsensical or superfluous, or that defies rationality, is absurd") (internal quotation marks omitted) (internal and other citations omitted).

[261] 12A V.I.C. § 102(c)-(d).

[262] 12A V.I.C. § 102(d).

[263] 12A V.I.C. § 102(e).

[264] 12A V.I.C. § 108(a)(2) (emphasis added).

transaction. Any conclusion to the contrary would lead to absurd results because it would render the definition of "merchant" superfluous, in direct contravention of clear and unambiguous statutory language.[265]

██ This construction is consistent with the Court's conclusion that the plain language of CPL does not mandate contractual privity between the parties as a pre-requisite to bringing an action for deceptive or unconscionable trade practices, as there will likely be no contractual privity between a consumer and a wholesaler or manufacturer who is indirectly involved in the transaction. Furthermore, this conclusion aligns with the remedial purpose FTCA, upon which CPL is based, to "protect the public"[266] by eliminating unfair or deceptive business practices.[267]

Notably, courts in other jurisdictions have reached similar conclusions when interpreting state consumer protection laws.[268] Specifically, many courts have concluded that contractual privity is not necessary to establish liability under state consumer protection laws[269] and permit actions for deceptive or unfair trade practices by indirect purchasers against upstream

---

[265] See Dupigny, 66 V.I. at 440-441.

[266] Regina Corp. v. Fed. Trade Com., 322 F.2d 765, 768 (3d Cir. 1963) ("The purpose of the Federal Trade Commission Act is to protect the public, . . . and it is in the public interest to stop any deception at its incipiency") (internal and other citations omitted).

[267] See Cal. Dental Ass'n v. FTC, 526 U.S. 756, 768, 119 S. Ct. 1604, 143 L. Ed. 2d 935 (1999) (the purpose of FTC Act is to eliminate unfair or deceptive business practices); see also Ryan P. Quinn & Thomas Watterson, Note, Fair is Fair — Reshaping Alaska's Unfair Trade Practices and Consumer Protection Act, 28 ALASKA L. REV. 295, 299 (2011) (citations omitted); Victor E. Schwarz & Cary Silverman, Article, Common-Sense Construction of Consumer Protection Acts, 54 KAN. L. REV. 1, 8-16 (2005).

[268] Infra n.269-270; see Waltham Watch Co. v. FTC, 318 F.2d 28, 31 (7th Cir. 1963) ("[T]hose who put into the hands of others the means by which they may mislead the public, are themselves guilty of a violation of Section 5 of the Federal Trade Commission Act").

[269] See, e.g., Haynes v. George Ballas Buick-GMC Truck, No. L-89-168, 1990 Ohio App. LEXIS 5661, at *49 (Ct. App. Dec. 21, 1990) ("the defendant must have some connection to the consumer transaction in order to be liable for any violation of the [Ohio Consumer Sales Practices Act, OHIO REV. CODE ANN. § 1345.01 et seq.] . . . there is nothing under the statute which provides that privity of contract is a necessary prerequisite to recovery of damages") (citations omitted); In re Ford Motor Co. Ignition Switch Prods. Liab. Litig. v. Ford Motor Co., 1999 U.S. Dist. LEXIS 22892, at *30-31 (D.N.J. May 14, 1999) (finding consumer protection laws of Nebraska, NEB. REV. STAT. ANN. § 59-1601 et seq., and Oklahoma, OKLA. STAT. tit. 15, § 751 et seq., sufficiently broad such that they "include[ ] upstream component part suppliers[,]" especially when the "component is included in many thousands of vehicles sold to consumers in Nebraska"), vacated in part on other grounds, 1999 U.S. Dist. LEXIS 22891 (D.N.J. July 27, 1999); Gibbons v. J. Nuckolls, Inc., 216 S.W.3d 667, 670 (Mo. 2007) (en banc) (finding wholesaler of automobile that was sold to plaintiff through a dealership

manufacturers, particularly where the consumer protection statute contains broad language that phrases the prohibited contact "in connection with" the consumer transaction or permits liability based on "indirect" contact with the consumer.[270]

subject to Missouri's consumer protection law; in rejecting defendant's contention that "private plaintiffs can only sue a direct seller," the court noted that "[p]rivity of contract is not required under similar statutes of numerous other states[,]" while "national experts generally consider privity irrelevant to the analysis" since "unfair and deceptive acts and practices claims . . . are not based on contract") (internal and other citations omitted) (collecting cases); *Holiday Resort Cmty. Assn v. Echo Lake Assocs., LLC*, 134 Wash. App. 210, 219, 135 P.3d 499, 504 (2006) ("As a general rule and as a matter of legislative intent, neither the CPA nor case law require privity of contract in order to bring a CPA claim alleging an unfair or deceptive act or practice[,]" but noting "any person" injured in violation of Washington's consumer protection law may bring an action) (citing RCW 19.86.020), *amended by* 2006 Wash. App. LEXIS 1832 (Ct. App. Aug. 15, 2006); *Heatherly v. Merrimack Mut. Fire Ins. Co.*, 43 S.W.3d 911, 915 (Tenn. Ct. App. 2000) ("Privity of contract is not required for consumer protection act claims") (citations omitted).

[270] *See, e.g., Jones v. Sportelli*, 166 N.J. Super. 383, 390, 399 A.2d 1047, 1050 (1979) (manufacturer of IUD was subject to liability under New Jersey consumer protection law because "the term 'sale' was liberally expanded by the Legislature . . . [to] encompass[ ] any 'attempt directly or indirectly to sell' " and the manufacturer's "provision of an IUD to a gynecologist essentially constitutes, at the very least, an indirect attempt to sell the IUD to a wanting patient with the concomitant expectation of monetary return. Upon actual sale or distribution, economic benefit accrues to the manufacturer, and although the manufacturer might receive payment from the gynecologist, it is unrealistic to suggest that the patient is not, in the ordinary course of business, ultimately charged with the cost") (citing N.J.S.A. 56:8-1(e)); *Kociemba v. G.D. Searle & Co.*, 680 F. Supp. 1293, 1304-05 (D. Minn. 1988) (Because the language of Minnesota's consumer protection law "cover[s] 'direct and indirect' outreaches to the public . . . [the] advertisement to a physician is an 'indirect' advertisement to the public") (citing MINN. STAT. § 325F.67); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 193 (D. Me. 2004) ("As with Maine and Montana, the New Hampshire consumer protection statute does not apply only to those who have directly engaged in trade or commerce with consumers") (citations omitted); *Merriman v. Auto Excellence, Inc.*, 55 Va. Cir. 330, 331 (Va. Cir. Ct. 2001) (permitting consumer's action against upstream retailer, who sold vehicle to a wholesaler, who then sold the vehicle to plaintiff, because "lack of privity is not a defense . . . to a claim brought under the Virginia Consumer Protection Act[,] . . . [since] the language of the statute[,]" which provides that certain "[f]raudulent acts or practices committed by a supplier in connection with a consumer transaction are unlawful[,]" VA. CODE ANN. § 59.1-200(A), "does not seem to limit protection only to those transactions that occur directly between a supplier and the ultimate consumer[,]" particularly in light of the statute's remedial purpose); *Amstadt v. United States Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996) (Under Texas' consumer protection law, though "[p]rivity of contract with a defendant is not required for the plaintiff to be a consumer[,] . . . the defendant's deceptive conduct must occur in connection with a consumer transaction[,]" which can "[r]each upstream manufacturers and suppliers [only] when their misrepresentations are . . . communicated to the consumer") (internal and other citations

389

TKH and Takata Japan urge the Court to adopt the United States District Court for the Virgin Islands' conclusion in *MRL Dev. I, LLC v. Whitecap Inv. Corp.* [271] that the CPL only applies to direct interactions between the purchaser and seller.[272] In that case, the District Court concluded that CPL "does not protect private persons who were not the direct purchaser[,]" but did so in relying on the "persuasive reasoning" of the United States Court of Appeals for the Third Circuit's interpretation of "similarly worded provisions of Pennsylvania's Unfair Trade Practices and Consumer Protection Law."[273] Having performed its own statutory interpretation of Virgin Islands CPL, the Court must respectfully depart from the District Court's conclusion for a variety of reasons.[274]

First, while Pennsylvania's consumer protection statute resembles the Virgin Islands CPL, the statutory language is quite different. In *Katz v.*

---

omitted); *see also Hoffman v. Stamper*, 155 Md. App. 247, 314, 843 A.2d 153, 193 (Ct. Spec. App. 2004) (Although the defendant real estate appraiser was not the direct seller and the definition of "sale" under Maryland's consumer protection law does not explicitly encompass "indirect" transactions, the defendant's "appraisals were so vital to the sales of consumer realty here that his conduct in performing them was the equivalent of conduct committed 'in' the sale, for purposes of [Maryland's consumer protection law]"), *aff'd in part and rev'd on other grounds*, 385 Md. 1, 31-32, 867 A.2d 276, 294-95 (2005) ("[I]t is quite possible that a deceptive trade practice committed by someone who is not the seller would so infect the sale or offer for sale to a consumer that the law would deem the practice to have been committed 'in' the sale or offer for sale") (citations omitted); *Pack & Process, Inc. v. Celotex Corp.*, 503 A.2d 646, 658 (Del. Super. Ct. 1985) ("Unlawful practice" under 6 Del. C. § 2513(a) of Delaware's consumer fraud statute that prohibits "[t]he act, use or employment by any person . . . in connection with the sale, lease or advertisement of any merchandise[,]" which "suggest[s] a broad interpretation of how involved with the distribution of merchandise a consumer has to be in order to bring a cause of action under the statute. The emphasis of the Consumer Fraud Act is on the unlawful practices of merchants and not on the specific relationship of the consumer to the alleged unlawful practice").

[271] 2014 U.S. Dist. LEXIS 24081 (D.V.I. Feb. 26, 2014).

[272] Def. TKH's Mot. to Dismiss, p. 23.

[273] *MRL*, 2014 U.S. Dist. LEXIS 24081, at *17 (citing *Katz v. Aetna Cas & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. Pa. 1992).

[274] *Ernest v. Morris*, 64 V.I. 627, 637-38 (V.I. 2016) (explaining that decisions of the District Court of the Virgin, Islands sitting as a federal trial court are "merely persuasive authority[,]" as are "Third Circuit decisions . . . if the case, was before that court on appeal from the District of Delaware, the District of New Jersey, the Eastern, Western, or, Middle Districts of Pennsylvania, or the District Court of the Virgin Islands sitting as a federal trial court"): *see Hamed v. Hamed*, 63 V.I. 529, 534-35 (V.I. 2015) (explaining in *dicta* that Appellate Division and Third Circuit decisions are, not binding on the Superior Court)).

*Aetna Cas. & Sur. Co.*,[275] the Third Circuit case that the District Court in *MRL* found "persuasive," the Third Circuit concluded that "[h]ad the Pennsylvania legislature wanted to create a cause of action for those not involved in a sale or lease, it would have done so."[276] The Third Circuit reached that conclusion after considering the statutory language of 73 PA. STAT. ANN. § 201-9.2(a), the provision pertaining to private actions under Pennsylvania's consumer protection statute, § 201-2, the provision setting forth definitions for "unfair or deceptive acts or practices" and " 'trade' and 'commerce,' " and § 201-3, the provision declaring "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . unlawful."[277] Significantly, that determination was based largely on the fact that 73 PA. STAT. ANN. § 201-9.2(a) "unambiguously permits only persons who have purchased or leased goods or services to sue."[278] However, the Virgin Islands CPL does not describe private actions the same; rather, 12A V.I.C. § 108 states that "a consumer may bring an action" and a "consumer" includes prospective, as well as actual, purchasers and lessees.[279] Moreover, the statutes are distinctly dissimilar in that plaintiffs under the Pennsylvania statute must "demonstrate reliance and resulting injury to establish a private cause of action,"[280] while plaintiffs have no burden of proof with respect to these

---

[275] 972 F.2d 53 (3d Cir. 1992).

[276] *Id.* at 55.

[277] *Id.*

[278] *Id.* (citing 73 PA. STAT. ANN. § 201-9.2(a)). 73 PA. STAT. ANN. § 201-9.2(a) provides:

> *Any person who purchases or leases* goods or services primarily for personal, family or household, purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result, of the use or employment by any person of a method, act or practice declared unlawful by section 3, of this act, *may bring a private action* to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages, sustained, but not less than one hundred dollars ($100), and may provide such additional relief as, it deems necessary or proper. The court may award to the plaintiff, in addition to other relief, provided in this section, costs and reasonable attorney tees. (emphasis added).

[279] 12A V.I.C. § 102(d).

[280] *Toy v. Metro. Life Ins. Co.*, 2004 PA Super 404, 863 A.2d 1, 10 (2004) ("[A] plaintiff must demonstrate reliance and, resulting injury to establish a private cause of action under any of the [Pennsylvania Uniform Trade Practices and, Consumer Protection Law]'s sections. Specifically, we stated that plaintiffs retain 'the burden of establishing a causal, connection to or

elements under the Virgin Islands CPL.[281] Further, the provisions declaring the unlawfulness of unfair or deceptive acts or practices contain vastly different language, with 73 PA. STAT. ANN. § 201-3 prohibiting "unfair or deceptive acts or practices in the conduct of any trade or commerce," as opposed to 12A V.I.C. § 101's prohibition against "any deceptive or unconscionable trade practice in the sale, lease, rental or loan or in the offering for sale, lease, rental, or loan of any consumer goods or services. . . ."[282] Of course, the Virgin Islands CPL and the Pennsylvania statute, like most state consumer protection statutes, are similar because they touch on the same subject, but their divergent statutory language makes clear that neither statute is "patterned" after the other so as to warrant an application of the "borrowed statute doctrine."[283] For this reason, the Court finds that the Third Circuit's ruling in *Katz* is neither "instructive" nor "persuasive."[284]

 Second, the District Court in *MRL* neglected to consider the Virgin Islands CPL as a whole, and instead isolated sections 101, 102(d) and (e) from the overall statutory scheme.[285] Rather than "give consistent

---

reliance on the alleged misrepresentations' of the defendant") (citations omitted), *aff'd*, 593 Pa. 20, 928 A.2d 186 (2007)).

[281] *See Island Insteel Sys.*, 296 F.3d at 204, 213-14 (discussing the elements required in consumer's private action, under the Virgin Islands CPL); 12A V.I.C. §§ 101, 102(a), 108.

[282] *Compare* 73 PA. STAT. ANN. § 201-3 *with* 12A V.I.C. § 101. Notably, sections 101-105, 110 of CPL are substantially, similar to sections 700-704, 706 of the New York City Consumer Protection Law, N.Y.C. ADMIN. CODE §§ 20-700 – 704, though private actions may be brought under the Virgin Islands CPL, while no private mechanism is provided, under the New York City law. *See Dimond v. Darden Rests., Inc.*, 2014 U.S. Dist. LEXIS 94004, at *17 (S.D.N.Y., July 9, 2014) (collecting cases).

[283] *Antilles Sch.*, 64 V.I. at 419 ("[W]here a Virgin Islands statute is patterned after a statute from another jurisdiction,, the borrowed statute shall be construed to mean what the highest court from the borrowed statute's jurisdiction, prior, to the Virgin Islands enactment, construed the statute to mean. . . . In other words, the purpose of the borrowed-statute, doctrine is to predict what the Legislature intended when it enacted a substantive law") (internal and other citations, omitted); *Dupigny*, 66 V.I. at 443 ("When statutes from other jurisdictions are substantially, similar to a Virgin Islands statute, this Court may look for guidance at how that jurisdiction's courts have interpreted, the similar statute") (citing *Ottley v. Estate of Bell*, 61 V.I. 480, 494 n.10 (V.I. 2014)).

[284] *Contra MRL*, 2014 U.S. Dist. LEXIS 24081, at *17-18.

[285] *In re Joseph*, 65 V.I. 217, 230 (V.I. 2016) ("[I]n interpreting a statute, 'we must do our best, bearing in mind the, fundamental canon of statutory construction that the words of a statute must be read in their context and with a view, to their place in the overall statutory scheme.' . . .

and harmonious effect to each . . . provision[,]"[286] the District Court focused primarily on CPL's definition of "consumer."[287] Indeed, the District Court made no mention of the interplay between the definition of "merchant" under section 102(e) and a consumer's private action under section 108(a)(2) and made no attempt to explain the apparent dichotomy between the plain meaning of those provisions and the court's ultimate conclusion.[288] On this point, the Court notes that the District Court made little attempt to conduct any analysis with respect to how the Supreme Court of the Virgin Islands would rule on the issue, despite that it was sitting in diversity and subject to the Erie doctrine,[289] and seemingly gave deference to how it believed the Third Circuit would rule instead.[290] This is relevant, considering the well-established position of the Supreme Court of the Virgin Islands in favor of standing.[291] As a result, the District

---

Accordingly, this Court must not 'confine itself to examining a, particular statutory provision in isolation' ") (internal quotation marks omitted) (internal and other citations omitted).

[286] *Heyliger v. People of the V.I.*, 66 V.I. 340, 353-354 (V.I. 2017) ("[T]he, '[s]tatutory text is to be interpreted to give consistent and harmonious effect to each of its provisions' ") (internal, quotation marks and citations omitted).

[287] *MRL*, 2014 U.S. Dist. LEXIS 24081, at *17 (framing the issue as whether "an indirect purchaser — someone who, did not buy the materials at issue directly from the defendant, but rather from a third party — is considered a 'purchaser, or lessee or prospective purchaser or lessee' for purposes of the Virgin Islands Code").

[288] *See id.*

[289] *Edwards v. HOVENSA, LLC*, 497 F.3d 355, 358-62, 49 V.I. 1133 (3d Cir. 2007) (holding that the District Court sitting in diversity, is subject to the *Erie* doctrine and thus is "bound to follow state law as announced by the highest state court. 'If the, highest court has not spoken to the issue, we can garner assistance from the decisions of the state's intermediate, appellate courts in predicting how the state's highest court would rule' ") (citing *Mosley v. Wilson*, 102 F.3d 85, 92 (3d Cir. 1996)); *see Brennan v. Norton*, 350 F.3d 399, 432 n.28 (3d Cir. 2003) ("In predicting how the highest court, of the state would resolve the issue, we must consider relevant state precedents, analogous decisions, considered dicta,, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would, decide the issue at hand"); *MRL Dev. I, LLC v. Whitecap Inv. Corp.*, No. 2013-48, 2014 U.S. Dist. LEXIS 4533, at *6-7 (D.V.I. Jan. 14, 2014) (prior proceeding in which the District Court states that it is "sitting in diversity").

[290] *See MRL*, 2014 U.S. Dist. LEXIS 24081.

[291] *See Rennie v. Hess Oil V.I. Corp.*, 62 V.I. 529, 550 (V.I. 2015) (The Supreme Court of the Virgin Islands "has, repeatedly held that statutes which are silent as to who has standing to bring suit should be broadly interpreted to, confer standing") (collecting cases); *Benjamin v. AIG Ins. Co. of P.R.*, 56 V.I. 558, 564 (V.I. 2012) (overruling "any, language in older opinions indicating that standing is jurisdictional").

Court's conclusion in *MRL* does not persuade the Court to stray from its initial conclusion.

■ Because the plain language of CPL is clear, the Court cannot, "under the pretext of statutory construction, read into the statute that which the legislature has not sought fit to include."[292] Consequently, the Court finds that CPL does not restrict actions by consumers against upstream manufacturers that are related to the ultimate transaction and who satisfy the definition of "merchant" under section 102(e).

### 3. Sufficiency of the factual allegations in the Complaint.

Having already concluded that the first element of the cause of action has been met, the Court must assess the sufficiency of the factual allegations in the Complaint with respect to the second and third elements: that the defendant is engaged in a deceptive or unconscionable trade practice and that the deceptive or unconscionable trade practice occurred in the context of a consumer transaction.

■ In the Complaint, Plaintiff alleges that TKH and Takata Japan manufactured the defective airbags that were installed in Honda vehicles and sold to Virgin Islands residents.[293] A vehicle, including its component parts, such as an airbag, is a consumer good if used or bought for personal, household, or family purposes. Though TKH and Takata Japan did not directly sell the airbags or vehicles containing the airbags to Virgin Islands consumers, as manufacturers of the airbags, TKH and Takata Japan fall within the definition of "merchant" under section 102(e) and thus within the purview of CPL. As to a showing of "deceptive trade practices," Plaintiff alleges that TKH and Takata Japan "made numerous affirmative deceptive statements about the nature of the defects plaguing its airbag inflators and the number of cars affected" to consumers, NHTSA, and Honda.[294] This conclusion is supported by numerous specific factual allegations throughout the Complaint, including, *inter alia*, that TKH and Takata Japan "produced testing reports that contained selective, incomplete, or inaccurate data[;]"[295] TKH and Takata Japan

---

[292] *In re Joseph*, 65 V.I. at 229 (citations omitted).

[293] Compl. ¶¶ 14-15, 31.

[294] Compl. ¶ 152.

[295] Compl. ¶¶ 143(c).

failed to disclose material information to Honda and NHTSA that would indicate the scope of the vehicles affected by the alleged defects or that TKH and Takata Japan "never determined how to remedy" or the "root cause" of the problem; and that "Takata's" website contained statements indicating that TKH and Takata Japan had "fully cooperat[ed] with NHTSA" and that the "airbags are high-performance and meet or exceed the legal regulations of countries around the world and the stringent requirements of the automakers[,]" when they did not.[296] Plaintiff alleges that TKH and Takata Japan's actions affected the recalls issued by Honda, NHTSA's investigation, and the information regarding the alleged defects that was available to consumers, which culminated in TKH and Takata Japan "unfairly t[aking] advantage of [Virgin Islands consumers'] lack of knowledge."[297] These facts, as pled, are sufficient to demonstrate that TKH and Takata Japan made representations that had the capacity, tendency, or effect of deceiving or misleading Virgin Islands consumers to purchase, or prospectively purchase, Honda vehicles containing TKH and Takata Japan's airbags on the erroneous belief that the defects had been remedied and made safe. Because the purported statements of TKH and Takata Japan occurred in relation to the sale of Honda vehicles containing the allegedly defective airbags to consumers, the final element is also satisfied by the facts stated in the Complaint.[298]

All three elements having been satisfied by the well-pled allegations of the Complaint, the Court concludes that the Complaint states a claim for deceptive or unconscionable trade practices under CPL. Consequently, the Court will deny TKH and Takata Japan's Motions to Dismiss with respect to Count II of the Complaint.

---

[296] Compl. ¶¶ 46-112, 121, 128 (deceptive statements made by TKH and Takata Japan to consumers through its, website), 118, 129 (deceptive statements made by TKH and Takata Japan to NHTSA), 46-49 (Takata Japan, manufactured PSAN-propelled inflators despite that they faded Takata's process validating testing), 50-52 (Takata, Japan altered test results so that the PSAN-propelled inflators would comply with Honda's "specific technical, specifications aimed at entrusing their safe and reliable performance").

[297] Compl. ¶ 154.

[298] *Accord Country Tweeds, Inc. v. FTC*, 326 F.2d 144 (2d Cir. 1964) (Manufacturers of cashmere coats and other, materials violated 15 U.S.C. § 45(a)(1) by deceptive advertising where they altered report prepared for them by United, States Testing Company on respective qualities of two brands of cashmere, and distributed altered form to their dealers, throughout United States. In its altered form, the report misrepresented quality of tested products as found by testing company).

### b. Consumer Fraud and Deceptive Business Practices Act.

#### 1. Statutory provisions of CFDBPA.

 Under CFDBPA, specifically 12A V.I.C. § 304, "[i]t is unlawful for any person to engage in unfair methods of competition or unfair or deceptive trade acts or practices in the conduct of any trade or commerce."[299] To state a claim under CFDBPA, a plaintiff must establish the following elements: (1) defendant is a "person" under CFDBPA; (2) defendant is engaged in unfair methods of competition, unfair, or deceptive trade acts or practices; and (3) that the unfair method of competition or deceptive trade act or practice occurred in the conduct of any trade or commerce. At the outset, the Court notes that private actions under CFDBPA are limited to class actions by "any person or business that is injured by a deceptive trade practice[,]" while a public action may be brought by the Department of Licensing of Consumer Affairs for declaratory and injunctive relief, "on behalf of one or more consumers for . . . actual damages[,]" and for "any . . . action provided by law."[300] As discussed, the Attorney General is statutorily authorized to bring suit on behalf of the Department of Licensing and Consumer Affairs.[301]

With respect to the first element, the definition of "person" under CFDBPA includes a "corporation."[302] As corporations, TKH and Takata Japan are susceptible to liability under CFDBPA. With respect to the second element, Plaintiff's alleges TKH and Takata Japan engaged in unfair or deceptive trade acts or practices.[303] CFDBPA defines "deceptive business practice" with the same language a "deceptive trade practice" under CPL,[304] though the statutes define the terms used in the definitions

---

[299] 12A V.I.C. § 304.

[300] 12A V.I.C. § 328(a)(1)-(5), (g).

[301] *Supra* n.230.

[302] 12A V.I.C. § 303(h) (" 'Person' means any natural person or his legal representative, partnership, corporation, domestic or foreign, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestui que trust thereof").

[303] *See* Compl. ¶¶ 165-169. As a result, it is not necessary for the Court to address unfair methods of competition under, CFDBPA.

[304] *Compare* 12A V.I.C. § 303(e) with 12A V.I.C. § 102(a). 12A V.I.C. § 303(e) provides:

"Deceptive business practice" means any false, falsely disparaging, or misleading oral or written statement, visual description or other representation of any kind made in

differently. Specifically, CFDBPA defines "sale" as "a revenue transaction where goods or services are delivered to a customer in return for cash or a contractual obligation to pay."[305] Under CFDBPA, "consumer" is defined to "mean[ ] any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household."[306] "Merchandise" is defined as "any article of commerce usually sold directly to the consumer."[307] "Consumer goods" is not defined, nor is an "unfair trade act or practice."[308]

Finally, the third element requires the "unfair or deceptive act or practice" occur "in the conduct of trade or commerce."[309] "Trade or commerce," as used in section 304 of CFDBPA, is defined as "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated."[310]

## 2. Statutory interpretation of CFDBPA.

TKH and Takata Japan argue that the definitions of "consumer," "sale," and "merchandise" indicate that liability under CFDBPA is limited to "the sale of a good usually sold directly to a consumer for use in the

---

connection with the sale, lease, rental, or loan of consumer goods or services, or in the extension of consumer credit or in the collection of consumer debts which has the capacity, tendency or effect of deceiving or misleading consumers.

While the Court recognizes the differing definitions under CFDBPA and CPL, the Court finds that its statutory construction of "deceptive trade practice" under CPL remains equally applicable to the construction of "deceptive business practice" under CFDBPA because the differing terms do not alter the plain meaning of the definition. Indeed, the definition of "sale" in CFDBPA largely reflects the common meaning of the word, as considered by the Court when interpreting CPL, and is immediately followed by other types of transactions, namely "lease, rental, or loan."

[305] 12A V.I.C. § 303(j).

[306] 12A V.I.C. § 303(d).

[307] 12A V.I.C. § 303(g).

[308] The definition of "unfair acts or practices" is informed by the definition under the FTCA. *See* 12A V.I.C. § 304 (The Legislature has instructed the Court to consider "the interpretations of the Federal Trade Commission and the federal courts relating to 15 U.S.C. § 45 *at the time of enactment of this chapter*" on May 17, 2006) (emphasis added).

[309] 12A V.I.C. § 304.

[310] 12A V.I.C. § 303(k).

consumer's household[.]"[311] Yet again, because neither the Supreme Court of the Virgin Islands, nor any other persuasive source, has interpreted CFDBPA, the Court must endeavor to ascertain the meaning of "consumer" and "merchandise" under CFDBPA by applying the standard governing statutory interpretation.[312]

■■■ First, the Court considers the definition of "consumer" under CFDBPA: "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household."[313] In looking to the common meaning of the words used in this definition, "purchase" means "to obtain by paying money or its equivalent,"[314] while "contracts" means making "a business arrangement for the supply of goods or services at a fixed price."[315] "Re-sale" means "the act of selling again usually to a new party," "a secondhand sale," and "an additional sale to the same buyer[,]"[316] while "ordinary course of business" means "as part of doing regular business."[317] With respect to the phrase "his use or that of a member of his household," "use" means "the act or practice of employing something" and "a method or manner of employing or applying something"[318] and "household" means "those who dwell under the same roof and compose a family" and "a social unit composed of those living together in the same dwelling."[319] Taken together, the plain and ordinary meaning of the words clearly denote that a "consumer" under CFDBPA is one who has bought, or is under contract to buy. merchandise, as defined

---

[311] Def. TKH's Mot. to Dismiss, p. 24. Though TKH and Takata Japan do not discuss the distinction between, "deceptive" and "unfair" trade acts or practices, the definitions under CFDBPA and FTCA, respectively, contain the, word "consumer," which in turn is defined under CFDBPA with the term "merchandise."

[312] *Supra* n.248.

[313] 12A V.I.C. § 303(d).

[314] https://www.merriam-webster.com/dictionary/purchase (last visited on May 23, 2017).

[315] https://www.merriam-webster.com/dictionary/contracts (last visited on May 23, 2017).

[316] https://www.merriam-webster.com/dictionary/resale (last visited on May 23, 2017).

[317] https://www.merriam-webster.com/dictionary/ordinary%20course%20of%20business (last visited on May 23, 2017).

[318] https://www.merriam-webster.com/dictionary/use (last visited on May 23, 2017).

[319] https://www.merriam-webster.com/dictionary/household (last visited on May 23, 2017).

by statute, that is to be used for the buyer's personal, family, or household purposes.[320]

Next, the Court considers the term "merchandise," which is defined under section 303(g) as "any article of commerce usually sold directly to the consumer."[321] In this context, the common meaning of "article" is "a member of a class of things[,]"[322] which here is "of commerce." "Commerce" is "the exchange or buying and selling of commodities on a large scale involving transportation from place to place."[323] "Usually" is derived from "usual," which commonly means "accordant with usage, custom, or habit," "commonly or ordinarily used," and "found in ordinary practice or in the ordinary course of events."[324] Merriam-Webster defines "directly" as "in a direct manner[,]" "in immediate physical contact[,]" "in the manner of direct variation[,]" "without delay[,]" and "in a little while."[325] "Direct" is defined, in pertinent part, as "to cause to turn, move, or point undeviatingly or to follow a straight course" and "to point, extend, or protect in a specified line or course."[326]

Considering the plain meaning of these words together, the Court concludes that the definition of "merchandise" under section 303(g) is ambiguous because the phrase "usually sold directly to the consumer" is susceptible to more than one interpretation. The first interpretation is that "merchandise" under section 303(g) encompasses items of commerce that are ordinarily sold immediately, without deviation, to consumers, as defined under CFDBPA. This interpretation essentially creates a contractual privity requirement between the consumer and defendant. However, the provision is susceptible to a second interpretation, namely, that

---

[320] Notably, this definition is more limited than the definition of "consumers" under CPL, which includes "prospective, purchasers" and "prospective lessees," as well as actual purchasers and lessees. *See* 12A V.I.C. § 102(d).

[321] 12A V.I.C. § 303(g).

[322] https://www.merriam-webster.com/dictionary/article (last visited on May 23, 2017).

[323] https://www.merriam-webster.com/dictionary/commerce (last visited on May 23, 2017).

[324] https://www.merriam-webster.com/dictionary/usually (last visited May 23, 2017).

[325] https://www.merriam-webster.com/dictionary/directly (last visited on May 23, 2017). Black's Law Dictionary defines "directly" as "[i]n a straightforward manner[,]" "[i]n a straight line or course," or "[i]mmediately[,]" while, "direct" is defined as "straightforward[,]" "[f]ree from extraneous influence; immediate[,]" or "[t]o cause (something, or someone) to move on a particular course." BLACK'S LAW DICTIONARY 527, 525 (9th ed. 2009), *Gov't of the V.I. v. Takata Corp., et al.*

[326] https://www.merriam-webster.com/dictionary/direct (last visited on May 23, 2017).

"usually sold directly to the consumer" does not impose a contractual privity requirement, but instead functions to limit the scope of CFDBPA to transactions involving consumer goods. This interpretation coincides with CFDBPA's definition of "consumer," which requires the "article of commerce" not be purchased "for resale in the ordinary course of . . . [the consumer's] business."[327]

The first interpretation is at odds with legislative intent, which requires that "[t]he provisions of [CFDBPA] . . . be liberally construed to protect the consuming public from deceptive and unfair acts or practices in the conduct of any trade or commerce[,]"[328] particularly considering the broad definition of "trade or commerce" under CFDBPA. Further, the Legislature has instructed the Court to consider interpretations under FTCA, which does not impose a contractual privity requirement on the consumer and defendant.[329] Notably, FTCA does not define "consumer[,]"[330] nor does it provide explicit scope limitations on the consumer transactions within its purview.[331] The Virgin Islands Legislature deviated from this model by specifically describing the types of transaction subject to CFDBPA. Interpreting "merchandise" under CFDBPA as a scope limitation on the type of transactions subject to the Act is in line with CFDBPA's remedial purpose, while imposing contractual privity as a standing requirement is not.

██ ██ Considering this, and in light of the remedial purpose of CFDBPA,[332] the Court cannot conclude that the use of the phrase "usually sold directly to the consumer" in CFDBPA's definition of

---

[327] *See* 12A V.I.C. § 303(d).

[328] 12A V.I.C. § 302.

[329] *See* 12A V.I.C. § 304; FEDERAL TRADE COMMISSION LAW PRACTICE AND PROCEDURE §§ 6.03, 14.04 (Law Journal Press, 2017); Stephen B. Burbank, Sean Farhang, & Herbert M. Kritzer, Article, *Private Enforceinent*, 17 LEWIS & CLARK L. REV. 637, 705 (2013) ("All of the 50 states have some form of general statute dealing with UDAP [unfair and deceptive acts or practices] issues, often referred to as 'little FTC Acts.' These acts vary from state to state, with regard, both to scope and to enforcement provisions. A 2009 report prepared for the National Consumer Law Center (NCLC) describes these variations and provides a chart summarizing some of the key differences among the states which we, include as an Appendix").

[330] *See* 15 U.S.C. § 45; *FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 937 (N.D. Ill. 2008).

[331] *W. Star Trucks, Inc. v. Big Iron Equip. Serv.*, 101 P.3d 1047, 1053-54 (Alaska 2004) ("It is clear that 15 USCS § 45(a)(1) is not limited to consumer transactions").

[332] 12A V.I.C. § 302.

"merchandise" requires the individual also be in contractual privity with the defendant in order to qualify as a "consumer" under CFDBPA. Such a requirement would lead to absurd consequences in direct contravention of the Legislature's stated intent, particularly in public actions brought by the Attorney General on behalf of the Government of the Virgin Islands for the purpose of protecting the Virgin Islands public at large. As the Supreme Court of Vermont aptly stated:

> [A] privity requirement would seriously undermine the utility of the [Vermont Consumer Fraud] Act. Virtually all of the representations about the quality and features of a modern automobile are made by manufacturers, most through national and regional media advertisements. If we enforced a privity requirement, the consumer could not reach the perpetrator of consumer fraud.[333]

Like the Supreme Court of Vermont, the Court finds a liberal construction of CFDBPA "to protect the consuming public from deceptive and unfair acts or practices in the conduct of any trade or commerce" requires the Court to decline from imposing a contractual privity requirement between the consumer and defendant under the Act.[334] In the Court's view, legislative intent is best evinced by interpreting the phrase "usually sold directly to the consumer" in the definition of "merchandise" as a scope limitation on the type of consumer transactions subject to CFDBPA, namely those involving the purchase, or contract to purchase, "articles of commerce" used for personal, household, or family purposes.

This conclusion is consistent with the statutory scheme of CFDBPA as a whole. A contractual privity requirement cannot be inferred from a statutory definition of "seller" or "defendant," since CFDBPA provides no such definition.[335] Likewise, CFDBPA affords "any person or business that is injured by a deceptive trade practice" the right to "bring a class action to protect the rights of Virgin Islands consumers" for damages, but notably, provides no parameters indicating that only defendants in contractual privity with consumers are susceptible to liability under

---

[333] *Elkins v. Microsoft Corp.*, 174 Vt. 328, 332, 817 A.2d 9 (2002) (discussing 9 V.S.A. § 2451 *et seq.*).
[334] *See* 12A V.I.C. § 302.
[335] *See* 12A V.I.C. § 302.

CFDBPA.[336] Moreover, section 328 of CFDBPA permits the Department of Licensing and Consumer Affairs to bring "[a]n action to enjoin any person who has violated, is violating, or is otherwise likely to violate, this Chapter[,]"[337] but a "likely" violation of CFDBPA would ordinarily occur prior to the transaction, and thus before contractual privity is formed between the parties. Finally, the construction coincides with the definitions of "consumer" and "deceptive business practice," both of which indicate that CFDBPA applies to consumer transactions for the sale of articles of commerce that are for personal, family, or household use.[338]

▮ For these reasons, the Court concludes that the Legislature did not intend for an individual to qualify as a "consumer" only where contractual privity exists between the individual and defendant, but rather that the Legislature intended the phrase "usually sold directly to the consumer" in the definition of "merchandise" to limit the scope of CFDBPA to consumer transactions, as opposed to general commercial transactions, such as those between a manufacturer and distributor.[339]

### 3. Sufficiency of the factual allegations in the Complaint.

▮ The Court has already concluded that the first element of a cause of action under CFDBPA has been met. The second and third elements under CFDBPA require the facts alleged in the Complaint to plausibly suggest that the defendant engaged in unfair or deceptive trade acts or practices, which occurred in the conduct of any trade or commerce. The factual allegations, as described above with respect to Plaintiff's claim under CPL, satisfy these elements as to Virgin Islands residents who purchased or were under contract to purchase vehicles containing the allegedly defective airbags for their personal, family, or household use. Further, nothing in CFDBPA requires Plaintiff the Government of the

---

[336] *Compare* 12A V.I.C. § 331 with KY. REV. STAT. § 367.220(1).

[337] 12A V.I.C. § 328(a)(2).

[338] 12A V.I.C. § 303(e) (defining "deceptive business practice" as being "made in connection with the sale, lease, rental or loan of *consumer goods or services*") (emphasis added); 12A V.I.C. § 303(d).

[339] The Court recognizes that CFDBPA contains provisions that resemble, but are not identical to, those under 73 PA. STAT. ANN. § 201-1 *et seq.* However, the Court still finds the ruling in *MRL* unpersuasive because the District Court's analysis in *MRL* was limited to the plaintiff's statutory standing under CPL, not CFDBPA. *See MRL*, 2014 U.S. Dist. LEXIS 24081, at *16-20.

Virgin Islands to prove actual damages or an economic injury in order bring an action under CFDBPA. Indeed, section 328 explicitly makes a variety of types of relief available to the government, including, inter alia, injunctive relief to "enjoin any person . . . likely to violate, this chapter[,]"[340] which may well occur before actual damages are sustained.

Consequently, the Complaint states a claim for consumer fraud under CFDBPA, and the Court will deny TKH and Takata Japan's Motions to Dismiss as to Count III of the Complaint.

### C. Count IV: Public Nuisance.

In Count IV of the Complaint, Plaintiff alleges that TKH and Takata Japan have created a public nuisance in the Virgin Islands and seeks an Order "providing for abatement of Defendants' public nuisance by compelling Defendants to engage in a robust public education effort to ensure that affected consumers are aware of the potential hazards of their Takata Airbags and the availability of repairs to replace these airbags [.]"[341] TKH and Takata Japan argue that the Complaint fails to state a claim for public nuisance because the presence of allegedly defective airbags in "7,000 vehicles in the U.S. Virgin Islands" does not constitute interference with a public right, but even if it does, the interference is not significant or unreasonable.[342] Further, TKH and Takata Japan contend that "public nuisance is not the proper cause of action through which to secure a remedy" because it would improperly blur "the boundary between public nuisance law and product liability[,]" and, in any event, "TKH is already engaging in the . . . remedial action" sought by Plaintiff "in response to the NHTSA recall order" by creating a website "with up-to-date information relating to the on-going airbag recalls" and launching "a digital advertising campaign to reach owners of recalled vehicles. . . ."[343] In opposition, Plaintiff argues that the presence of the allegedly defective airbags interferes with the public's right to public safety, not only to the owners of the 7,000 vehicles containing the airbags, but to all drivers "on roads

---

[340] 12A V.I.C. § 328(a).

[341] Compl. ¶¶ 170-176, 187(e).

[342] Def. TKH's Mot. to Dismiss, pp. 26.

[343] Def. TKH's Mot. to Dismiss, p. 28.

throughout the territory. "[344] Plaintiff contends this "massive threat to public safety" constitutes significant and unreasonable interference because TKH and Takata Japan rendered the airbags, "one of the most important safety devises a car has," unreliable, despite knowing "of PSAN's dangerous properties from the beginning[,]" and "expended considerable effort to misrepresent to and conceal that fact from Honda, NHTSA, and the public" in violation of Virgin Islands law.[345] Finally, Plaintiff claims that its request for relief is proper because, not only are TKH's efforts to comply with NHTSA's directives outside the pleadings, and thus not properly considered when deciding a motion to dismiss, they are beyond the Court's authority "to determine the nature of or enforce that campaign" and "TKH has not shown that [its] . . . customer outreach" targets or addresses the Virgin Islands.[346]

■ With respect to civil liability for a public nuisance, the Superior Court has adopted the definition of "public nuisance" set forth in the RESTATEMENT (SECOND) OF TORTS § 821B(1).[347] Under this rule, "a public nuisance is 'an unreasonable interference with a right common to the general public.' "[348] In addition, Section 821B(2) of the Restatement states that "[c]ircumstances that may sustain a holding that an interference with a public right is unreasonable include[,]" *inter alia*, "conduct [that] involves a significant interference with the public health . . . [or] public safety[,] . . . conduct [that] is proscribed by a statute, ordinance or administrative regulation, or . . . conduct [that] is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public

---

[344] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, pp. 28-30.

[345] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, p. 30.

[346] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, p. 32.

[347] *Bell v. Radcliffe*, 2014 V.I. LEXIS 119, at *22-24 (V.I. Super. Ct. Apr. 30, 2014) (conducting the requisite analysis, mandated in *Banks*, 55 V.I. at 967 with respect to the definition of public nuisance); *but see Sickler v. Mandahl Bay Holding, Inc.*, 2014 V.I. LEXIS 39, at *20 (V.I. Super. Ct. July 7, 2014) (applying the definition of public nuisance in, 14 V.I.C. § 1461 in a civil proceeding because "[t]his statute has been interpreted as declaring the standard common, law definition of public nuisance" rather than conduct a *Banks* analysis) (citations omitted). Having reviewed the Superior Court's *Banks* analysis in *Bell v. Radcliffe* and agreeing with the methodology and conclusions of same, the Court hereby adopts the standard articulated in that case. *See Bell*, 2014 V.I. LEXIS 119, at *22-24.

[348] RESTATEMENT (SECOND) OF TORTS § 821B(1) (1979).

right."[349] While the Superior Court has yet to explicitly adopt Section 821B(2), the Court finds it instructive because it mirrors aspects of the crime of public nuisance under the Virgin Islands Code, as well as public nuisance under the general common law.[350]

First, the Court considers the interference with a public right requirement. Public safety, which includes the public right of safe passage on public highways, has long been recognized as a right common to the public.[351] The threat of impending danger to the public is sufficient to constitute an interference with the right of public safety.[352] Despite TKH and Takata Japan's suggestion, Plaintiff is not required to show actual injury or death, so long as the facts sufficiently demonstrate a public right is threatened. Further, "[i]t is not . . . necessary that the entire community be affected by a public nuisance, so long as the nuisance will interfere

---

[349] RESTATEMENT (SECOND) OF TORTS § 821B(2)(a)-(c).

[350] 14 V.I.C. § 1461; see 14 V.I.C. § 1462 (setting forth the criminal punishment for "willfully omit[ting] to perform, any legal duty relating to the removal of a public nuisance" where "no punishment [for maintaining or committing a, public nuisance] is prescribed elsewhere in this title or other law"). Notably, the criminal definition of public nuisance, does not dictate the law governing the civil tort of public nuisance. 58 AM. JUR. 2D Nuisances § 27 (2017) ("The codification of certain common law nuisances in a state criminal code and a legislative declaration that certain other, conditions constitute nuisances does not exclude common law nuisances not codified therein from being classed as, public nuisances") (footnotes omitted); RESTATEMENT (SECOND) OF TORTS § 821B cmt. d ("The defendant may be liable in tort though immune to criminal prosecution" for a public nuisance) (citing Urie v. Franconia Paper Corp., 107 N.H. 131, 218 A.2d 360 (1966); State ex rel. Board of Comm'rs v. WOR-TV Tower, 39 N.J. Super. 583, 121 A.2d, 764 (1956)) (other citations omitted).

[351] Gov't of the V.I. v. Latalladi, 8 V.I. 137, 141 (Mun. Ct. 1970) (noting that 14 V.I.C. §§ 1461-1462 "seems declaratory of the common law which defines a public nuisance as 'the doing of or the failure to do something that, injuriously affects the safety, health, or morals of the public or works some substantial annoyance, inconvenience or injury to the public' ") (citations omitted).

[352] See RESTATEMENT (SECOND) OF TORTS § 821B cmt. i ("[F]or damages to be awarded [in public nuisance cases], significant harm must have been actually incurred, while for an injunction harm need only be threatened and need not, actually have been sustained at all"); 5 J. Pomeroy, A Treatise on Equity Jurisprudence and Equitable Remedies, § 1937 (§ 523), at 4398 (2d ed. 1919) (noting that while "a mere possibility of a future nuisance will not support an, injunction," relief will be warranted when "the risk of its happening is greater than a reasonable man would incur"); Michigan v. United States Army Corps of Eng'rs, 667 F.3d 765, 781 (7th Cir. 2011) (threat of injury may constitute, public nuisance under federal law).

with those who come in contact with it in the exercise of a public right or it otherwise affects the interests of the community at large."[353]

Here, Plaintiff asserts that 7,000 vehicles in the Virgin Islands potentially contain PSAN-propelled airbags manufactured by TKH.[354] According to Plaintiff, PSAN is a "dangerous and unstable propellant" with combustion properties that can be altered by the PSAN's absorption of moisture, which can cause the airbag inflator to rupture, "sending metal fragments through the airbag and into the vehicle's occupants at lethal velocities[,]" and that the risk of rupture is greatest over "several years of exposure to persistent conditions of high humidity."[355] The factual allegations suggest that the hazard posed by the PSAN-propelled airbags is present when the vehicles are operated properly and lawfully, even when driving at a significantly low speed of five miles per hour.[356] Considering the Virgin Islands' year-round tropical climate increases the risk of injury and death posed by TKH and Takata Japan's PSAN-propelled airbags, Plaintiff alleges these vehicles pose grave harm to the safety of persons traveling on Virgin Islands roadways.[357] Significantly, Plaintiff alleges that TKH and Takata Japan engaged in a years long "cover up" of the alleged defect, whereby TKH and Takata Japan misled the public, federal regulators, distributors and retailers of the vehicles containing the allegedly defective airbags regarding the scope and nature of the defect.[358] According to the Complaint, this resulted in inadequate recalls by Honda, as well as an inadequate dissemination of information to the consuming public, which caused the Virgin Islands public to unwittingly continue to purchase vehicles containing the allegedly defective and hazardous airbags with no knowledge of the risks associated therewith.[359] From the facts alleged, the Court can reasonably infer that TKH and Takata Japan's conduct prevented Virgin Islands residents from recognizing the risks posed by the allegedly defective airbags when purchasing vehicles and remedying the defect for years,

---

[353] RESTATEMENT (SECOND) OF TORTS § 821B cmt. g.

[354] Compl. ¶ 31.

[355] Compl. ¶¶ 22-25.

[356] Compl. ¶¶ 23-31.

[357] Compl. ¶¶ 27, 173-175.

[358] Compl. ¶¶ 21-130.

[359] Compl. ¶¶ 21-130.

which, as discussed, increases the risk that the airbag inflator will rupture in the Virgin Islands' persistent tropical climate.

Accepting these facts as true, the Court finds the allegations in the Complaint sufficiently demonstrate that TKH and Takata Japan's conduct interferes with a public right by threatening the right of public safety on public highways in the Virgin Islands. Despite TKH and Takata Japan's contention, this threat to public safety is not limited to the 7,000 owners of vehicles containing the allegedly defective airbags. The danger extends to all drivers and occupants of the vehicles containing the airbags, as well as other drivers on the public roadways and even pedestrians. Not only could the metal fragments shot from an exploding PSAN-propelled airbag injure the non-owner driver and occupants of the vehicle, but a driver injured or panicked by the explosion poses a potential danger to other drivers and pedestrians also using territory's public roadways.

Next, the Court must determine whether TKH and Takata Japan's interference with public safety is unreasonable. TKH and Takata Japan's alleged participation in the "cover up" of the defect for over a decade clearly falls within conduct that is proscribed by Virgin Islands statute, namely CPL, CFDBPA, and CICO.[360] Additionally, these facts plausibly suggest that TKH and Takata Japan's actions produced a long-lasting effect, which TKH and Takata Japan had reason to know had a significant impact upon the right of public safety in the Virgin Islands. As a result, TKH and Takata Japan's conduct, as alleged, falls squarely within circumstances demonstrating unreasonable interference under Section 821B(2) of the Restatement (Second) of Torts.

In general, courts also require the plaintiff make some showing of causation that links the defendant to the creation or maintenance of the public nuisance. When the tort of public nuisance is based on Section 821B, courts have expansively construed the causation requirement in

---

[360] Compl. ¶¶ 47 (alleging "Takata['s] process validation analysis of the PSAN-propelled PSDI inflator, completed in, January 2000 . . . uncovered a number of problems — the very same problems predicated in Takata's own patent, application [in 1999]"), 51-52 ("[T]he data points sent to Honda [by Takata Japan] in the June 15, 2000 report were, simply made up"); 129 (alleging "Takata" made deceptive statements to NHTSA, which were made available to the public on NHTSA's website in 2015); *see generally* Compl. ¶¶ 21-130, 131-144 (regarding alleged violations of CICO, 14 V.I.C. § 600 *et seq.*), 145-157 (regarding alleged violations of CPL, 12A V.I.C. § 101 *et seq.*), 158-168 (regarding alleged violations of CFDBPA, 12A V.I.C. § 301 *et seq.*).

accordance with the broad language of the Restatement provision.[361] Some courts in other jurisdictions address "causation" in public nuisance claims in terms of an additional "control" element by requiring the plaintiff to demonstrate that each defendant had "control over the instrument that caused the nuisance."[362] This is often fatal to public nuisance claims against "product manufacturers or distributors . . . because the defendants no longer have the ability to end the conduct alleged to constitute the nuisance."[363] Notably, however, Section 821B does not include a "control" element.[364] The Ohio Supreme Court and the California Supreme Court, which have "adopted the interpretation of nuisance as set forth in the Restatement (Second) of Torts," do not require an element of control.[365] Instead of focusing on whether the defendant had control of the product the time the actual harm occurred, these courts focus on whether the defendant's acts caused, or are likely to cause, an unreasonable invasion of a public right.[366]

---

[361] *See City of Cincinnati v. Beretta U.S.A. Corp.*, 95 Ohio St. 3d 416, 2002-Ohio-2480, 768 N.E.2d 1136, 1142 (2002).

[362] *Ileto v. Glock Inc.*, 349 F.3d 1191, 1212 (9th Cir. 2003) (citations omitted); Victor E. Schwartz & Phil Goldberg, Article, *The Law of Public Nuisance: Maintaining Rational Boundaries on a Rational Tort*, 45 WASHBURN L.J. 541, 567 (2006) (discussing the element of control in public nuisance claims); *see State v. Lead Indus. Ass'n*, 951 A.2d, 428, 446-47 (R.I. 2008) (discussing the requisite element of control in a public nuisance claim in Rhode Island).

[363] Donald G. Gifford, Article, *Public Nuisance as a Mass Products Liability Tort*, 71 U. CIN. L. REV. 741, 820 (2003)).

[364] *See* Peter Tipps, Note, Controlling the Lead Paint Debate: Why Control is Not an Element of Public Nuisance, 50 B.C. L. REV. 605, 607 (2009) ("Of course, states are free to develop their own common law, but those that profess to, adopt the RESTATEMENT (SECOND) OF TORTS view on public nuisance do not remain faithful to that view by imposing a, control element"); *infra* n.365.

[365] *Ileto*, 349 F.3d at 1212 (citing *City of Cincinnati*, 768 N.E.2d at 1142); *People ex rel. Gallo v. Acuna*, 14 Cal. 4th, 1090, 1105, 60 Cal. Rptr. 2d 277, 285, 929 P.2d 596, 604 (1997); *See City of Milwaukee v. NL Indus.*, 2008 WI App 181, 315 Wis. 2d 443, 498, 762 N.W.2d 757 n.20 (noting that a public nuisance claim under Wisconsin law does not encompass an element of, control); *In re Lead Paint Litigation*, 191 N.J. 405, 924 A.2d 484, 510 (2007) (Zazzali, C.J., dissenting) (concluding that control, over the nuisance is not a necessary element of a public nuisance claim at common law); Tipps, *supra* n.364, at 625, & n.173 (collecting cases).

[366] *In re Firearm Cases*, 126 Cal. App. 4th 959, 988, 24 Cal. Rptr. 3d 659, 680 (2005) ("Although it is not necessary to show that harm actually occurred, plaintiffs must show that a defendant's acts are likely to cause a significant invasion of a public right . . . . [However,

■ While Virgin Islands courts have not addressed whether a separate "control" element is necessary to state a claim for a public nuisance, the Court need not decide this issue now. Even assuming, arguendo, a "control" element is required, the Complaint contains sufficient facts to demonstrate both "control" and "causation." While Plaintiff's allegations undeniably stem from the existence of the defect, Plaintiff alleges that the public nuisance is caused by the lack of information afforded to the public regarding the defect as a result of TKH and Takata Japan's systematic concealment and misrepresentation of the defect. It can reasonably be inferred from the facts alleged in the Complaint that TKH and Takata Japan controlled and continued to control the information available to the public regarding the defect. Thus, the Complaint is sufficient in demonstrating both the "control" and "causation" elements.

As TKH and Takata Japan point out, courts commonly reject product-based public nuisance claims on the grounds that they sound in products liability and impermissibly seek to circumvent "the basic requirements of products liability law."[367] However, some courts have distinguished public nuisance claims from those that sound in product liability when presented with facts that demonstrate the manufacturer defendant's "affirmative conduct . . . assisted in the creation of a hazardous condition" as opposed to the "mere manufacture and distribution of [a product] or . . . failure to warn of its hazards."[368] For example, in concluding that the complaint contained sufficient allegations to state a claim for public nuisance against manufacturers of lead paint, a California Court of Appeals explained:

---

m]erely engaging in what plaintiffs deem to be a risky practice, without a connecting causative link to a threatened harm, is not a public nuisance") (citations omitted); *see City of Cincinnati*, 95 Ohio St. 3d 416, 2002- Ohio 2480, 768 N.E.2d 1136, 1142.

[367] *Lead Indus. Ass'n*, 951 A.2d at 456 (citations omitted).

[368] *See Cty. of Santa Clara v. Atl. Richfield Co.*, 137 Cal. App. 4th 292, 309-10, 40 Cal. Rptr. 3d 313 (2006); *In re Methyl, Tertiary Butyl Ether Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 628 (S.D.N.Y. 2001); *see also Smith & Wesson Corp. v. City of Gary*, 875 N.E.2d 422, 431 (Ind. Ct. App. 2007) (defendant manufacturers, distributors, and dealers of, handguns intentionally supplied, participated in, or ignored the illegal purchase of handguns, resulting in "a large, number of handguns in the hands of persons who present a substantial danger to public safety in the City of Gary," were "sufficient to allege an unreasonable chain of distribution of handguns sufficient to give rise to a public, nuisance generated by all defendants" at the motion to dismiss stage).

> [L]iability is premised on defendants' promotion of lead paint for interior use with knowledge of the hazard that such use would create. This conduct is distinct from and far more egregious than simply producing a defective product or failing to warn of a defective product; ... Because this type of nuisance action does not seek damages but rather abatement, a plaintiff may obtain relief before the hazard causes any physical injury or physical damage to property. ... In contrast, a products liability action may be brought only by one who has already suffered a physical injury to his or her person or property, and the plaintiff in a products liability action is limited to recovering damages for such physical injuries. A products liability action does not provide an avenue to prevent future harm from a hazardous condition, and it cannot allow a public entity to act on behalf of a community that has been subjected to a widespread public health hazard.[369]

Here, TKH and Takata Japan contend that Plaintiff has brought a product liability claim under the guise of public nuisance because liability is based on alleged harm caused by TKH and Takata Japan's product. However, this argument ignores the crux of Plaintiff's allegations, which largely pertain to TKH and Takata Japan's conduct in affirmatively misrepresenting and concealing information regarding a known hazardous defect, rather than TKH and Takata Japan's initial manufacture and placement of the defective product in the stream of commerce. Further, Plaintiff does not seek damages for physical injuries incurred as a result of TKH and Takata Japan's allegedly defective airbags, but rather abatement of the dangers posed by TKH and Takata Japan's purported misrepresentation and concealment. Because Plaintiff's claim differs from a products liability claim, the concern that "nuisance law would become a monster that would devour in one gulp the entire law of tort"[370] is not implicated here.

█ Finally, the Court considers Plaintiff's requested relief of abatement. It is well established that governments may seek the

---

[369] *Cty. of Santa Clara*, 137 Cal. App. 4th at 309-10 (internal and other citations omitted).
[370] *Camden County Board of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 540 (3d Cir. N.J. 2001) (citing *Tioga Public Sch. Dist. v. U.S. Gypsum Co.*, 984 F.2d 915, 921 (8th Cir. 1993)).

abatement of a public nuisance.[371] Whether a nuisance can be abated is a question of fact.[372] Indeed, "[i]n a nuisance case, abatement is a discretionary decision for the judge after the case has been tried and the jury discharged[,] . . . according to the facts and circumstances of the particular case."[373] The relief requested by Plaintiff is permissible under the law governing public nuisance, and any further adjudication regarding the viability of implementing the relief requested by Plaintiff is premature at the motion to dismiss stage of the proceedings.

Considering the Complaint contains sufficient facts to plausibly give rise to an entitlement of relief for a public nuisance, the Court concludes that Count IV states a claim upon which relief can be granted.

### D. Count V: Fraudulent Concealment.

In Count V of the Complaint, Plaintiff alleges that TKH and Takata Japan are liable for the tort of fraudulent concealment.[374] TKH and Takata Japan contend this count must be dismissed because Plaintiff fails to allege facts demonstrating injury, an essential element of the fraudulent concealment claim.[375] Plaintiff counters that the Complaint sufficiently pleads an "injury" by alleging "TKH economically devalued the [7000] vehicles driven by Virgin Islands residents equipped with those defective airbags" and that "the manifestation defense does not apply because the airbags are defective."[376]

 As TKH and Takata Japan point out, a party alleging fraud is subject to the heightened pleading requirements of V.I. R. Civ. P. 9(b).[377]

---

[371] *See* Restatement (Second) of Torts §§ 821C, 821B cmt. i; Am. Jur. 2d, *supra* n.350, § 205 (footnotes omitted).

[372] *See e.g., Christian v. Atl. Richfield Co.*, 2015 MT 255, 380 Mont. 495, 515, 358 P.3d 131 (2015); *Gulf C. & S. F. R. Co. v. Belton*, 57 Tex. Civ. App. 460, 469, 122 S.W. 413, 417 (1909); *Gray v. Westinghouse Elec. Corp.*, 624 N.E.2d 49, 53 (Ind. Ct. App. 1993); *Sharon Steel Corp. v. Fairmont*, 175 W. Va. 479, 488, 334 S.E.2d 616, 626 (1985).

[373] Am. Jur. 2d, *supra* n.350, § 271 (footnotes omitted).

[374] Compl. ¶¶ 177-181.

[375] Def. TKH's Mot. to Dismiss, pp. 28-29.

[376] Pl.'s Opp'n to TKH's Mot. to Dismiss, p. 32.

[377] V.I. R. Civ. P. 9(b) contains identical language to Fed. R. Civ. P. 9(b). *Compare* V.I. R. Civ. P. 9(b) with Fed. R. Civ. P. 9(b). As a result, prior precedent of Virgin Islands courts applying the heightened pleading requirements for, allegations of fraud under Fed. R. Civ. P. 9(b) remains applicable.

Under this standard, a pleader is not necessarily required to "set forth the date, time, and place of the alleged fraud or misrepresentation," but the pleader must "otherwise inject precision or some measure of substantiation into a fraud allegation."[378] In their briefs, the parties do not recite the elements of a fraudulent concealment claim. The Court suspects that this is because the Supreme Court of the Virgin Islands has not issued an opinion specifically defining the elements of a fraudulent concealment claim, nor has a *Banks* analysis been conducted by the Superior Court.[379] However, the Superior Court has held that the principle of "fraud" in the Virgin Islands "expresses itself as a cause of action for fraudulent misrepresentation."[380] *Banks* analyses have been conducted by the Superior Court with respect to claims for fraudulent misrepresentation and negligent misrepresentation.[381] The rule governing fraudulent misrepresentation in the Virgin Islands is particularly relevant here because "there is no clear line of demarcation between" that claim and a claim for fraudulent concealment.[382] Applying the "soundest rule fir the Virgin Islands" in regard to a claim for fraudulent misrepresentation, which slightly modifies the definition of fraudulent misrepresentation

---

[378] *Merchs. Commercial Bank v. Oceanside Vill., Inc.*, 64 V.I. 3, 24 (Super. Ct. 2015) (internal quotation marks and citations omitted).

[379] While the Court understands that the pending motions have required extensive briefing by the parties, this does not negate their duties under V.I. R. CIV. P. 11 and the Virgin Islands Rules of Professional Conduct to "fully brief all questions of law relevant to the issues that are being litigated, including all three *Banks* factors." *Antilles Sch., Inc. v. Lembach*, 64 V.I. at 428 n.13 (citations omitted); *see People of the V.I. v. Armstrong*, 64 V.I. 528, 536 n.6 (V.I. 2016). For years, this Court has repeatedly warned litigants that their failure to properly brief their arguments in accordance with the mandates of *Banks*, 55 V.I. 967, may result in an imposition of sanctions. *See, e.g., SBRM COA, LLC v. Morehouse Real Estate Invs., LLC*, 62 V.I. 168, 190 n.75 (Super. Ct. 2015); *Benjamin v. Coral World VI, Inc.*, 2014 V.I. LEXIS 35, at *14-16 n.38 (V.I. Super. Ct. June 12, 2014); *People of the V.I. v. Willis*, 61 V.I. 60, 74 n.37 (Super. Ct. 2014).

[380] *Merchs. Commercial Bank*, 64 V.I. at 16; *see Harbison v. Auto Depot, LLC*, 2017 V.I. LEXIS 75, at *8 (V.I. Super. Ct. May 24, 2017) (citations omitted).

[381] *Merchs. Commercial Bank*, 64 V.I. at 17-22, 25-30 (conducting the requisite analyses mandated in *Banks*, 55 V.I. 967 with respect to claims for fraudulent misrepresentation and negligent misrepresentation).

[382] *Lock v. Schreppler*, 426 A.2d 856, 859 n.* (Del. Super. Ct. 1981) (citing 37 AM. JUR. 2D, *Fraud and Deceit*, § 2).

under Section 525 of the RESTATEMENT (SECOND) OF TORTS (1979),[383] the Superior Court has held:

> To state a claim for fraudulent misrepresentation, a plaintiff must plead that the defendant (1) made a misrepresentation of fact, opinion, intention, or law (2) that the defendant either knew or had reason to know was false, (3) and that was made for the purpose of inducing plaintiff to act or refrain from acting on it, and (4) that plaintiff suffered pecuniary loss caused by the his or her justifiable reliance on the misrepresentation.[384]

Importantly, however, claims for fraudulent misrepresentation and fraudulent concealment do not necessarily encompass identical elements.[385] As a result, the Court must undertake the three-part analysis delineated in *Banks* in order to ascertain the parameters of a claim for fraudulent concealment in the Virgin Islands.[386] In so doing, the Court must balance the following nondispositive factors set forth in *Banks*:

> (1) whether any Virgin Islands courts have previously adopted a particular rule;
> (2) the position taken by a majority of courts from other jurisdictions; and

---

[383] *Merchs. Commercial Bank*, 64 V.I. at 22. Having reviewed the Superior Court's *Banks* analysis in *Merchs. Commercial Bank v. Oceanside Vill., Inc.* and agreeing with the methodology and conclusions of same, the Court hereby adopts the standards articulated in that case. *See id.* at 17-22.

[384] *Big Bear Construction, Inc. v. Hoford*, 2016 V.I. LEXIS 2, at *14-15 (V.I. Super. Ct. Jan. 15, 2016) (citing *Merchs. Commercial Bank*, 64 V.I. at 17-22).

[385] *See Knights of Columbus Council 3152 v. KFS Bd, Inc.*, 280 Neb. 904, 924-28, 791 N.W.2d 317 (2010) (discussing the difference between claims for fraudulent misrepresentation and fraudulent concealment).

[386] "As established in *Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967, 981-84 (V.I. 2011), and subsequent cases, when confronted with an issue of Virgin Islands common law that . . . [the Supreme Court of the Virgin Islands] has not resolved — or that has been addressed only through erroneous reliance on former 1 V.I.C. § 4 — courts [in this jurisdiction] must 'engage in a three-factor analysis: first examining which common law rule Virgin Islands courts have applied in the past; next identifying the rule adopted by a majority of courts of other jurisdictions; and then finally — but most importantly — determining which common law rule is soundest for the Virgin Islands.' " *Machado v. Yacht Haven U.S.V.I., LLC*, 61 V.I. 373, 380 (V.I. 2014) (citing *Better Bldg. Maint. of the V.I., Inc. v. Lee*, 60 V.I. 740, 757 (V.I. 2014); *Gov't of the V.I. v. Connor*, 60 V.I. 597, 603 (V.I. 2014); *Walters v. Walters*, 60 V.I. 768, 777 n.11 (V.I. 2014)).

(3) most importantly, which approach represents the soundest rule for the Virgin Islands.[387]

With respect to the first factor under *Banks*, whether any Virgin Islands courts have previously adopted a particular rule, "fraudulent concealment" has largely been considered by Virgin Islands courts for purposes of tolling the statutes of limitation in medical malpractice actions.[388] As an independent cause of action for purposes of imposing civil tort liability, fraudulent concealment has not been addressed by Virgin Islands courts with frequency. In 2005, the Superior Court considered a cause of action for fraudulent concealment, but cited case law regarding the tolling of statutory limitations in medical malpractice actions and the RESTATEMENT (FIRST) OF TORTS § 550 (1938) in accordance with 1 V.I.C. § 4.[389] In another pre-*Banks* case, the Superior Court discussed the defendant's liability for the non-disclosure of a fact that the defendant had a duty to disclose through a rote application of RESTATEMENT (SECOND) OF TORTS §§ 310 and 557A.[390]

The second factor under *Banks*, "determining the position taken by a majority of courts from other jurisdictions[,] directs the Superior Court to consider all potential sides of an issue by viewing the potentially different ways that other states and territories have resolved a particular question."[391] In some jurisdictions, a fraudulent misrepresentation claim is statutorily defined as including the "suppression of facts."[392] Where recognized by common law, a vast majority of other jurisdictions apply a

---

[387] *Simon*, 59 V.I. at 613 (interpreting *Banks*); *Hamed*, 63 V.I. at 534-37 (discussing the evolution of *Banks* and its progeny).

[388] *See, e.g., Frederick v. Ellet*, 2014 V.I. LEXIS 5, at *6 (V.I Super. Ct. Feb. 14, 2014); *Warner v. Ross*, 164 Fed. Appx. 218, 220 (3d Cir. 2006) (rendered while serving as the *de facto* court of last resort in the Virgin Islands); *Simmons v. Martinez*, 45 V.I. 278, 284-85 (Terr. Ct. 2003); *Payne v. Gov't of the V.I.*, 44 V.I. 213, 217 (Terr. Ct. 2002). This is because the Virgin Islands Medical Malpractice Act specifically permits the tolling of the statute of limitations for medical malpractice claims in certain circumstances. *See* 27 V.I.C. § 166d.

[389] *Manbodh v. Hess Oil V.I. Corp. (In re Manbodh Asbestos Litig Series)*, 47 V.I. 215, 244 (Super. Ct. 2005).

[390] *See Shealy v. W. Indies Mgmt. Co.*, 2011 V.I. LEXIS 58, at *16-20 (V.I. Super. Ct. Dec. 5, 2011).

[391] *Connor*, 60 V.I. at 603 (citations omitted).

[392] *See* N.D. CENT. CODE § 9-03-08; CAL. CIV. CODE §§ 1709-1710; ALA. CODE §§ 6-5-100-6-5-102; *see also Davis v. HSBC Bank*, 691 F.3d 1152, 1163 (9th Cir. 2012) (applying California law). The Superior Court should consider "non-statutory law created by

modified version of the elements of a fraudulent misrepresentation claim[393] to claims for fraudulent concealment.[394] Essentially, these courts replace the requirement in fraudulent misrepresentation claims that the representation be "false" with a requirement that the defendant fail to disclose or conceal facts in circumstances where the defendant had a duty to diselose.[395] Though courts differ as to their characterization of fraudulent concealment, with some courts considering fraudulent concealment as a type of fraudulent misrepresentation,[396] while others

judicial precedent" and "exclude[e] case law relying on state statutes from a *Banks* analysis." *In re L.O.F.*, 62 V.I. at 661 n.6 (citing *King v. Appleton*, 61 V.I. 339, 351 n.9 (V.I. 2014)).

[393] Courts in other jurisdictions use varying terminology to refer to common law fraud. For the sake of clarity and consistency, the Court will refer to the concept of "fraud" as "fraudulent misrepresentation" throughout this discussion.

[394] *Knights*, 280 Neb. at 926-27 (collecting cases); *see Merchs. Commercial Bank*, 64 V.I. at 19 (noting that "some jurisdictions recognize that one can make an actionable misstatement through omission"); *see also, e.g., Carr v. Fleet Bank*, 73 Conn. App. 593, 595, 812 A.2d 14, 16-17 (2002); *Borgschulte v. Bonnot*, 285 S.W.3d 345, 349 (Mo. Ct. App. 2009); *Williams v. Aetna Fin. Co.*, 83 Ohio St. 3d 464, 1998 Ohio 294, 700 N.E.2d 859, 868 (1998); *Barr v. Dyke*, 2012 ME 108, 49 A.3d 1280, 1286-87 (2012); *Oxbow Calcining USA Inc. v. Am. Indus. Partners*, 948 N.Y.S.2d 24, 30, 96 A.D.3d 646 (2012); *Dow Chem. Co. v. Mahlum*, 114 Nev. 1468, 970 P.2d 98, 110 (1998), *overruled in part on other grounds*, 117 Nev. 265, 21 P.3d 11, 15 (2001); *Berkeley Pump Co. v. Reed-Joseph Land Co.*, 279 Ark. 384, 396-97, 653 S.W.2d 128 (1983); *Odom v. Oliver*, 310 S.W.3d 344, 349-50 (Tenn. Ct. App. 2009); *Transpetrol, Ltd. Radulovic*, 764 So. 2d 878, 879-80 (Fla. Dist. Ct. App. 2000); *Sallee v. Fort Knox Nat'l Bank, N.A. (In re Sallee)*, 286 F.3d 878, 895-96 (6th Cir. 2002) (applying Kentucky law); *Hoffman v. Stamper*, 155 Md. App. 247, 304-05, 843 A.2d 153, 187-88 (Ct. Spec. App. 2004), *aff'd in part, rev'd in part on other grounds and remanded*, 385 Md. 1, 867 A.2d 276 (2005); *Cannon Techs., Inc. v. Sensus Metering Sys.*, 734 F. Supp. 2d 753, 769 (D. Minn. 2010) (citing *Wild v. Rarig*, 302 Minn. 419, 234 N.W.2d 775, 795 (1975)) (internal quotation marks omitted).

[395] *Borgschulte*, 285 S.W.3d at 349 (citations omitted); *see Carr*, 812 A.2d at 16-17 (citations omitted); *Williams*, 700 N.E.2d at 868 (citations omitted); *Barr*, 49 A.3d at 1286-87 (citations omitted); *Oxbow*, 948 N.Y.S.2d at 30 (citations omitted); *Camp v. First Fed. Sav. & Loan*, 12 Ark. App. 150, 154-55, 671 S.W.2d 213, 215-16 (1984) (citations omitted); *Transpetrol*, 764 So. 2d at 879-80 (citations omitted); *Sallee*, 286 F.3d at 896 (applying Kentucky law) (citations omitted); *Hoffman*, 155 Md. App. at 304-05 (citations omitted).

[396] This approach mirrors the layout of the Restatement (Second) of Torts, which "includes fraudulent concealment and non-disclosure of material information which the person has a duty to reveal, as a species of fraudulent misrepresentation." *Lock*, 426 A.2d at 859 n.* (citing RESTATEMENT (SECOND) OF TORTS §§ 526, 529, 550, 551).

consider it as a stand-alone claim,[397] this does not negate the similarities in the treatment of a fraudulent concealment claim by the courts.

The requirement of a duty to disclose is reflective of Section 551 of the Restatement (Second) of Torts (1979).[398] The Restatement (Second) of Torts also recognizes a cause of action for fraudulent concealment, which imposes liability for active concealment as if it were an affirmative misrepresentation, with no requirement that the defendant have had a duty to disclose.[399] Notably, however, most courts in other jurisdictions assess whether there was an underlying duty to disclose when discussing claims for fraudulent concealment.[400] In these jurisdictions, "mere silence is not fraudulent absent a duty to disclose."[401] Whether a duty to disclose exists is generally determined by the specific facts and circumstances of the

---

[397] *See Oxbow*, 948 N.Y.S.2d at 30 (citations omitted); *Dow Chem. Co.*, 970 P.2d at 110 (citations omitted); *Barr*, 49 A.3d at 1286-87 (citations omitted); *Odom*, 310 S.W.3d at 349-50; *Hoffman*, 155 Md. App. at 304-05 (citations omitted).

[398] Section 551 of the RESTATEMENT (SECOND) OF TORTS provides:

> (1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.
>
> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
>
> (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and
>
> (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
>
> (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and
>
> (d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and
>
> (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

[399] RESTATEMENT (SECOND) OF TORTS § 550 (1979) ("One party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering").

[400] *Supra* n.394.

[401] *See Sallee*, 286 F.3d at 896 (citations omitted).

case,[402] though some jurisdictions have delineated specific circumstances that give rise to a duty to disclose.[403]

■ ■ Finally, the third factor under *Banks*, requires the Court to adopt the soundest rule for the Virgin Islands. Considering the foregoing, the soundest rule for the Virgin Islands is:

> To state a claim for fraudulent concealment, a plaintiff must plead that: (1) the defendant concealed or suppressed a material fact; (2) the defendant had a duty to disclose the fact to the plaintiff; (3) the defendant knew or had reason to know that the material fact had been concealed or suppressed; (4) the defendant concealed or suppressed the material fact for the purpose of inducing the plaintiff to act or refrain from acting; and (5) the plaintiff suffered pecuniary loss caused by the his or her justifiable reliance on the concealed or suppressed material fact.

This approach modifies the existing elements applicable to a claim for fraudulent misrepresentation in the Virgin Islands. By retaining the elements of reliance, injury, and damages, this rule fosters consistency in the territory's application of common law fraud. By requiring the defendant have a duty to disclose, this rule aligns the Virgin Islands with the majority approach to fraudulent concealment claims, while providing a barrier necessary to protect those who are silent, without a duty to disclose, from tort liability for fraud. In that vein, the Court concludes that the soundest rule for the Virgin Islands with respect to the duty to disclose is as follows:

> Whether the defendant had a duty to disclose is determined by the facts and circumstances of the case, through an application of the following

---

[402] *See* 37 AM. JUR. 2D *Fraud and Deceit* § 198 (2017) (collecting cases); *Camp*, 12 Ark. App. 150, 154-55, 671 S.W.2d 213, 215-16 (1984) ("[W]hether a duty to speak exists is determinable by reference to all the circumstances of the case, and by comparing the facts not disclosed with the object and end sought by the contracting parties. The difficulty is not so much in stating the general principles of law, which are fairly well understood, as in applying the law to particular groups of facts") (citations omitted).

[403] *See Cannon Techs.*, 734 F. Supp. 2d at 769 ("[F]raud does not exist based solely on the failure to disclose facts unless 'special circumstances' require that disclosure. ... Three such 'special circumstances' have been recognized by the Minnesota Supreme Court: where there exists a confidential or fiduciary relationship between the parties; where disclosure is necessary to clarify information already disclosed, which would otherwise be misleading; or where the non-disclosing party 'has special knowledge of material facts to which the other party does not have access') (citing *L & H Airco, Inc. v. Rapistan Corp.*, 446 N.W.2d 372, 380 (Minn. 1989)) (internal and other citations omitted).

417

factors: (1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiff's opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances.[404]

A factor test affords the Court with the flexibility necessary to assess the defendant's duty to disclose in all cases. While the Section 551 of the Restatement (Second) of Torts specifically delineates particular instances that give rise to "a duty to the other [in a transaction] to exercise reasonable care to disclose the matter in question[,]" such a specialized rule could inhibit the applicability of the rule. On the other hand, the factor test ensures that a cause of action for fraudulent concealment is broadly applicable in civil cases and that the defendant's legal duty is assessed in terms of the unique facts and circumstances presented by each case. Further, the factor test provides a foundation upon which Virgin Islands courts can identify their own "special circumstances" giving rise to a duty to disclose in the Virgin Islands.

██ Here, Plaintiff's claim for fraudulent concealment against TKH and Takata Japan fails. While Plaintiff has alleged facts that plausibly suggest TKH and Takata Japan intentionally concealed or suppressed material facts regarding the extent of airbags' defects in order to maximize their profits and that TKH and Takata Japan arguably had a duty to disclose the information to prevent the public from being misled by their public assertions that the defect had been remedied to render the airbags were safe,[405] Plaintiff has not alleged facts that demonstrate Plaintiff, the Government of the Virgin Islands, relied on TKH and Takata Japan or suffered pecuniary loss as a result thereof. That allegedly 7,000 Virgin Islands residents own vehicles that were "economically devalued" as a result of the allegedly defective airbags does not demonstrate reliance or damages by the Government of the Virgin Islands itself.

The parties dispute the applicability of the "manifestation defense," which is recognized in other jurisdictions to preclude products liability

---

[404] Accord Armstrong Bus. Servs. v. AmSouth Bank, 817 So. 2d 665, 677 (Ala. 2001) (citations omitted).

[405] Because the reliance and damages elements are not met, the Court need not reach a conclusion on whether TKH and Takata Japan owed a duty to disclose here. However, the Court notes that at least one court has ruled that manufacturers have a post-sale duty to warn consumers of product defects. See Holmes v. Wegman Oil Co., 492 N.W.2d 107, 112 (S.D. 1992).

claims by "purchasers of an allegedly defective product . . . where the alleged defect has not manifested itself in the product they own[,]"[406] but none of the parties cite any binding authority that suggests the concept applies in the Virgin Islands. "[I]n general, the Court will not make a movant's arguments for him when he has failed to do So."[407]

Moreover, even assuming, *arguendo*, the manifestation defense applies in this jurisdiction and the Court were to accept Plaintiff's assertion that the defense does not apply here, Plaintiff's claim for fraudulent concealment would still fail. Pecuniary loss in the form of diminished value or loss of resale value can only result if Plaintiff itself owned at least one vehicle containing an allegedly defective airbag, but the Complaint alleges no facts that suggests Plaintiff purchased a vehicle containing one of TKH and Takata Japan's airbags. Rather, Plaintiff seeks to demonstrate pecuniary loss through that suffered by its residents, which is insufficient to satisfy the damages element of a fraudulent concealment claim. While Plaintiff reiterates throughout its Opposition to TKH's Motion to Dismiss that this lawsuit is brought by the Government of the Virgin Islands "on behalf of the People of the Virgin Islands and in the public interest[,]"[408] Plaintiff cites no authority that suggests the reliance and damages elements of a fraudulent concealment claim may be satisfied by someone other than Plaintiff itself.

Consequently, the Complaint fails to state a claim for fraudulent concealment against TKH and Takata Japan.

### E. Economic Loss Doctrine.

TKH and Takata Japan also move to dismiss Counts II-V on the grounds that they are "barred by the economic loss doctrine, which

---

[406] *Briehl v. GMC*, 172 F.3d 623, 628 (8th Cir. 1999) (citing *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 99 (S.D.N.Y. 1997)) (other citations omitted).

[407] *People of the Virgin Islands v. Penn*, 53 V.I. 315, 318 (V.I. Super. Ct. 2010) (denying a defendant's motion to dismiss when he did not present any argument or case law supporting his claim of discrimination); *see Simpson v. Golden*, 56 V.I. 272, 280 (V.I. 2012) ("The rules that require a litigant to brief and support his arguments . . . before the Superior Court, are not mere formalistic requirements. They exist to give the Superior Court the opportunity to consider, review, and address an argument"); *Bertrand v. Mystic Granite & Marble, Inc.*, 63 V.I. 772, 782 (V.I. 2015) ("[S]imply stating a principle of law without any argument or explanation of how it applies to the case at hand is not sufficient to fairly present the issue to the Superior Court") (citing *Yusuf v. Hamed*, 59 V.I. 841, 851 n.5 (V.I. 2013)).

[408] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, p. 33.

'prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract.' "[409] Specifically, TKH and Takata Japan contend that Plaintiff's claims are barred because they are based on "the same facts that would support breach of warranty claims[,]" namely, "that a product failed to work as promised[.]"[410] In opposition, Plaintiff argues the economic loss doctrine does not apply because the Government of the Virgin Islands and TKH and Takata Japan "have no contractual relationship."[411] Plaintiff asserts that this public enforcement action has been brought "separate and apart from any private action any private individual or consumer may have[,]" contending that the Government of the Virgin Islands is not "pursuing any remedies in a proprietary capacity[,]" but rather is "seek[ing] injunctive and declaratory relief preventing TKH from continuing to violate Virgin Islands laws, administrative fines and civil penalties, disgorgement, abatement, and punitive damages, which are not 'economic losses' flowing from a contract."[412]

■ The economic loss doctrine, which "forbids a party from suing or recovering in tort for economic or pecuniary losses that arise only from breach of contract or are associated with the contract relationship[,]" has been adopted by the Superior Court as the soundest rule for the Virgin Islands.[413] However, the Superior Court has not adopted the economic loss doctrine as a "bright-line rule." Rather, the economic loss doctrine must be applied through "a fact-intensive, case-by-case approach" because "the eccentricities of each case may counsel different conclusions for different reasons at different times."[414]

---

[409] Def. TKH's Mot. to Dismiss, p. 29.

[410] Def. TKH's Mot. to Dismiss, p. 30.

[411] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, p. 33.

[412] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, p. 33.

[413] *Turnbull v. Univ. of the V.I.*, 2016 V.I. LEXIS 22, at *14-15 (V.I. Super. Ct. Mar. 2, 2016) (conducting the requisite analysis mandated in *Banks*, 55 V.I. 967 with respect to the economic loss doctrine) (citations omitted). Having reviewed the Superior Court's *Banks* analysis and agreeing with the methodology and conclusions of same, the Court hereby adopts the standards articulated in *Turnbull v. Univ. of the V.I. See id.* 2016 V.I. LEXIS 22, at *14-17.

[414] *Id.* 2016 V.I. LEXIS 22, at *19.

TKH and Takata Japan urge the Court to adopt the Third Circuit's reasoning in *Werwinski v. Ford Motor Co.,*[415] which involved private claims brought by individuals against an automobile manufacturer for breach of warranty, fraudulent concealment, and violations of Pennsylvania's consumer protection statute as a result of their vehicles containing allegedly defective transmission parts.[416] In *Werwinski,* the Third Circuit predicted that the Pennsylvania Supreme Court would apply the economic loss doctrine to intentional fraud claims, including those arising under Pennsylvania's consumer protection statute, for various reasons, including, *inter alia,* that the Pennsylvania Supreme Court had adopted the "gist of the action" doctrine, that courts in other jurisdictions apply the economic loss doctrine where the fraud claim is "interwoven with the breach of contract," and, without further guidance from the Pennsylvania Supreme Court, it should "opt for the interpretation that restricts liability[.]"[417]

 Unlike the Third Circuit in *Werwinski,* the Superior Court must adopt common law doctrines that have not yet been addressed by the Supreme Court of the Virgin Islands, such as the economic loss doctrine, within the confines of a *Banks* analysis. The Court has accepted the sound reasoning of the Superior Court in adopting the economic loss doctrine under a fact-intensive case-by-case approach and sees no reason to create discordant precedent by deviating to a "bright-line" rule approach merely because the Third Circuit reached a different conclusion when applying the law of a different state.[418]

 Assuming, *arguendo,* Plaintiff's fraudulent concealment claim in Count V was viable, the Court would be hesitant to apply the economic loss doctrine in this case because "[t]he purpose of the economic loss

---

[415] 286 F.3d 661 (3d Cir. 2002).

[416] *Id.* at 663.

[417] *Id.* at 670-80.

[418] TKH and Takata Japan note that in *Ringo v. Southland Gaming of the United States V.I., Inc.,* 2010 V.I. LEXIS 62, at *15-16 (V.I. Super. Ct. Sept. 22, 2010), this Court applied the economic loss doctrine by relying on the Third Circuit's opinion in *Werwinski,* 286 F.3d at 671. Def. TKH's Reply, p. 27. This Court's opinion in *Ringo* was issued in 2010, prior to the Supreme Court of the Virgin Islands' landmark decision in *Banks.* Clearly, the law of the territory has changed substantially since *Banks,* and the Court will not rely on outdated case law merely because the Superior Court formerly placed greater weight on Third Circuit precedent than it does now.

rule . . . is to prevent parties from recovering in tort to extricate themselves from prior freely negotiated agreements[, but] . . . tort duties arise to protect individuals unable to protect themselves from the unscrupulous actions of others and irrespective of the existence of a contract."[419] As the Superior Court has noted, many courts have "carved out an exception to the economic loss rule for fraud and negligent misrepresentation claims."[420] Doing so would likely be necessary where, as here, Plaintiff's claims arise from TKH and Takata Japan's allegedly misleading conduct and tort duties imposed by law, as opposed to a breach of contractual duties arising from an underlying contractual agreement.[421]

Likewise, the Court also finds that the economic loss doctrine does not bar Plaintiff's claims under CPL and CFDBPA, set forth in Counts II-III of the Complaint. Plaintiff is statutorily authorized to bring suit to enforce CPL and CFDBPA.[422] In addition to injunctive relief[423] and declaratory relief,[424] CPL and CFDBPA permit Plaintiff to seek to recover civil penalties,[425] actual damages on behalf of one or more consumers,[426] and restitution from TKH and Takata Japan for monies owed to "all persons who purchased the goods or services during the period of violation[.]"[427] Despite TKH and Takata Japan's suggestion, the Court will not blindly follow the Third Circuit's reasoning in *Werwinski* when doing so would directly contravene the will of the Legislature, which has explicitly created remedies for the public enforcement of CPL and CFDBPA.[428]

---

[419] R. Joseph Barton, Note, *Drowning in a Sea of Contract: Application of the Economic Loss Rule to Fraud and Negligent Misrepresentation Claims*, 41 WM. & MARY L. REV. 1789, 1797 (2000).

[420] *Turnbull*, 2016 V.I. LEXIS 22, at *18 (citations omitted).

[421] Barton, *supra* n.419, at 1803-05; *see also Lloyd v. GMC*, 397 Md. 108, 131, 916 A.2d 257 (2007) (discussing the economic loss doctrine in terms of a products liability suit against a manufacturer).

[422] *See* 12A V.I.C. § 104, 12A V.I.C. § 328; *supra* n.230.

[423] 12A V.I.C. § 104(d); 12A V.I.C. § 328(a)(2).

[424] 12A V.I.C. § 328(a)(1).

[425] 12A V.I.C. § 328(b).

[426] 12A V.I.C. § 328(a)(3).

[427] 12A V.I.C. § 104(c).

[428] *See Banks*, 55 V.I. at 979-80 ("[T]he will of the Legislature will generally prevail in the event of a conflict between a statute and a judicial decision") (citations omitted); *Grispino v.*

Finally, as to Count IV of the Complaint, the common law authorizes Plaintiff to bring a public action for abatement of a public nuisance.[429] The Court recognizes that some courts have concluded that the economic loss doctrine bars public entities from recouping monetary costs paid by the public entity in grappling with an alleged public nuisance.[430] Here, however, Plaintiff does not seek reimbursement for costs already paid, but rather seeks relief in the form of abatement of the public nuisance through a public education campaign focused on the Virgin Islands.[431] Moreover, whether a public nuisance can be abated and the extent to which relief in the form of abatement will be granted are questions of fact that cannot be resolved at this stage of the proceedings. Consequently, the Court finds that the economic loss doctrine does not bar Plaintiff's claim for public nuisance under Count IV of the Complaint.

---

*New Eng. Mut. Life Ins. Co. (In re New Eng. Mut. Life Ins. Co. Sales Practices Litig.)*, 2003 U.S. Dist. LEXIS 25664, at *33 (D. Mass. May 20, 2003) (questioning the Third Circuit's ruling in *Werwinski* as violating legislative intent) (citing *O'Keefe v. Mercedes-Benz USA*, 214 F.R.D. 266, 2003 WL 1826501, *5 (E.D. Pa. 2003)); *cf. Ulbrich v. Groth*, 310 Conn. 375, 411-12, 78 A.3d 76, 101-02 (2013); *Abi-Najm v. Concord Condo., LLC*, 280 Va. 350, 699 S.E.2d 483, 489 (2010); *Kailin v. Armstrong*, 643 N.W.2d 132, 149, 2002 WI App 70, 252 Wis. 2d 676 (2002) (all finding that the economic loss doctrine did not bar actions brought under the state consumer protection statutes).

[429] *Supra* n.371.

[430] *See City of Chi. v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 424, 290 Ill. Dec. 525, 569-70, 821 N.E.2d 1099, 1143-44 (2004) (The City sought to recoup "the costs of emergency medical services, law enforcement efforts, the prosecution of violations of gun control ordinances, and other related expenses[,]" while the County sought to recoup "the costs of treatment of victims of gun violence and the costs of prosecutions for criminal use of firearms, including the expenses associated with providing defense counsel to those accused of gun crimes"); *City of Cleveland v. Ameriquest Marv. Sec., Inc.*, 621 F. Supp. 2d 513, 520, 522-24 (N.D. Ohio 2009) (The City sought to "recover damages in the form of municipal expenditures it claims were necessary due to the increased need for police and fire protection and demolition of the foreclosed and vacant homes").

[431] *Cf. Tioga Pub. Sch. Dist. #15 v. United States Gypsum Co.*, 984 F.2d 915, 919-20 (8th Cir. 1993) (In concluding "the economic loss doctrine does not bar tort recovery for the cost of removing asbestos-containing building materials[,]" the Court noted that the endangerment of "the lives and health of the building's occupants, . . . unlike typical economic loss, . . . was not the type of risk normally allocated between parties by agreement") (collecting cases) (citations omitted).

## F. Plaintiff's Request for Punitive Damages.

In the Complaint, Plaintiff seeks an award of punitive damages against all Defendants.[432] TKH and Takata Japan raise two issues with respect to Plaintiff's request for punitive damages. First, TKH and Takata Japan argue that Plaintiff's request for punitive damages fails to meet the requisite pleading requirements.[433] Second, TKH and Takata Japan contend that, under the choice of law rules, the determination of damages is not controlled by Virgin Islands law, but rather Michigan and Japanese law, which do not permit recovery for punitive damages.[434]

The Court will first address the sufficiency of the allegations in the Complaint. Specifically, TKH and Takata Japan note that "because [Plaintiff] has failed to plead a cognizable fraudulent concealment claim, his request for punitive damages likewise fails."[435] Plaintiff concedes that "the claim for which the Government seeks punitive damages is fraudulent concealment."[436]

■ "Claimants must plead punitive damages with particularity" in accordance with V.I. R. CIV. P. 9(g).[437] With respect to punitive damages, the Superior Court has adopted the RESTATEMENT (SECOND) OF TORTS § 908(2) as the "soundest rule for the Virgin Islands," which provides that "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others."[438] However, as TKH and Takata Japan point out,

---

[432] Compl. ¶¶ 182-187(f).

[433] *See* Def. TKH's Mot. to Dismiss, p. 30 n.24.

[434] Def. TKH's Mot. to Dismiss, pp. 30-32; Def. Takata Japan's Mot. to Dismiss, pp. 3-5.

[435] Def. TKH's Mot. to Dismiss, p. 30 n.24.

[436] Pl.'s Opp'n to Def. Takata Japan's Mot. to Dismiss, p. 12.

[437] *Libien v. MIFR, Inc.*, 2016 V.I. LEXIS 193, at *17 (V.I. Super. Ct. Nov. 28, 2016) (citing FED. R. CIV. P. 9(g)). Since V.I. R. CIV. P. 9(g) mirrors FED. R. CIV. P. 9(g), this case law remains applicable.

[438] *Isaac v. Crichlow*, 63 V.I. 38, 69 n.13 (Super. Ct. 2015) (citing *Powell v. Chi-Co's Distributing, Inc.*, 2014 V.I. LEXIS 21 (V.I. Super. Ct. Apr. 3, 2014) (conducting the requisite analyses mandated in *Banks*, 55 V.I. 967 with respect to punitive damages)); *Libien*, 2016 V.I. LEXIS 193, at *18-19 (citing *Segura v. Meyer*, ST-13-CV-565, mem. op., 2014 V.I. LEXIS 130, at *8 n.24 (V.I. Super. Ct., Feb. 21, 2014) (conducting the requisite analyses mandated in *Banks*, 55 V.I. 967 with respect to punitive damages and reaching the same conclusion as the Superior Court in *Powell*, 2014 V.I. LEXIS 21)). Having reviewed the Superior Court's *Banks* analysis in *Powell v. Chi-Co's Distributing, Inc.* and agreeing with the methodology

"[p]unitive damages are a remedy incidental to a cause of action[.]"[439] As such, "punitive damages are not a stand-alone claim"[440] and "do not constitute an individual cause of action."[441]

██ As discussed at length above, the Court has found that Count V fails to state a claim for fraudulent concealment. Because Plaintiff only requests punitive damages in connection with Count V of the Complaint,[442] which fails to state a claim upon which relief can be granted, Plaintiff's request for punitive damages also fails.

The Court recognizes that Plaintiff alleges that "Defendants' intentional, willful, and reckless disregard of the rights [and safety] of others" pertain to facts that relate to Plaintiff's claims under CPL and CFDBPA, as well as the fraudulent concealment claim, and that Plaintiff pleads "[i]n the alternative, . . . that [D]efendants' conduct was negligent or grossly negligent."[443] However, Plaintiff does not request punitive damages in relation to the consumer protection claims, nor does Plaintiff submit any argument indicating that punitive damages are available in public actions brought by the Government of the Virgin Islands under CPL or CFDBPA. In fact, those statutes specifically delineate the remedies available in public actions, making no mention of the Government of the Virgin Islands' entitlement to punitive damages under CPL or CFDBPA.[444] Further, Plaintiff does not assert claims of negligence and gross negligence against TKH and Takata Japan in the Complaint. Thus, there is no underlying cause of action upon which Plaintiff's request for punitive damages relates.

Although the foregoing justifies the striking of Plaintiff's request for punitive damages, the Court will also briefly address TKH and Takata Japan's remaining argument. Primarily, TKH and Takata Japan claim that

---

and conclusions of same, the Court hereby adopts the standards articulated in that case. *Powell*, 2014 V.I. LEXIS 21, at *7-9.

[439] *Libien*, 2016 V.I. LEXIS 193, at *17 (citations omitted).

[440] *Der Weer v. Hess Oil Virgin Island Corp.*, 61 V.I. 87, 102 (V.I. Super. Ct. 2014) (citing *Anthony v. FirstBank V.I.*, 58 V.I. 224, 227 n.4 (V.I. 2012)).

[441] *Libien*, 2016 V.I. LEXIS 193, at *17 (citations omitted); *Willie v. Amerada Hess Corp.*, 66 V.I. 23, 95-96 (V.I. Super. Ct. 2017) ("[A] demand for punitive damages . . . is not a cause of action") (citing *Abednego v. St. Croix Alumina, LLC*, 63 V.I. 153, 185 (Super. Ct. 2015)).

[442] Compl. ¶ 187(f).

[443] Compl. ¶¶ 182-187.

[444] *See* 12A V.I.C. § 101 *et seq.*; 12A V.I.C. § 301 *et seq.*

425

Plaintiff's request for punitive damages must be stricken because the choice of law governing the measure of damages under the "most significant relationship" test set forth in the RESTATEMENT (SECOND) OF CONFLICTS OF LAWS §§ 145 and 171 is that of Michigan and Japan, respectively, neither of which permit awards of punitive damages.[445] In its Opposition to TKH's Motion to Dismiss, Plaintiff agrees that the "most significant relationship" test, set forth in Section 145 of the Restatement, applies, but contends that the parties' contacts weigh in favor of an application of Virgin Islands law.[446] Similarly, Plaintiff submits in its Opposition to Takata Japan's Motion to Dismiss that the parties' contacts weigh in favor of an application of Virgin Islands law, but cites Section 148 of the Restatement (Second) of Conflicts of Laws, which governs fraud and misrepresentation claims, as the controlling Restatement provision.[447] Takata Japan counters that Section 148 of the Restatement applies to choice of law determinations regarding substantive tort liability, but not the measure of damages.[448]

The Supreme Court of the Virgin Islands has yet to address the choice of law rules governing the measure of damages in the Virgin Islands, nor has the issue been analyzed within the confines of *Banks* by the Superior Court.[449] As a result, the Court would have to conduct a *Banks* analysis in order to determine the choice of law rule applicable to the measure of

---

[445] Def. TKH's Mot. to Dismiss, pp. 30-32; Def. Takata Japan's Mot. to Dismiss, pp. 3-5.

[446] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, pp. 34-35.

[447] Pl.'s Opp'n to Def. Takata Japan's Mot. to Dismiss, pp. 12-15.

[448] Def. Takata Japan's Mot. to Dismiss, p. 16.

[449] In support of their arguments regarding the applicable choice of law rules in the Virgin Islands, the parties rely on a variety of sources, including, *inter alia*, case law or secondary materials that involve mechanistic applications of the Restatement (Second) of Conflicts of Law in violation of *Banks*, 55 V.I. 967. Def. TKH's Mot. to Dismiss, pp. 30-32 & n. 25; Def. Takata Japan's Mot. to Dismiss, p. 4 n. 3; Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, pp. 34-35; Pl.'s Opp'n to Def. Takata Japan's Mot. to Dismiss, pp. 12-13; *See Dysart v. Dysart*, 45 V.I. 118, 126-27 (Terr. Ct. 2002) (mechanistically applying RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(1) in accordance with 1 V.I.C. § 4 with respect to the choice of law rule where the law of the state is chosen by the parties); *St. Croix Renaissance Grp. v. St. Croix Alumina*, Civil Action No. 04-067, 2009 U.S. Dist. LEXIS 120525, at *30-31 (D.V.I. Dec. 23, 2009) (mechanistically applying RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 148 in accordance with 1 V.I.C. § 4 with respect to the choice of law rule applicable to fraud or misrepresentation claims); *see also Bally Corp. v. Enighed Condos., LLC*, 58 V.I. 93, 104 (Super. Ct. 2013) (citing *Virgin Islands v. Lansdale*, 172 F. Supp. 2d 636, 645 n.8 (D.V.I. 2001)) (mechanistically applying RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 307 in

damages, which would in turn inform the Court as to the availability of punitive damages in this action.[450] However, because there is no underlying cause of action through which Plaintiff may request punitive damages, the Court will, in the interests of judicial economy and efficacy, defer from conducting a *Banks* analysis unless and until a resolution of this issue becomes necessary.

### G. Federal Preemption.

Finally, TKH and Takata Japan argue that Plaintiff's claims, all of which arise under Virgin Islands law, are preempted by the federal Motor Vehicle Safety Act,[451] under which NHTSA has been delegated "exclusive authority in . . . 'enforcing [fiederal motor vehicle safety standards and associated regulations, investigating possible safety-related defects, and making non-compliance and defect determinations.' "[452] According to TKH and Takata Japan, "the Complaint should be dismissed on preemption grounds because the relief sought . . . potentially 'stands as an obstacle to the NHTSA recall.' "[453] Plaintiff objects to TKH and Takata Japan's construction of its request for injunctive relief, asserting that "courts have held that judicial recalls are not preempted by the Motor Vehicle Safety Act."[454]

█ The Court agrees with Plaintiff. The Supremacy Clause of the Constitution of the United States provides that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."[455] "Therefore, when the federal government enacts laws within its enumerated powers, these laws are

---

accordance with 1 V.I.C. § 4 with respect to the choice of law rule applicable when determining whether to pierce the corporate veil).

[450] *Supra* n.386 & 387.

[451] 49 U.S.C.S. § 30101 *et seq.*

[452] Def. TKH's Mot. to Dismiss, p. 35 (citing 49 C.F.R. § 554.1).

[453] Def. TKH's Mot. to Dismiss, p. 32.

[454] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, pp. 35-36.

[455] U.S. CONST. art. VI, cl. 2.

'supreme' to state laws."[456] Although the Virgin Islands is a U.S. territory rather than a "state," the federal Motor Vehicle Safety Act includes the Virgin Islands within its definition of a "state."[457] Thus, Virgin Islands law is susceptible to federal preemption by the Motor Vehicle Safety Act and the federal safety regulations associated therewith.[458]

■■■ "Federal law can preempt state law in three ways: (1) express preemption, (2) field preemption, and (3) conflict preemption."[459] Here, TKH and Takata Japan argue that conflict preemption precludes Plaintiff from the requested injunctive relief.[460] "Conflict preemption nullifies state law inasmuch as it conflicts with federal law, either where compliance with both laws is impossible or where state law erects an 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' "[461] The existence of conflict preemption "turns on the identification of 'actual conflict' " between the state law and the federal regulation or statutes.[462] However, a presumption against preemption applies in fields traditionally regulated by the states,[463] although the presumption "is not triggered when the State regulates in an area where there has been a history of significant federal presence."[464]

---

[456] *Alleyne v. Diageo USVI, Inc.*, 63 V.I. 384, 391-92 (Super. Ct. 2015) (citing *Free v. Bland*, 369 U.S. 663, 666, 82 S. Ct. 1089, 8 L. Ed. 2d 180 (1962) ("[A]ny state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield")).

[457] 49 U.S.C.S. § 30102(a)(12) (" 'State' means a State of the United States, the District of Columbia, Puerto Rico, the Northern Mariana Islands, Guam, American Samoa, and the Virgin Islands").

[458] *Accord Alleyne*, 63 V.I. at 392; *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 713, 85 L. Ed. 2d 714, 105 S. Ct. 2371 (1985) ("[S]tate laws can be pre-empted by federal regulations as well as by federal statutes").

[459] *Alleyne*, 63 V.I. at 392 (quoting *Farina v. Nokia, Inc.*, 625 F.3d 97, 115 (3d Cir. 2010)) (internal quotation marks omitted).

[460] Def. TKH's Mot. to Dismiss, p. 34.

[461] *Farina*, 625 F.3d at 115 (citing *Hillsborough Cnty.*, 471 U.S. at 713).

[462] *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 884, 120 S. Ct. 1913, 1927, 146 L. Ed. 2d 914 (2000).

[463] *Wyeth v. Levine*, 555 U.S. 555, 129 S. Ct. 1187, 1194-1195, 173 L. Ed. 2d 51 (2009) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947)).

[464] *United States v. Locke*, 529 U.S. 89, 108, 120 S. Ct. 1135, 1147-48, 146 L. Ed. 2d 69 (2000) (citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 51 L. Ed. 2d 604, 97 S. Ct. 1305 (1977)).

When discussing federal preemption in terms of vehicle recalls, courts disagree on whether the presumption against preemption applies.[465] Some courts have applied the presumption against preemption, reasoning "[m]otor vehicle safety is an area of law traditionally regulated by the states" and, although regulated in some ways by Congress, "[i]n no field has . . . deference to state regulation been greater than that of highway safety regulation."[466] On the other hand, other courts have concluded that the presumption against preemption does not apply because, while "vehicle safety is [certainly] not an area in which 'Congress has legislated . . . from the earliest days of the Republic[,]' "[467] "states have never assumed a significant role in recalls related to vehicle safety."[468]

██ The Court agrees with the former view that the relevant area of law is motor vehicle safety, which is subject to the presumption against preemption as "an area of traditional State police power" without "a history of significant federal presence."[469] Where, as here, the presumption against preemption applies, the "[d]efendant bears the burden of showing that it was Congress' 'clear and manifest' intent to preempt State law."[470] However, even where the presumption does not apply, the state law will not be preempted unless the defendant shows "clear evidence of a conflict[,]"[471] which in turn can be demonstrated in a variety of ways, including, inter alia, that "the state policy may produce

---

[465] Compare In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig., 754 F. Supp. 2d 1145, 1196-97 (C.D. Cal. 2010); Chamberlan v. Ford Motor Co., 314 F. Supp. 2d 953, 958 (N.D. Cal. 2004) with In re Bridgestone/Firestone Inc., ATX, ATX II & Wilderness Tires Prods. Liab. Litig., 153 F. Supp. 2d 935, 942 (S.D. Ind. 2001).

[466] In re Toyota Motor Corp., 754 F. Supp. 2d at 1196 (citing Chamberlan, 314 F. Supp. 2d at 958) (quoting Raymond Motor Transp., Inc. v. Rice, 434 U.S. 429, 443, 98 S. Ct. 787, 54 L. Ed. 2d 664 (1978))) (internal quotation marks and citations omitted).

[467] Bridgestone, 153 F. Supp. 2d at 942 (citing Locke, 529 U.S. at 108).

[468] Id.

[469] In re Toyota Motor Corp., 754 F. Supp. 2d at 1196 (citing Chamberlan, 314 F. Supp. 2d at 958) (citing City of Columbus v. Ours Garage & Wrecker Serv., 536 U.S. 424, 439, 122 S. Ct. 2226, 153 L. Ed. 2d 430 (2002))).

[470] Chamberlan, 314 F. Supp. 2d at 962 (quoting California v. ARC Am. Corp., 490 U.S. 93, 101, 109 S. Ct. 1661, 1665, 104 L. Ed. 2d 86 (1989)).

[471] Geier, 529 U.S. at 885 (citing English v. Gen. Elec. Co., 496 U.S. 72, 90, 110 S. Ct. 2270, 2273, 110 L. Ed. 2d 65 (1990)).

a result inconsistent with the objective of the federal statute"[472] or through the objective underlying a regulation itself.[473]

Congress enacted the Motor Vehicle Safety Act with the purpose of "reduce[ing] traffic accidents and deaths and injuries resulting from traffic accidents."[474] "In order to accomplish its safety objectives, the [Motor Vehicle Safety Act] imposes two primary obligations upon the Department of Transportation and vehicle manufacturers[.]"[475] First, the Motor Vehicle Safety Act "delegates authority to the Secretary of Transportation to 'prescribe motor vehicle safety standards' and investigate and order remediation of vehicle defects[.]"[476] "The Secretary, in turn, has delegated authority to NHTSA to carry out these duties."[477] Second, the Motor Vehicle Safety Act "imposes upon vehicle manufacturers obligations to notify NHTSA and consumers of the discovery of safety-related vehicle defects, and to remedy those defects."[478] The Motor Vehicle Safety Act "extensively regulates vehicle recalls, and imposes upon manufacturers the obligation to timely remedy or repair safety defects."[479] Though the United States Supreme Court has not specifically addressed conflict preemption in relation to vehicle recalls under the Motor Vehicle Safety Act, it has addressed conflict preemption in relation the Act and state tort claims.

---

[472] *Rice*, 331 U.S. at 230 (citations omitted).

[473] *See Geier*, 529 U.S. at 874-84.

[474] 49 U.S.C. § 30101.

[475] *In re Ford Motor Co. Speed Control Deactivation Switch Prods. Lab. Litig.*, 2007 U.S. Dist. LEXIS 62483, at *13 (E.D. Mich. Aug. 24, 2007) (citing 49 U.S.C. § 30101 *et seq.*).

[476] *Id.* Some of NHTSA's duties are listed as follows. *See* 49 U.S.C. § 30166(b)(1) (to inspect and investigate); 49 U.S.C. §§ 30118-30120 (to ensure that defective vehicles and equipment are recalled and remedied and that owners are notified of a defect and how to have the defect remedied); 49 U.S.C. § 30120(c) (to ensure the adequacy of the remedy, including through acceleration of the remedy program; 49 U.S.C. § 30166(e) (to require vehicle manufacturers and equipment manufacturers to keep records and make reports); 49 U.S.C. § 30166(g) (to require any person to file reports or answers to specific questions); 49 U.S.C. § 30165 (to seek civil penalties).

[477] *Kent v. DaimlerClaysler Corp.*, 200 F. Supp. 2d 1208, 1216 (N.D. Cal. 2002) (citing 49 C.F.R. §§ 501.1, 501.2).

[478] *In re Ford Motor Co.*, 2007 U.S. Dist. LEXIS 62483, at *13; *see* 49 U.S.C. § 30120(a)(1), (c)(2) (delineating some, but not all, of manufacturers' obligations under the Motor Vehicle Safety Act).

[479] *In re Ford Motor Co.*, 2007 U.S. Dist. LEXIS 62483, at *13.

In *Geier v. Am. Honda Motor Co.*,[480] the United States Supreme Court found conflict preemption precluded a state tort suit that imposed a duty upon the automobile manufacturer to install airbags in all vehicles because the applicable federal safety standard, which "provided the manufacturer with a range of choices among different passive restraint devices" in order to facilitate the gradual phase-in of passive restraint devices in vehicles over time, was deliberately sought, in the policy judgment of the Department of Transportation ("DOT"), as the best means of promoting its safety objectives.[481] As a result, the United States Supreme Court concluded that the duty imposed in the state law tort suit "would have stood 'as an obstacle to the accomplishment and execution of' " the safety objectives that were achieved through the federal regulation.[482]

The United States Supreme Court clarified the scope of its ruling in *Geier* the following year in *Williamson v. Mazda Motor of Am., Inc.*[483] In *Williamson*, the court addressed whether a federal safety standard under the Motor Vehicle Safety Act, which permitted — but did not require — the installation of lap-and-shoulder seat belts in the rear inner seats of vehicles, preempted a state tort suit based on the manufacturer's decision to only install a simple lap belt.[484] Although the facts were similar to *Geier* in that both federal safety regulations "left the manufacturer with a choice[,]" the United States Supreme Court found in *Williamson* that the state tort suit was not preempted because the choice given to the manufacturer in *Williamson* was not "deliberately sought" to achieve its policy objectives, namely safety, but rather based on DOT's belief that a lap-and-shoulder belt requirement "would not be cost-effective."[485] Consequently, the United States Supreme Court concluded in *Williamson* that "even though the state tort suit may restrict the manufacturer's

---

[480] 529 U.S. 861, 120 S. Ct. 1913, 146 L. Ed. 2d 914.

[481] *Id.* at 874-84.

[482] *Id.* at 881-82.

[483] 562 U.S. 323, 131 S. Ct. 1131, 179 L. Ed. 2d 75 (2011).

[484] *Id.* at 327-37.

[485] *Id.* at 334-35.

choice, it does not 'stan[d] as an obstacle to the accomplishment . . . of the full purposes and objectives' of federal law."[486]

Here, the basic question is whether Plaintiff's requested injunctive relief — that the Court issue an Order directing Defendants to cease their violations of CICO, CPL, CFDBPA, and abate the alleged public nuisance — conflict with the Consent Orders entered by NHTSA while regulating TKH and Takata Japan's compliance under Motor Vehicle Safety Act. Specifically, TKH and Takata Japan argue conflict preemption defeats Plaintiff's claims in two ways. First, TKH and Takata Japan contend that Plaintiff's request for "an injunction ordering Defendants to cease their violations of the law . . . would disrupt the careful balance struck by NHTSA" and "impermissibly interfere with . . . [the] NHTSA's goal of mitigating and controlling the risk of serious injury or death due to an airbag inflator rupture" by "imposing liability on TKH for continuing to provide non-desiccated PSAN inflators as temporary replacement parts" when "NHTSA's recall plan . . . allows Takata until December 2019 to phase out all non-desiccated PSAN frontal airbags[.]"[487]

Despite TKH and Takata Japan's suggestion, Plaintiff's Complaint does not request that the Court enjoin TKH and Takata Japan from temporarily using non-desiccated PSAN propelled inflators as replacement parts in accordance with NHTSA's Consent Orders.[488] Rather, Plaintiff seeks an injunction that would enjoin TKH and Takata Japan from unlawfully concealing information and making deceptive or misleading statements to the public regarding the safety of the non-desiccated PSAN propelled inflators in violation of CICO, CPL, CFDBPA. Plaintiff alleges that TKH and Takata Japan continue to use the non-desiccated PSAN-propelled inflators to " 'repair' recalled vehicles."[489] When accepted as true in light of the other well-pleaded factual allegations, the Complaint plausibly suggests that Plaintiff is entitled to injunctive relief under CPL and CFDBPA because Virgin Islands residents remain unaware as to the potential dangers associated

---

[486] *Id.* at 336 (citing *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 85 L. Ed. 581 (1941)).

[487] Def. TKH's Mot. to Dismiss, p. 33 (internal quotation marks omitted).

[488] *See generally* Compl.; *see also* Pl.'s Opp'n to Def. TKH's Mot. to Stay, p. 36 n.27.

[489] Compl. ¶ 110.

with the allegedly defective airbags due to TKH and Takata Japan's systematic concealment of information, as well as deceptive and misleading statements, regarding the "source or extent of the defect." These circumstances remain regardless of whether NHTSA has given TKH and Takata Japan permission to use non-desiccated PSAN-propelled inflators as temporary replacement parts because the proposed injunction would pertain to curtailing misleading and deceptive practices by TKH and Takata Japan, not their compliance with the Motor Vehicle Safety Act or NHTSA's Consent Orders.[490] Indeed, "the long history of state common-law and statutory remedies against . . . unfair business practices [plainly indicates] . . . that this is an area traditionally regulated by the States.[491]

With this in mind, the Court notes that TKH and Takata Japan point to no authority that suggests manufacturers' deceptive or misleading statements to the public are regulated by the Motor Vehicle Safety Act or its associated federal safety standards so as to be in "actual conflict" with CPL and CFDBPA and preclude the tort remedies available thereunder. Likewise, TKH and Takata Japan fail to identify any provision of the relevant federal law and regulations that suggests a government's authority to prosecute violations of CICO conflicts with the Motor Vehicle Safety Act.[492]

As to Plaintiff's public nuisance claim, for which Plaintiff seeks abatement in the form of a "robust public education effort" directed at the Virgin Islands,[493] TKH and Takata Japan posit that they are "already engaging in the only remedial action" sought by Plaintiff in connection with this claim, stating "NHTSA has ordered TKH to engage in customer outreach to assist automakers in maximizing recall recompletion

---

[490] *People of Cal. v. GM L.L.C. (In re GM LLC Ignition Switch Litig.)*, 69 F. Supp. 3d 404, 415 (S.D.N.Y. 2014) (noting while addressing federal subject matter jurisdiction that "it is not the 'rare' state consumer protection suit that involves alleged violations of federal law: instead, '[s]tate courts frequently handle state-law consumer protection suits that refer to or are predicated on standards set forth in federal statutes' ") (citing *Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 676 (9th Cir. 2012)).

[491] *ARC Am. Corp.*, 490 U.S. at 101 (citing *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146, 83 S. Ct. 1210, 1219, 10 L. Ed. 2d 248 (1963)).

[492] Again, the Court reiterates that it "will not make a movant's arguments for him when he has failed to do so." *Supra* n.407.

[493] Compl. ¶ 187(e).

rates[.]"[494] Even assuming, arguendo, the Court were to order abatement in the manner requested in the Complaint, TKH and Takata Japan fail to explain how complying with both an Order by this Court and one from the NHTSA is impossible, nor do TKH and Takata Japan address how Plaintiff's claim for a public nuisance somehow "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,"[495] particularly when considering the Congress' legislative intent in enacting the Motor Vehicle Safety Act.[496] TKH and Takata Japan do not address how an order directing TKH and Takata Japan to abate the alleged public nuisance would vitiate this purpose.[497] The Court agrees with Plaintiff that the cases cited by TKH and Takata Japan, while relevant insofar as they relate to recalls of vehicles, are inapposite because Plaintiff does not request a judicial recall of the non-desiccated PSAN-propelled inflators.

 The Court will elaborate no further on this issue. To reach conclusions by hypothesizing arguments that the parties could have made, but did not, is antithetical to the principles of fundamental fairness and judicial economy that underpin the foundations of this Court. Even if a presumption against preemption did not apply, TKH and Takata Japan have not satisfied their burden of showing clear evidence of an actual conflict between Virgin Islands law and the Motor Vehicle Safety Act.

 Second, TKH and Takata Japan argue that "requiring Takata to provide the restitution and disgorgement sought in the Complaint *could* hinder Takata's ability to pay NHTSA's $200 million fine and produce replacement parts to comply with NHTSA's recall."[498] " '[A] real and substantial possibility' of conflict is insufficient to warrant dismissal on

---

[494] Def. TKH's Mot. to Dismiss, p. 28.

[495] *Supra* n.461.

[496] 49 U.S.C. § 30101.

[497] *See Williamson*, 562 U.S. at 335 ("[T]o infer from the mere existence of such a cost-effectiveness judgment that the federal agency intends to bar States from imposing stricter standards would treat all such federal standards as if they were *maximum* standards, eliminating the possibility that the federal agency seeks only to set forth a *minimum* standard potentially supplemented through state tort law").

[498] Def. TKH's Mot. to Dismiss, p. 34 (emphasis added).

434

preemption grounds."[499] Moreover, 49 U.S.C. § 30165 authorizes NHTSA to impose civil penalties for violations of the Motor Vehicle Safety Act, but this provision must be construed in light of the Act's saving provision, which expressly provides that "compliance with a motor vehicle safety standard . . . does not exempt a person from liability at common law[.]"[500] Plaintiff's viable state law claims are not preempted merely because they allow for the recovery of monetary remedies and TKH and Takata Japan question their ability to pay the civil penalties imposed by the NHTSA. This tension simply does not present an actual conflict between the relevant federal law and Virgin Islands law.[501]

Having found TKH and Takata Japan have failed to sufficiently demonstrate an "actual conflict" between the relevant federal law, including federal safety regulations and NHTSA's Consent Orders, and Plaintiff's viable state law claims, the Court concludes that the Complaint is not preempted by the Motor Vehicle Safety Act.

---

[499] *In re Toyota Motor Corp.*, 754 F. Supp. 2d at 1198; *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204, 103 S. Ct. 1713, 1722, 75 L. Ed. 2d 752 (1983)).

[500] 49 U.S.C. § 30103(e).

[501] *See In re Ford Motor Co.*, 2007 U.S. Dist. LEXIS 62483, at *15-16 ("[T]he fact that Defendants may have to pay damages for its failure to have sufficient replacement parts on hand does not interfere with the enforcement of the [Motor Vehicle Safety Act]. Whether Defendants may have to pay such damages does not pose an actual and irreconcilable dilemma, and does not interfere with the NHTSA oversight of the recalls. The state laws at issue do not preclude Defendants from complying with their MVSA obligations; rather, they impose obligations on Defendants *in addition to* those found within the MVSA. Defendants' motion to dismiss will not be granted on these grounds"); *cf. Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 255, 104 S. Ct. 615, 625, 78 L. Ed. 2d 443 (1984) (construing the Atomic Energy Act, 42 U. S. C. § 2011 *et seq.* (1976 ed. and Supp. V) and stating "Congress assumed that traditional principles of state tort law would apply with full force unless they were expressly supplanted. Thus, it is [the defendant's] burden to show that Congress intended to preclude such awards. . . . [The Nuclear Regulatory Committee] is authorized to impose civil penalties on licensees when federal standards have been violated[, but] . . . the award of punitive damages in the present case does not conflict with that scheme. Paying both federal fines and state-imposed punitive damages for the same incident would not appear to be physically impossible. Nor does exposure to punitive damages frustrate any purpose of the federal remedial scheme"); *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 489, 128 S. Ct. 2605, 2619, 171 L. Ed. 2d 570 (2008) ("[W]e have rejected similar attempts to sever remedies from their causes of action") (citing *Silkwood*, 464 U.S. at 255-56).

## H. Plaintiff's request for leave to amend the Complaint.

■ "To the extent the Court finds any allegation or claim in the Complaint deficient in any way, [Plaintiff] . . . requests the opportunity to amend — for the first time — any such allegation or claim."[502] Where a complaint is subject to dismissal for failure to state a claim upon which relief can be granted, the Superior Court has consistently granted plaintiffs leave to amend the complaint to cure any deficiencies, unless doing so would be inequitable or futile.[503] Although "[a]n amendment would be futile if the complaint, as amended, would fail to state a claim upon which relief could be granted[,]"[504] Plaintiff could potentially allege facts in an amended Complaint that substantiate Count V of the Complaint. As a result, amendment is not futile with respect Plaintiff's claim for fraudulent concealment and associated request for punitive damages. Therefore, the Court will dismiss Count V and the associated request for punitive damages without prejudice in order to give Plaintiff an opportunity to amend the Complaint.

## III. TKH's and Takata Japan's Motions for Stay.

Should "the Court not dismiss this action altogether," TKH and Takata Japan move the Court to stay the proceedings "pending completion of the NHTSA recall and final judgment in the consumer class action pending in the Southern District of Florida."[505] According to TKH and Takata Japan, this multidistrict litigation ("MDL") in federal court involves individual claims of "Virgin Islands residents that purchased or leased vehicles equipped with recalled airbags[,]" who "allege[ ] that Takata engaged in the same conduct and transactions that are the subject of this action and assert[ ] identical causes of action under Virgin Islands law, as well as violations of RICO, and seek[ ] much of the same relief" as Plaintiff the

---

[502] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, p. 38.

[503] *Adams v. North West Co., Inc.*, 2015 V.I. LEXIS 123, at *18 (V.I. Super. Ct. Oct. 6, 2015) (citing *Benjamin v. Bennerson*, 2012 V.I. LEXIS 7, at *7 (V.I. Super. Ct. Feb. 13, 2012); *James-St. Jules v. Thompson*, 2015 V.I. LEXIS 74, at *12-13 (V.I. Super. Ct. June 25, 2015) (citing *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004); *Brathwaite v. H.D.V.I. Holding Co.*, 2017 V.I. LEXIS 76, at *8 (V.I. Super. Ct. May 24, 2017) (citations omitted).

[504] *James-St. Jules*, 2015 V.I. LEXIS 74, at *13 (citing *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 175 (3d Cir. 2010)).

[505] Def. TKH's Mot. to Dismiss, p. 36.

Government of the Virgin Islands in this action."[506] In opposition, Plaintiff contends that TKH and Takata Japan have not satisfied their burden to justify a stay, noting, *inter alia*, the inherent differences between a suit filed by the government on behalf of the public interest and a private lawsuit, the Government of the Virgin Islands' strong interest in pursuing the public interest in this action, the indefinite duration of the requested stay, and "the very real concern that TKH's assets may soon be dissipated[.]"[507]

 The Court's authority to grant or deny a request for a discretionary stay of proceedings derives from its "inherent power 'to control the disposition of the causes on [the Court's] docket with economy of time and effort for itself, for counsel, and for litigants.' "[508] "How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance."[509] In the context of "exercising . . . discretion to stay an action before [the Court] in favor of a case in another court, a court must be motivated by considerations of judicial economy, fundamental fairness and the orderly administration of justice."[510] In so doing, the Court considers: "(1) whether the proposed stay would prejudice the non-moving party; (2) whether the proponent of the stay would suffer a hardship or inequity if forced to proceed; and (3) whether granting the stay would further the interest of judicial economy."[511] "In weighing these factors, the court must keep in mind that the party proposing the stay 'must state a clear countervailing interest to abridge a party's right to litigate.' "[512]

---

[506] Def. TKH's Mot. to Dismiss, p. 37.

[507] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, pp. 37-38.

[508] *Pedro v. Ranger Am. of the V.I., Inc.*, 63 V.I. 511, 527 (V.I. 2015) (Gómez, J., dissenting in part) (sitting as a designated Justice of the Supreme Court of the Virgin Islands in accordance with 4 V.I.C. § 24(a)) (citing *United States v. Colomb*, 419 F.3d 292, 299 (5th Cir. 2005))); *see Landis*, 299 U.S. at 254.

[509] *Burke v. Treasure Bay V.I. Corp.*, 2016 V.I. LEXIS 161, at *8-9 (V.I. Super. Ct. Oct. 6, 2016) (citing *Landis*, 299 U.S. at 254-55).

[510] *McDonald v. Piedmont Aviation, Inc.*, 625 F. Supp. 762, 767 (S.D.N.Y. 1986) (citations omitted).

[511] *Burke*, 2016 V.I. LEXIS 161, at *9 (citations omitted).

[512] *Id.* (citing *CTF Hotel Holdings, Inc. v. Marriott Int'l., Inc.*, 381 F.3d 131, 138 (3d Cir. 2004)).

■ Here, a stay would prejudice Plaintiff, the non-moving party, since Plaintiff is not a party to the consumer class action pending in federal court. Plaintiff is authorized by statute and the common law to pursue its claims on behalf of the Virgin Islands public, apart from any individual claims Virgin Islands residents may have against the same defendants. Plaintiff has the "right to chart the course of [its] own litigation and to prosecute [its] claims in the manner of [its] choice[,]"[513] but a stay "could substantially affect [Plaintiff's] right to litigate" because, "[a]t this juncture, [Plaintiff] would have to wait an indefinite amount of time before [it] could litigate" its claims against TKH and Takata Japan.[514] This, in turn, raises other concerns, including, *inter alia*, the effect an indefinite stay would have on Plaintiff's ability to recover the relief requested in the Complaint and prepare for trial.[515] Indeed, Plaintiff contends that "the Government filed its request for a preliminary injunction precisely because of the very real concern that TKH's assets may soon be dissipated, causing irreparable harm."[516] While TKH and Takata Japan claim that the "stay is not of indefinite duration" because it will be lifted upon the "completion of the NHTSA recall or the MDL[,]"[517] the Court cannot predict the length of time either will remain pending. TKH and Japan point to the Superior Court's recommended two year time limit for complex litigation cases such as this, but that is not indicative of the federal court's docket, while the December 31, 2019, deadline for completing all recalls under NHTSA's Consent Order is more than two years away, barring unforeseen circumstances.[518] The Court is not persuaded that TKH and Takata Japan's projections compel the conclusion that the requested stay is of moderate length. In the Court's

---

[513] *McDonald*, 625 F. Supp. at 767 (citing *Bell v. Hood*, 327 U.S. 678, 90 L. Ed. 939, 66 S. Ct. 773 (1946)).

[514] *Burke*, 2016 V.I. LEXIS 161, at *10 (citing *Dover v. Diguglielmo*, 181 Fed. Appx. 234, 237 (3d Cir. 2006)).

[515] *Cf. EQT Prod. Co. v. Terra Servs., LLC*, 2016 U.S. Dist. LEXIS 172613, at *10 (W.D. Pa. Dec. 14, 2016) ("the loss of additional witnesses would result in undue prejudice to Plaintiff").

[516] Pl.'s Opp'n to Def. TKH's Mot. to Dismiss, p. 38.

[517] Def. TKH's Reply, pp. 30-31.

[518] *See EQT*, 2016 U.S. Dist. LEXIS 172613, at *11.

view, the requested stay is of indefinite duration and, thus, is subject to closer scrutiny by the Court.[519]

As to the second factor, TKH and Takata Japan do not specifically identify how they would suffer a hardship or inequity if forced to proceed without a stay, although they contend that "letting this action proceed risks jeopardizing Takata's ability to carry out the recall that prioritizes repair of Virgin Islands vehicles and to satisfy any judgments entered in the MDL on behalf of Virgin Islands residents for the same alleged misconduct."[520] TKH and Takata Japan's contention fails to take into account that much of the relief requested by Plaintiff does not involve money damages and that the Complaint was filed on behalf of the entire Virgin Islands public, not just the owners of vehicles containing the allegedly defective airbags.

Lastly, the Court considers whether granting the stay would further the interest of judicial economy. Staying a case pending the outcome of another case can further the interests of judicial economy, but this generally occurs where the actions involve the same parties, claims, and available relief.[521] Because Plaintiff is not a party to the MDL, an application of the doctrines of res judicata and collateral estoppel will be severely limited, if not entirely foreclosed.[522] Further, in exercising its authority to bring suit on behalf of the public interest, Plaintiff is able to obtain relief in this action that differs from that available to plaintiffs in the MDL, as do some of the standards underlying Plaintiff's claims.[523]

---

[519] *See id.* at *10-11 (collecting cases).

[520] Def. TKH's Reply, p. 31.

[521] *McDonald,* 625 F. Supp. at 767 ("Ordinarily, a court would not be justified in holding in abeyance a later-filed action such as this one unless the parties and issues of the concurrent actions are substantially identical") (citing *Kistler Instruniente A.G. v. PCB Piezotronics,* 419 F. Supp. 120, 123 (W.D.N.Y. 1976)); *cf. Chrysler Credit Corp. v. Marino,* 63 F.3d 574, 578 (7th Cir. 1995) ("A federal suit may be dismissed for 'reasons of wise judicial administration . . . whenever it is duplicative of a parallel action already pending in another federal court.' A suit is only duplicative if it involves the 'same claims, parties, and available relief' ") (citations omitted).

[522] *See Stewart v. V.I. Bd. of Land Use Appeals,* 66 V.I. 522, 533, 547-548 (V.I. 2017) (discussing the requirements that must be present in order to apply doctrines of res judicata and collateral estoppel in the Virgin Islands).

[523] For example, the remedies available in private actions, class actions, and public actions differ under CPL and CFDBPA. *See* 12A V.I.C. § 101 *et seq.*; 12A V.I.C. § 301 *et seq.* The standard applicable to public nuisance claims under the Restatement (Second) of Torts differs

TKH and Takata Japan's ability to pay monetary relief awarded in connection with this action does not impact judicial economy, but stalling this action for years at the pleadings stage will significantly hamper it.

Having considered and weighed the foregoing factors, the Court concludes that staying these proceedings pending the resolution of MDL or NHTSA's recall is not warranted. Consequently, TKH's and Takata Japan's Motions for Stay will be denied.

## CONCLUSION

Considering the foregoing, Defendant TKH's and Defendant Takata Japan's Motions to Dismiss the Complaint, or in the Alternative, for a Stay will be denied as to Counts I-IV of the Complaint and as to Defendants' requests to stay the proceedings. Defendants' motions will be granted in part as to Count V of the Complaint and Plaintiff's request for punitive damages, which will be dismissed without prejudice. Plaintiff will be granted leave to amend the Complaint to cure the deficiencies.

An Order consistent with this Memorandum Opinion shall follow.

---

depending on whether the action is brought by the plaintiff as a representative of the general public or in an individual action for damages. *See* RESTATEMENT (SECOND) OF TORTS §§ 821B, 821C. A claim brought under Virgin Islands CICO is not identical to a claim under RICO. *Compare* 14 V.I.C. § 600 *et seq.* with 18 U.S.C.S. § 1961 *et seq.*